## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE ELLEN WARTLUFT F/K/A JULIE ELLEN BARTELS AND FREDERICK L. BARTELS, JR., Individually and as Administrators of the Estate of Abrielle Kira Bartels, Deceased<br><br>c/o Dilworth Paxson LLP<br>1500 Market Street, Suite 3500E<br>Philadelphia, PA 19102,<br>                              Plaintiffs,<br><br>           v.<br><br>THE MILTON HERSHEY SCHOOL AND SCHOOL TRUST<br>and<br>THE MILTON HERSHEY SCHOOL TRUST<br>and<br>THE BOARD OF MANAGERS OF THE MILTON HERSHEY SCHOOL<br>and<br>THE HERSHEY TRUST COMPANY, AS TRUSTEE OF THE MILTON HERSHEY SCHOOL TRUST<br>                             Defendants. | C.A. NO.:<br><br>_____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Julie Ellen Wartluft f/k/a Julie Ellen Bartels and Frederick L. Bartels, Jr., Individually and as Administrators of the Estate of Abrielle Kira Bartels, Deceased, by and through their attorneys Dilworth Paxson LLP, bring this Complaint and aver as follows:

This case involves the tragic death of a 14 year old child, precipitated by discriminatory practices and mistreatment by administrators at the Milton Hershey School ("MHS"). Abrielle Kira Bartels ("Abbie") was a tender and sensitive child who thought she had found a home in the protective environment of MHS where she had lived from age five until a week before her death at the age of 14. Abbie was an honor roll student, a role model, and was admired and loved by fellow students and teachers alike. Abbie consistently performed at exceptional academic levels

and by all accounts had a promising future, with a dream of becoming an FBI agent.  But as is not uncommon for girls Abbie's age – particularly ones with the risk factors of children enrolled at MHS – Abbie faced some severe but treatable depression toward the end of eighth grade. MHS medical professionals began therapeutic intervention.

When it became clear that Abbie suffered from a depressive disorder and needed more than intermittent help with her suicidal ideation, MHS coldly embarked on a strategy to terminate Abbie's enrollment, in direct violation of a settlement agreement the school previously signed with the United States of America that prohibited the exact kind of discrimination that the school perpetrated against Abbie, a vulnerable child with a diagnosed disability under federal law.  MHS's illegal and heartless strategy of expelling Abbie because of her disability battered her fragile psyche, erased the progress she had made and hurtled her towards a tragic end.  In a pattern that has become all too frequent at MHS, the first step was to advise Abbie's mother that Abbie's mental health needs were beyond the scope of MHS programs, despite its mission and $12 billon of resources.  The second step was to transport her a second time to a mental health facility, alone enough to justify expulsion under MHS's apparent two-hospitalization rule.  Next, while Abbie was at this mental health facility for one week in mid-June 2013, making progress on her own mental health, she was told that she would be banished from MHS for at least one year and most likely terminated.  Finally, on the day after she was released from the facility, and the day before her hard-earned MHS eight grade graduation, comprised of event that included a picnic at her student home with her houseparents and classmates, MHS disinvited Abbie and her Family from the events.  MHS even went so far as to threaten expulsion by security guards if they set foot on campus.  Just when Abbie was regaining her footing, MHS banished her from her school family of caring adults and close friends, informing Abbie and her family that she was

no longer welcome at her "home."  The termination was for all intents and purposes complete. Abbie had done nothing wrong.  She was thrown out of her home, barred from graduation and expelled for a mental health disability (depression), all in violation of federal law. Despite being one of the children at MHS with the highest social need, Abbie was terminated by MHS and released back to a poor, unstable and at-risk environment, contrary to any reasonable treatment of her depression which needed supervised and controlled – treatment available at the MHS, where she was safe.

MHS turned its back on Abbie, more concerned about its own image above Abbie's well-being, in disregard of the law, its own policies, basic norms for treating depressed children, and the recommendation of expert psychologists, including ones on MHS's staff.  This, after more than nine years of near perfect conduct and academic success, and just shortly after the onset of symptoms.  MHS so callously withdrew its care and support that Abbie's subsequent despair was entirely predictable.  Worries over suicide were the very reason Abbie was banished from the School.  Two outside professional assessments even warned MHS that Abbie *needed* MHS as a beacon of hope for her future in a structured environment.

MHS took this action knowing that it would intensify her depression, and increase the risk of self-harm.  It took this action when Abbie was at the most vulnerable point in her life, and in need of a community of support that could not be provided by her parents, who faced both financial issues and mental health issues of their own.  In fact, MHS recognized Abbie's chaotic family situation as her chief stress factor.  When MHS had the opportunity to show Abbie that her "family" would rally around her, that she still belonged to this MHS world, it instead barred her from graduation and a chance to say goodbye to her closest friends and houseparents.  This made her feel like a stigmatized outsider and pariah.

At 14 years of age, on June 29, 2013 (nearly three years to the day of this filing), Abbie tragically succumbed to her suicidal ideation while still awaiting word from MHS if she had any hope for a positive outcome, word that never came. MHS's behavior was so egregious that it became a factual cause in this totally preventable tragedy.

## PARTIES

1.     Julie Ellen Wartluft and Frederick L. Bartels, Jr. are Abbie's parents. Julie Ellen Wartluft is an adult female individual, was the mother and natural guardian of Abbie, and is a citizen of the State of Arizona currently residing in Cottonwood, Arizona. Frederick L. Bartels, Jr. is an adult male individual, was the father and natural guardian of Abbie, and is a citizen of the Commonwealth of Pennsylvania currently residing in Dauphin County, Pennsylvania. Abbie died intestate in Perry County and her parents, Julie Ellen Wartluft and Frederick L. Bartels, Jr., have been appointed by the Court of Common Pleas of Perry County as Administrators of the Estate of Abrielle Kira Bartels, Deceased. The Estate of Abrielle Kira Bartels, Deceased, Julie Ellen Wartluft and Frederick L. Bartels, Jr. shall be referred to collectively herein as "Plaintiffs." Although not formally named as a party in this case, Karen Fitzpatrick, the former live-in companion of Plaintiff Frederick L. Bartels, Jr., at all times relevant, acted as another guardian of Abbie, although not in a legal sense.

2.     Defendants The Milton Hershey School and The Milton Hershey School Trust refer to themselves collectively as the "Milton Hershey School and School Trust," which they describe as being an integrated tax-exempt organization composed of a not-for-profit corporation, acting as Manager under the Deed of Trust, and the Trust itself, filing one Federal Form 990 (hereinafter referred to as "MHS" or the "School" or the "School Trust" as the context implies) with its principal address at 711 Crest Lane, Hershey, Pennsylvania 17033. MHS is organized, exists and operates pursuant to and by virtue of the laws of the

Commonwealth of Pennsylvania. MHS operates its residential school in Dauphin County, Pennsylvania, soliciting students for admission throughout the Commonwealth, including in Philadelphia County. With approximately $12 billion in assets, MHS is the world's wealthiest residential school, and serves children in grades K through 12. Its stated mission is to nurture and educate children in social and financial need to lead fulfilling and productive lives. The School Trust was and continues to be a charitable trust qualified under Section 501(c)(3) of the Internal Revenue Code of 1986 with its principal address at Hershey Trust Company, 100 Mansion East Road, P. O. Box 445, Hershey, Pennsylvania 17033. The School Trust is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout Pennsylvania, including in Philadelphia County. The School Trust's purpose is to maintain "a permanent institution for the residence and accommodation of poor children . . . and the maintenance, support, and education . . . of such children." The School Trust funds the School, owns a controlling interest in The Hershey Company, a publicly-traded corporation, and wholly owns The Hershey Trust Company, its trustee, and the Hershey Entertainment and Resorts Company ("HERCO"), which oversees resort properties along with an amusement park called Hersheypark.

3.      Defendant The Board of Managers of the Milton Hershey School (hereinafter, the "Board of Managers") was and continues to be a non-profit corporation acting as Manager of the School, with its principal address at P. O. Box 830, Hershey, Pennsylvania 17033-0830. The Board of Managers is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania, engaging in activity throughout the Commonwealth, including in Philadelphia County. The Board of Managers was identified in the School's Deed of Trust (providing for the establishment and operation of MHS) as the governing body of

MHS. These managers have broad discretion to utilize the assets of the School Trust in accordance with the Deed of Trust, in order to ensure the perpetuity of the School and oversee its operation.

4.     Defendant The Hershey Trust Company (hereinafter the "Trustee") was and continues to be a Pennsylvania for-profit corporation, with its principal place of business located at 100 Mansion Road East, in Derry Township, Hershey, Pennsylvania 17033-0445. The Hershey Trust Company is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout the Commonwealth, including in Philadelphia County. The Trustee was organized for the purpose of serving as trustee of the School Trust and continues to serve in this role. The Trustee is wholly owned by the Milton Hershey School and School Trust.

5.     The School, the School Trust, and the Trustee share a self-perpetuating, interlocking and integrated governance structure. The members of the School's Board of Managers are the same persons as the members of the board of directors of the Trustee. The School's Board of Managers and the board of directors of the Trustee will be collectively referred to herein as the "Trust/School Boards." These board members pay themselves extraordinary sums of compensation, from charitable assets, but have failed in their oversight of MHS policies and have failed to include within their membership a single residential childcare expert, or any member with the requisite experience in working with at-risk children.

6.     Each member of the Trust/School Boards is currently paid in excess of $100,000 per annum by the Trustee, which generally includes a $30,000 retainer and $6,500 for every day of meetings, with each Committee Chair receiving additional compensation as well. Some of them also appoint themselves to boards of MHS's for-profit controlled entities, thereby

119124787_1

amassing additional fees that can exceed $500,000 per year for a single director in the aggregate. Because the School Trust wholly owns the Trustee and HERCO, School Trust assets, meant for poor children, are used to pay approximately $2,000,000 annually of this board compensation to already wealthy board members.

7.     The Trust/School Boards have been put on notice that MHS teenagers were being expelled for depression and took no action to correct this illegal activity.

8.     All named defendants will be collectively referred to herein as "Defendants."

9.     At all times relevant hereto, Defendants acted by and through their agents, servants and employees, each of whom acted within the scope of his or her job duties.

## JURISDICTION AND VENUE

10.     This Court has federal question jurisdiction over the subject matter of Plaintiffs' claims under the Fair Housing Act (the "FHA") pursuant to 28 U.S.C. § 1331.

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

12.     This action is authorized by 42 U.S.C. § 3613.

13.     Venue is proper in the Eastern District of Pennsylvania by virtue of 28 U.S.C. §1391(b)(1) because The School, the School Trust, the Trustee and the Board of Managers are all entities that reside in this judicial district, pursuant to 28 U.S.C. §1391(c).

14.     Defendants actively solicit and enroll students in this judicial district, and give preferential admission to students from this judicial district.

15.     According to the MHS website, the School provides a "cost-free, private, coeducational home and school for children from families of low income, limited resources, and social need. The School is funded by a trust established by Milton S. Hershey and his wife

Catherine. Milton Hershey School offers a positive, structured home life year-round and an excellent pre-kindergarten through 12th grade education."

16.     MHS regularly conducts business in this judicial district in a variety of ways.  In particular, MHS regularly conducts enrollment fairs to solicit students in counties located within this judicial district, including Berks, Bucks, Chester, Lancaster, Northampton, Montgomery and Philadelphia Counties.  Defendants also mass market in these area counties, reaching out specifically (including by means of television and radio) to recruit children and persuade them to enroll, as well as to solicit potential employee houseparents.  Indeed, the yearly enrollment of students from these counties is of such a number that Defendants provide separate charter bus services to and from Philadelphia, King of Prussia, and Lancaster for Thanksgiving, Christmas, Easter and summer breaks.

17.     The School's Deed of Trust requires first level preferential admission to students born in certain counties in Pennsylvania, including Lancaster County, which is located in this judicial district.  The Deed of Trust also requires second level preferential admission to students residing in this judicial district, including in Philadelphia County, over students born in other states.  A true and correct copy of the Deed of Trust is attached hereto as Exhibit "A."

18.     Approximately 17 percent of MHS students are from the Philadelphia area.  The School has formed partnerships with post-secondary institutions in Philadelphia and arranges special guidance and assistance for School graduates at these institutions, including the Art Institute of Philadelphia, the Community College of Philadelphia, LaSalle University, and Temple University, through the auspices of the MHS Alliance School Programs.

19.     Finally, the School's alumni association, which serves as a spokesperson and recruiting agent for Defendants, has chartered chapters of the Milton Hershey School Alumni

Association in both Philadelphia and Lancaster Counties, both of which are within this judicial district.

20.     The School Trust, the Trustee and the Trust/School Boards, by virtue of their self-described status as organizations "integrated" and "interlocking" with the School, also regularly engage in the same kind of business in this judicial district.

## FACTS

### ABRIELLE KIRA BARTELS, A LOVING AND CARING CHILD

21.     Abbie was born on April 13, 1999 and died by suicide on June 29, 2013.  She was admitted to MHS on or about April 16, 2004, having just turned five.  During Abbie's life, her parents struggled with personal and financial difficulties.  Abbie attended, excelled, and thrived at MHS for more than nine years.

22.     Abbie's tender hearted nature and her integration into MHS can be gleaned from a sampling of the outpouring of love for Abbie that came immediately after her death, in the form of online posts from her MHS friends, family, houseparents, coaches, and teachers:

> "Abbie was a person that changed everyone she met in the good way she was kind and nice person and I wish the story of her did not end there."

> "Abbie was a member of class of 2017 and she was awesome person and I knew her since 3rd grade and she was like a family member to a lot of us at MHS, we love you and you're in our prayers."

> "Abbie was a genuine, loving, and caring child who gave her life to the spirit of others with a sense of true compassion for what she was given in her short life ..."

> "I was Abbie's swim coach for two years.  She was an absolute joy to have on our team . . . she will be missed."

> "I had the pleasure of being Abby's second grade teacher.  She was so sweet and kind to everyone.  She loved to read and write stories.  Abbie had a beautiful smile that would light up the classroom.  Rest in peace my little angel."

> "I was Abby's third grade teacher and was immensely blessed to have known and taught Abby.  I learned so much from her gentle spirit."

119124787_1

"It is hard to imagine how someone that I always viewed as so full of life and light is no longer with us."

"I was Abbie's art teacher in middle school . . . she was smart, sensitive, caring and creative. Her spirit was admired by classmates and teachers alike."

"Abbie, when you came into my life it was like you had always been there. You bound to my soul immediately. We joked, played and shared secrets . . . I will always love you and protect you. Every moment was a blessing to me."

23.    Despite her demonstrated social needs, Abbie was a model student during her nine years at MHS. Indeed, school records demonstrate that Abbie was a high-achiever and an outgoing and sensitive child. She was also intelligent, twice named MHS Middle School Student of the Month, was consistently on the Honor Roll, and maintained the highest levels of conduct, designated as "Spartan" or "Gold" by the School. Abbie was also an active member of an anti-bullying group and a member of the swim team. She thrived at the School and had a promising future.

24.    As late as May of 2013, Abbie expressed a desire to attend college and become an FBI agent, with all signs in her life pointing to achieving vastly more than her humble beginnings might have predicted.

25.    But merely because Abbie suffered a two-month bout of depression, MHS officials would completely disregard Abbie's model student standing, rupture all her existing social bonds with friends, houseparents, teachers, coaches, counselors, and other staff, destroy the home she had found at MHS, take away her entire support structure, banish her from MHS, stigmatize and marginalize her, and send her back to the very environment from which she had been rescued at the age of five, in total disregard of her well-being and with completely predictable results.

119124787_1

**THE SPECIAL, CUSTODIAL RELATIONSHIP EXISTING BETWEEN THE DEFENDANTS AND STUDENTS ENROLLED AT THE SCHOOL**

26.     MHS is a private residential school for children in financial and social need from pre-kindergarten through 12th grade.  It was tailor-made for young Abbie, who faced severe financial and social needs at age 5, with a tumultuous home life.

27.     MHS currently enrolls approximately 2,000 students and solicits applications for admission from children between the ages of 4 and 15.

28.     The School spends approximately $100,000 per year per enrolled student.  MHS also provides for up to approximately $80,000 in higher education benefits to each qualifying graduate.

29.     According to the School, its students live "in large, comfortable homes with 10 to 14 students in their own age group.  A pair of married houseparents oversee each home, providing the structure that children need and taking an active interest in their development."

30.     The School also advertises to prospective students and their parents or guardians that MHS "aims to create a family-like atmosphere for students" with houseparents and other students becoming a student's "extended family."

31.     MHS promotional materials represent that, "[o]ur students live at the School and our program is *year-round*.  So the Student home and houseparents are at the core of each child's stability and safety while they are here." (emphasis added).

32.     Indeed, MHS openly describes itself as "a private residential school with surrogate parenting responsibilities."

33.     Unsettlingly, Abbie's expulsion and exclusion from the School occurred just months after MHS had used Abbie's picture in its marketing materials, showing her engaged in

11

an extracurricular activity. *See* p. 3 of the "MHS Connection" newsletter distributed to parents and sponsors of MHS, a true and correct copy of which is attached hereto as Exhibit "B."

34.     In court documents recently filed by MHS in the Eastern District of Pennsylvania (*Mother Smith v. MHS*), MHS further described the special type of custodial relationship between the School and its students as follows:

> The Milton Hershey School educates children in a unique, home-like environment. … the School is designed and operated to raise and care for children, and to fulfill a parental role for most of the year.
>
> *   *   *
>
> [T]he School operates a home-like residential setting in conjunction with its educational program that is a fundamental part of its program. Students reside at the school 24 hours a day, 7 days a week, for most of the year, living in family style residences. … students often also reside at the School for most of the year, not just during the school year.

*See* p. 2 and 6-7 of Milton Hershey School's Answer with Affirmative Defenses to Amended Complaint and Counter-Claim for Declaratory Judgment in *Mother Smith* (E.D. Pa. 11-cv-07391 at Dkt. #10), a true and correct copy of which is attached hereto as Exhibit "C'.

35.     Elsewhere in the same filing, MHS explained the broad scope of primary and physical custodial control it exercises over its enrolled students by virtue of its status as the students' primary caregiver, as follows:

> [T]he School provides a unique all-encompassing program for these children, including an education, housing in a family setting, food, clothing, medical, dental and psychological care, and recreational opportunities, with no financial obligation to the family.

*Id.* at 17.

36.     Also in those documents, MHS refers to the "comprehensive nature of the care provided by the School" to students and touts "the unique 24/7 residential nature of its

programs and services" as well as its "unique residential private school setting" that includes "a very closely-knit community" with an "extended [school] year." *Id.* at 3, 21 and 23.

37.    In connection with a settlement reached in the above-noted proceeding, MHS confirmed that "it stands '*in loco parentis*' to all children attending the School" *See* ¶ 19 of the ADA Settlement Agreement discussed in more detail below (emphasis added).

38.    The breadth of MHS's custody over students extends to controlling both parental visitation schedules at the School and so-called "overnight" visits taken by students, which are often visits between the students and their natural parents and/or guardians.

39.    Indeed, MHS's desire to affirmatively undertake its surrogate family role is so pronounced that it prohibits parent-child interaction during the first month that a child is enrolled in MHS, even for children as young as four, working to create a new dynamic.

40.    The School monitors and regulates every aspect of children's lives, creating a virtual surrogate institutional family.  MHS even regulates the love lives of its students, and requires, among other things, that "Students must be at least 15 years of age and in Senior Division to begin dating," and that "[d]ating arrangement must be set up with and approved by houseparents."

41.    These and other MHS practices illustrate that MHS is deliberate in its effort to substitute its student home/MHS "school family" for the biological families of enrolled students, thereby heightening its own duties to these children, in good times and bad.

42.    Any subsequent removal from MHS is the equivalent of removal from a child's natural family, with traumatic consequences greater even in many cases than the original traumatization of entering MHS.

119124787_1

**THE UNITED STATES' DEPARTMENT OF JUSTICE RECENTLY FOUND THAT
THE DEFENDANTS HAVE DISCRIMINATED AGAINST STUDENTS WITH
DISABILITIES AND OTHERWISE FAILED TO ABIDE BY
THE AMERICANS WITH DISABILITIES ACT**

43.     In or around April of 2011, a 13 year old boy, going by the pseudonym "Abraham Smith," sought admission for fall enrollment at the School.

44.     At the time he sought admission, Abraham Smith was HIV positive.

45.     The School subsequently denied Abraham Smith enrollment based on the claim that his "documented needs are beyond the scope of the Milton Hershey School programs," which, as will be described at length below, is very similar to the reason given for denying Abbie continued residence at the School beyond eighth grade.

46.     In November of 2011, Abraham's mother, identified as "Mother Smith," filed a complaint captioned *Mother Smith, on behalf of herself as parent and natural guardian on behalf of Abraham Smith v. Milton Hershey School*, C.A. No. 11-CV-07391-CDJ (E.D. Pa.) (the "HIV Case").

47.     In the HIV Case, Mother Smith alleged that the School violated Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12181, *et seq.*, and its implementing regulation, 28 C.F.R. Part 36, as well as committed common law torts, by refusing to consider Abraham Smith for enrollment in the School due to the fact that he is HIV positive.

48.     Subsequently, the United States, through the Department of Justice ("DOJ"), initiated an investigation, at DJ #202-63-162, of the School's actions regarding Abraham Smith, ultimately resulting in a Settlement Agreement between The United States of America, The Milton Hershey School, and Mother Smith (on behalf of herself and Abraham Smith) dated September 12, 2012 (the "ADA Settlement Agreement"). A true and correct copy of the ADA Settlement Agreement is attached hereto as Exhibit "D."

119124787_1

49.   As a result of the investigation by the Department of Justice, and as reflected in the terms of the ADA Settlement Agreement, the United States made the following key findings:

(1)   the School is a covered entity under the ADA, as it operates a place of public accommodation within the meaning of 42 U.S.C. § 12182(a); is a private entity within the meaning of 42 U.S.C. § 12181(6); and is considered a place of public accommodation because it affects commerce and is a place of education within the meaning of 42 U.S.C. § 12181(7);

(2)   the School violated the ADA by rejecting Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying him the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the School, in violation of 42 U.S.C. § 12182 and 28 C.F.R. §§ 36.201 and 36.301; and

(3)   the School discriminated against Mother Smith by denying Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying Mother Smith, among other things, privileges, advantages, accommodations or other opportunities because of Abraham Smith's known disability, in violation of 42 U.S.C. § 12182(b)(1)(E) and 28 C.F.R. §36.205.

*Id.* at ¶¶ 6-22.

50.   The ADA Settlement Agreement went on to impose several continuing obligations on MHS, including the enactment and enforcement of a non-disclosure and equal opportunity policy applicable to its programs and services for all students. This policy was required to expressly provide, among other things, that,

(1)   the School does not discriminate against applicants or students on the basis of any disability (including but not limited to HIV);

(2)   applicants and students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School; and

(3)   the School shall make reasonable modifications to its policies, practices and procedures when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities.

119124787_1

*Id.* at ¶¶ 23-35,

51.     The ADA Settlement Agreement at paragraph 26 further required the School to "develop and provide training on title III of the ADA" (a) to all persons with responsibilities for educating students and/or for providing medical, dental, psychological, behavioral, or social work-related care to students; (b) to all persons involved in the admissions process; and (c) to all School administrators and officers. *Id.* at ¶ 26.

52.     Finally, the ADA Settlement Agreement at paragraph 43 provided the United States with the continuing opportunity to review the School's compliance with the ADA Settlement Agreement and/or Title III of the ADA.   Should the School fail to comply, the United States retained the right to initiate an enforcement action to enforce the ADA Settlement Agreement or Title III of the ADA. *Id.* at ¶ 43.

53.     As required by the ADA Settlement Agreement, MHS has developed a non-discrimination and equal opportunity policy entitled "Milton Hershey School (MHS) Student, Applicant and General Public Non-Discrimination and Equal Opportunity Policy," Policy No. 2.05.1, effective date December 4, 2012 (the "Equal Opportunity Policy").   A true and correct copy of the Equal Opportunity Policy is attached hereto as Exhibit "E."

54.     The Equal Opportunity Policy includes the following "Policy Statement":

> Milton Hershey School ("MHS" or the "School") will not tolerate any form of harassment or discrimination on the basis of race, color, religion, sex, disability or need for accommodation, association with or relationship to person with a disability, or any other class or status protected under federal, Pennsylvania, or local law (collectively "Protected Characteristics"), against any applicant for admission, enrolled student, or any other individual(s) who participate(s) in the programs, services, and activities of the School. … Individuals protected by this policy, other than applicants and students, would include parent/sponsors and visitors touring the School or attending public events.

* * *

16

> This Equal Opportunity Policy ("EO Policy" or "Policy") prohibits all forms of discrimination in all programs, services and activities of the School, including, but not limited to, admissions, academic and educational programs, other terms, conditions or privileges of education or enrollment at the School, and all activities open to the general public.

*Id.* at 1.

55.     The Equal Opportunity Policy goes on, in a section entitled "Disability Discrimination is Prohibited," to mandate the following protections for students enrolled at the School:

> The School is committed to preventing discrimination against persons with disabilities, and complying with the federal Americans with Disabilities Act ("ADA") and all similar Pennsylvania and local laws … .  All applicants for admission and currently enrolled students with disabilities … will have an equal opportunity to participate in and benefit from all goods, services, facilities, privileges, advantages, accommodations, or programs provided by or at MHS.
>
> * * *
>
> The School will not exclude persons with disabilities … from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability.
>
> * * *
>
> ***Applicants who are otherwise qualified for admission to the School will not*** be denied enrollment or ***have their enrollment discontinued solely on the basis of their disability***.
>
> * * *
>
> Applicants and students with disabilities … have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School.
>
> * * *
>
> The School will make reasonable modifications to its policies, practices, and procedures when the modifications are necessary to

17

afford goods, services, programs, facilities, privileges, advantages, or accommodations to all individuals with disabilities.

*Id.* at 2-3 (emphasis added.)

56.     Pursuant to the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(a).

57.     The ADA defines "mental impairment" to include "[a]ny mental or psychological disorder, such as … emotional or mental illness." 28 C.F.R. § 36.104.

58.     Further, it is well-established that emotional conditions such as anxiety and depression are disabilities included within the meaning of "disability" under the ADA.

59.     Thus, one of the things that the Defendants promised (through the ADA Settlement Agreement and the Equal Opportunity Policy) to root out and eliminate from the School was discrimination based on emotional or mental illnesses, including anxiety and depression. Abbie's treatment at the hands of MHS will demonstrate that illegal discrimination at MHS continues in the mental health arena.

60.     However, despite (a) the prior finding of discrimination by MHS against a disabled student; (b) the repeated promises made by MHS to the United States in the ADA Settlement Agreement; and (c) the clear requirements of MHS's own Equal Opportunity Policy designed to prevent future instances of discrimination, upon information and belief, Defendants refused to implement or inadequately implemented, among others things, (1) safeguards to prevent discrimination against students suffering from emotional or mental illnesses, including anxiety and depression; or (2) any type of reasonable modifications to afford goods, services,

programs, facilities, privileges, advantages, or accommodations to students suffering from emotional or mental illnesses, including anxiety and depression.

61.   Despite the promises made and stated intentions of the School in the ADA Settlement Agreement and the Equal Opportunity Policy, the Defendants have failed to follow their own directives when caring for Abbie, who MHS knew suffered from a diagnosed form of depression, resulting in acts of discrimination against Abbie on account of her disability which, ultimately, was a factual cause of Abbie's devastating and tragic death.

62.   Indeed, and notwithstanding the DOJ's prior investigation, the ADA Settlement Agreement and the Equal Opportunity Policy, the DOJ is currently pursuing *another* investigation into whether the School is compliant with the ADA and the Fair Housing Act, which has been ongoing for more than a year – the second such investigation in four years.

**THE COMMONWEALTH OF PENNSYLVANIA OFFICE OF ATTORNEY GENERAL RECENTLY FOUND THAT THE DEFENDANTS HAVE VIOLATED A PRIOR REFORM AGREEMENT DESIGNED TO CURB EXCESSIVE MHS BOARD COMPENSATION AND TO REQUIRE THE RECRUITMENT OF QUALIFIED BOARD MEMBERS**

63.   The ADA Settlement Agreement is not the only agreement with the government that MHS has violated.  In fact, MHS is currently in violation of a 2013 agreement with the Commonwealth of Pennsylvania, Office of Attorney General, as detailed in a February 8, 2016 letter, a true and correct copy of which is attached hereto as Exhibit "F."

64.   Among other violations, the February 8, 2016 letter from the Office of Attorney General noted that the MHS board has failed "to exercise its best efforts in a timely manner to secure new board members with experience in early childhood education as well as at-risk dependent children."

19

65.     The letter also detailed that the MHS board violated a conflict of interest policy and that a stock trade of Hershey Company stock carried out by two members of the Board was one of several "matters of concern … ."

66.     Upon information and belief, MHS has spent at least $4,200,000 of the Trust's assets in just the last 12 months on legal fees to investigate these claims of wrongdoing among its own Board members, money that should have been spent on the care of at-risk children.

## ABBIE ENROLLS AT MHS AT FIVE YEARS OF AGE WITH DEMONSTRATED SOCIAL NEEDS AND FOR THE NEXT NINE YEARS IS A MODEL STUDENT

67.     Abbie was considered for enrollment at the School in April of 2004, around the time of her fifth birthday.

68.     When she applied for admission to MHS, Abbie had great social needs related to her family structure and home life.

69.     Among other things, MHS's pre-enrollment interview notes stated that Abbie's immediate family members suffered from severe mental health problems, including her mother (depression and attention deficit disorder), paternal grandmother (schizophrenia and depression) and maternal grandmother (depression).   These notes also indicated that Abbie's mother struggled with drugs, whose side effects had caused cerebral damage that left her unable to adequately fulfill her parental responsibility.

70.     Abbie's enrollment process also included a series of tests, an interview, and several meetings between Abbie's family and MHS administrators.

71.     Due to this extensive examination and review, Defendants were fully aware of Abbie's social needs and family mental health issues when MHS admitted her as a student in April of 2004.  Based on this family history, MHS knew or should have known that there was a high degree of risk that she would exhibit symptoms of depression during her time at MHS.

119124787_1

Abbie's parents were not advised that: (a) if she began to exhibit such symptoms, there existed a high likelihood of expulsion, regardless of her thriving at MHS prior to such time; or (b) MHS was not able to care for children with depressive disorders.

**PRIOR TO ABBIE'S DEATH, THE DEFENDANTS MAKE SEVERAL IMPORTANT REPRESENTATIONS TO ABBIE, THE PLAINTIFFS, AND MS. FITZPATRICK**

72.     In early 2013, the Defendants made numerous representations regarding their supposed compliance with the ADA, commitment to non-discrimination and accommodating students with disabilities, and comprehensive array of mental health services available to their students.

73.     Related to compliance, the Equal Opportunity Policy – which was drafted as result of the stipulated finding in the ADA Settlement Agreement that MHS had committed blatant acts of discrimination – was sent to the Plaintiffs on March 25, 2013, along with an accompanying letter explaining what the document meant.  A true and correct copy of the March 25, 2013 letter is attached hereto as Exhibit "G."

74.     That letter stated, among other things, that "[o]ver the next several weeks, our entire faculty and staff will receive mandatory comprehensive training on … Title III of the Americans with Disabilities Act.  The mandatory training will also include review of this policy."

75.     While Abbie was enrolled at the School, Plaintiffs also received a copy of the MHS Student/Sponsor Handbook (the "Handbook"); a true and correct copy of which is attached hereto as Exhibit "H", which also contains a copy of the Equal Opportunity Policy.

76.     Also included in the Handbook at page 70 is an additional section entitled "ADA Accommodation Procedures for Applicant and Students."  As it relates to current students, those procedures provide that MHS will develop and implement individualized plans for

disabled students to ensure that MHS is able to accommodate those students at the School. Individualized plans dealing with mental health issues are to be managed by a Psychological Services Administrator. *Id.* at 46.

77.     Further, the Handbook discusses the several psychological services available to students and represents that "Psychological Services offers a comprehensive array of services, which includes individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, *crisis intervention and prevention*.   The type of psychological service provided for a student is dependent on the individual student's need." *Id.* at 46 (emphasis added.)

### MHS IS AWARE THAT ABBIE'S EMOTIONAL WELL-BEING BEGINS TO DETERIORATE TOWARD THE LATTER PART OF EIGHTH GRADE, AND PARTICULARLY DURING MAY AND JUNE OF 2013

78.     Abbie began eighth grade at MHS in August of 2012.

79.     Toward the end of that school year, Abbie's emotional well-being deteriorated as she was subjected to several incidents of bullying by her housemates.

80.     Also in the spring of 2013, Abbie endured the stress of knowing that her father, a very important figure in her life, was going to be jailed for a second DUI offense.

81.     Abbie's emotional well-being was particularly damaged when a  manipulative transferee from another student home, "M,"[1] arrived to live in Abbie's group home, around March of 2013.  M had difficulties at her previous student home and soon after her arrival, M falsely accused Abbie of making a series of physical threats against M.

82.     Although these accusations were eventually determined to be unfounded and false (with M again being disciplined accordingly), the relief houseparents filling in for Abbie's

---

[1]     The identity of this individual has been protected because she is a minor.  Her name is known to the Defendants.

regular houseparents at that time initially sided with M, and the purported threats were reported to the MHS administration.

83.     The reporting of these threats resulted in Abbie being disciplined, snatched from her student home, and involuntarily committed to the MHS Health Center, an on campus hospital-type facility on April 25, 2013.

84.     The sequence of these grossly unfair decisions had a profoundly disturbing impact on a child whose sterling reputation and concern for everyone around her was preeminent to her and well-known to all.  She could not fathom why her denials would not be believed.

85.     After being subjected to this mistreatment in a manner that strained Abbie's vulnerable psyche, Abbie was released the next day, but then placed back in the Health Center later that day for "having problems coping with surroundings," and released on the 27th.

86.     On April 27, the MHS psychologist monitoring Abbie, Benjamin Herr, M.D. ("Dr. Herr") learned from a housemate of Abbie's that she allegedly expressed a desire to kill herself the previous day.  When questioned, Abbie denied that she had any plan to hurt herself.

87.     Abbie was next admitted to the Health Center on May 1, 2013, for an overnight observation, after Abbie disclosed to her houseparents that she wanted to hurt herself.  At the time of her admission, Abbie disclosed that she had cut herself with a rock the previous night, as evidenced by superficial scratches on her arm, and that she had thoughts about wanting to die.  Abbie, now 14 years of age, further noted that she was 11 when she first thought about killing herself, but that those thoughts had subsided over time as she was able to gain control over her thoughts and behaviors on her own.

119124787_1

88.     Abbie underwent a psychological exam at the School on May 2, 2013.   During that exam, Abbie indicated that the "issue upsetting her is information her mother delivered on Saturday (4-27) about her father, whose alcoholism is causing him to lose his job, and his wife [companion] is planning to dismiss him from the house.   Mom reported that she may remove him from visitation list, so she would not be able to see him anymore.   This is her true concern and pushed her to HSSIB, sadness and depression."   Thus, MHS had its first warning that Abbie's home life in Newport, Pennsylvania was unstable and causing her tremendous anxiety, among the reasons she was enrolled in the School in the first place.

89.     At a weekly counseling session with Dr. Herr on May 6, 2013, Abbie "expressed sadness and anger at father about alcohol abuse, and reported he will have to serve jail time this summer for multiple DUI charges."

90.     At the next session on May 16,  most of the time was "spent discussing concerns about her Dad and his alcohol use."   Abbie also expressed that she was "anxious and uncomfortable" with the plan to visit her father's house that upcoming weekend due to tensions between Ms. Fitzpatrick (identified in the records as Abbie's "s/mo" or stepmother) and her father, and Abbie's concerns that "tensions will flare." Dr. Herr notes that Abbie "[a]ppeared stable, but internalizing, which likely increases the risk for her to struggle with managing emotional pain effectively."   MHS was thus by now clearly alerted to the volatile environment of Abbie's home life, to such an extent that Abbie preferred staying at MHS over spending a weekend visiting her family.

91.     On Monday, May 20, 2013, Abbie recounted to Dr. Herr a weekend kayaking trip with her mother, father, and Ms. Fitzpatrick.   Abbie told Dr. Herr that her father was drunk, which caused her great distress.   Further, "Abbie reported experiencing suicidal thoughts, urges,

24

thinking 'what's the point in living?'" Dr. Herr noted that he emailed Abbie's houseparents to "follow her closely" and disclosed his concern.

92.     The following day, May 21, Abbie was admitted again to the Health Center under close observation after she reported experiencing suicidal ideations for the last several nights when lying in bed.  During that admission, Abbie described to MHS staff that she was thinking of various methods of suicide.  Abbie further disclosed to staff that she previously duct-taped a pillow to her face during an apparent half-hearted suicide attempt while in seventh grade.  Finally, Abbie reported being very distressed about the problems in her family.

93.     When asked by Dr. Herr what specifically caused the recent suicidal ideations, Abbie first response was "Dad's alcoholism, [and] the family that I have (they are all split apart, and hardly have enough money to take care of themselves). . ." MHS was thus warned not only of the unstable and chaotic nature of Abbie's life away from MHS, but that another stressor was her parents' lack of financial stability and inability to take care of themselves, let alone Abbie. These feelings of perceived burdensomeness were another warning sign of suicide.

94.     On May 22nd, Dr. Herr learned from Abbie that she had significant urges to commit suicide (that she rates as a "10 out of 10") the previous night that she overcame.  The cause of these urges appeared to be a difficult call Abbie had with her mother, a call in which Abbie felt that her mother was rejecting her.  In a self-report filled out by Abbie on May 22nd, she checked blocks for "I am not sure if I am important to my family,"  and "I am not sure if anybody loves me."

95.     On May 23rd, Dr. Herr learned that Abbie's suicidal urges had abated and were a "5 out of 10."  Dr. Herr's notes also reflect that Abbie "is certain she does not want to go home this weekend.  She does not want to be around family anymore because they are

119124787_1

unpredictable and confusing; reported a firm desire to remain at and graduate from MHS." In other words, Abbie understood that MHS was her safe haven, where she felt she belonged and was not a burden, and what she needed for a positive future.

96.     Discharged from the Health Center early on May 23, 2013, Abbie was readmitted to the Health Center that evening, after she reported thoughts of self-harm and suicidal ideation.  During her stay, Abbie disclosed that the trigger for her distress was seeing happy photos of her family.  After expressing a desire to return to her student home, Abbie was discharged on May 24th, after the family pictures were removed.  Although the following day was the beginning of Memorial Day weekend, when many students leave MHS for overnight visits with parents, Abbie indicated that she would prefer to stay at MHS for the holiday.

97.     During a May 28 session with Dr. Herr, Abbie confirmed that her difficulties the previous week related to seeing pictures of her family during happier times.  Abbie told Dr. Herr that she had substantial negative feelings and anxiety about going home, connected to two main thoughts: "What if my Dad and s/mo conflict, and she kicks him out/makes him go to rehab?" and "My brother is sad all the time, and has no future."  Abbie further disclosed that over the past weekend she experienced urges of a level "9" to kill herself.  Dr. Herr judged Abbie's level of risk to be unacceptably high and determined that hospitalization at a mental health facility was warranted.

98.     From May 28, 2013 to June 5, Abbie was a patient at Philhaven, an independent mental and behavioral health care center off campus.  While at Philhaven, Abbie and Dr. Herr continued their therapy sessions.  On May 29, Dr. Herr met with Abbie, her mother, father, and Ms. Fitzpatrick.  During that meeting, Abbie stated that she is sometimes angry at her father because of his drinking, history of drug and alcohol use, and legal violations.  Dr. Herr advised

119124787_1

that Abbie tends to avoid and minimize painful feelings, struggles articulating them, and is upset about issues in the family that may not have bothered her in the past. Ms. Fitzpatrick acknowledged that she had some very volatile exchanges with Abbie's father over the past 6 months. In another family session on May 31, Abbie stated that her chief emotional struggle is anger at the family situation and circumstance, with her father's alcoholism as the chief concern. Dr. Herr noted that Abbie was angry, hurt, and apprehensive about her dawning awareness of the reality that her father continues to drink despite the pain this causes others, including her. In subsequent sessions on June 4th and 5th, Abbie confirmed that her father's alcoholism is probably what bothered her the most, and that tensions between her father and Ms. Fitzpatrick were very distressing to her as well. Abbie was discharged from Philhaven on June 5, 2013 and returned to the MHS Health Center the same day.

99.    The discharge instructions from Philhaven note the following key facts regarding Abbie's then-existing mental state and the following recommendations:

(1)    Abbie was diagnosed with acute symptoms of major depressive disorder, recurrent, severe, without psychotic-features;

(2)    Problems with Abbie's primary support group, social environment, and other psychological and environmental problems are the major life events affecting her mental health diagnosis and treatment;

(3)    Abbie is currently better able to manage depressive thoughts, but would benefit from continued support in this area;

(4)    She "is recommended to receive aftercare in the supportive environment of in the structured support of returning to Milton Hershey School;"

(5)    "It is recommended that she develop a safety/support plan with Milton Hershey School Therapist and staff;"

(6)    "It is recommended that the support plan include weekly therapy sessions; weekly check-ins with house parents and the therapist or other identified support staff;" and

(7)    It is further recommended that Abbie return to medication management with a psychiatrist; and that she participates in a community/school service or organization, *i.e.*, church youth group, school programs (sports, clubs, assisting a teacher, etc.) "to help build her sense of belonging to a community and strengthen her self-esteem.   Without this level of care, it is possible she could decompensate and require future hospitalization."

A true and correct copy of the Philhaven discharge instructions are attached hereto as Exhibit "I."  Philhaven professionals saw MHS as a critical component of her therapeutic recovery.

100.    Abbie was discharged back to her student home on June 6th.  During a session with Dr. Herr on June 5th, Abbie reiterated that family stressors had influenced her to consider suicide; however, she expressed a strong desire to attend school the following day.  In another session with Dr. Herr on June 6th, Abbie reported that she told her mother that she would prefer day visits, rather than coming home for entire weekends.

101.    On June 7, 2013, Abbie was readmitted to the Health Center, reporting an urge-to-die rating of "9" and a self-injure rating of "7."  Abbie stayed in the Health Center through June 11, but was allowed to leave for weekend day visits with her mother on both June 8th and 9th.  MHS records indicated that these visits were largely negative.  Abbie's mother and Ms. Fitzpatrick were both intoxicated, and Abbie was troubled by her oldest brother's behavior.  Abbie also saw a former romantic partner of her mother's whom Abbie does not like.  In sessions at the Health Center, Abbie reported to MHS staff that she had many negative thoughts about her family situation, including concerns about her father potentially dying of alcoholism and financial worries involving fears that her family would lose their housing.

102.    As a result of Abbie's mental state, on June 10, 2013, Dr. Herr and other clinicians at MHS determined that Abbie should be readmitted to either Philhaven or Pennsylvania Psychiatric Institute ("PPI") as soon as a bed could be secured.  Dr. Herr referred Abbie for a psychiatric evaluation by other MHS staff.

103.   The results of that psychiatric evaluation were as follows:

(1)   Abbie disclosed that recent weekend visits to her home did not go well and that Abbie perceived that her family seemed to make light of her father's serious problems with alcohol;

(2)   Abbie is highly preoccupied with the health and well-being of her father, who lost his job due to his alcohol use and has been having increasing problems with Ms. Fitzpatrick, with Abbie fearing he will get kicked out of home. Abbie's biggest worry is her father's drinking and her belief that he could be dying from it. Abbie also worries about her parents losing their money due to loss of jobs, is concerned about father's upcoming jail sentence for DUI conviction and indicated that Ms. Fitzpatrick previously tried to overdose and was hospitalized;

(3)   Fighting between her father and Ms. Fitzpatrick prompted Abbie's suicide attempt involving duct taping a pillow to her face;

(4)   Abbie's father is her favorite person, but Abbie is saddened that he is "careless" about his life and does not understand how it affects others. He is not available to Abbie, either physically or emotionally;

(5)   Abbie does not display any signs of thought disorder, but her mood was one of obvious sadness and anxiety with long-standing difficulties with sadness and depression that tends to come and go, but are sometimes quite extreme, coupled with some feelings of hopelessness and helplessness about the future; and

(6)   In spite of all her current emotional and mental issues, Abbie remains motivated to get help for her difficulties and is committed to coming back to School next year and graduating.

104.   The psychiatric evaluation included the following diagnosis for Abbie:

Struggles with depressive symptomatology, chronic underlying depression consistent with dysthymis;[2] periods of acute exacerbation of her symptoms with suicidal urges and history of an attempt. Of concern is she kept this secret for some time. Difficult to tease out whether persistence of depression symptomatology has anything to do with meds since only recently started, or whether related to persistent sadness that she experiences surrounding her family turmoil. She experienced loss of relationships at school and impending loss of H[ouse]P[arent]s. Unfortunately, she does not

---

[2]      According to the diagnosis manual DSM-IV's definition of dysthymia, it is a serious state of chronic depression, which persists for at least 2 years (1 year for children and adolescents) and which is less acute and severe than major depressive disorder.

experience a sense of stability in either relationship with her parents. At risk of mood difficulties given family history.

Recommendation: Readmit to hospital for additional support and stabilization. Efficiency of meds will need to be evaluated.

105.   A bed was secured for Abbie at PPI on June 11, 2013. Abbie remained at PPI for nine days, through June 19th. Abbie underwent additional psychotherapy at PPI and her medications were changed from 10 mg of Prozac to 50 mg of Zoloft.

106.   Dr. Herr, in stark contrast to his hands-on approach of intensive counseling when Abbie was at Philhaven, took a passive role in Abbie's treatment during her time at PPI. Indeed, Dr. Herr admits that he was "less directly involved in her treatment from that point, as MHS staff agreed that Abbie could not immediately return to MHS after this second hospitalization."

107.   In other words, MHS had already decided before June 11 that when presented with two choices for Abbie - the supportive and stable environment of MHS, or a chaotic, sometimes volatile, and financially unstable home life, which had her on the brink of suicide, MHS would wash its hands of Abbie and consign her to instability, chaos, and increased likelihood of suicide.

108.   MHS professionals ostensibly serving in therapeutic roles were very cautious about not presenting MHS as Abbie's protector, or even her future caregiver, as they had been conditioned to favor hasty and MHS image-preserving expulsion rather than continued enrollment, accommodations and attention to Abbie's mental health needs.

109.   Despite Abbie's many desperate pleas for help from MHS in dealing with her worrisome home life, what was lacking from MHS was any assurance to Abbie not to worry, that MHS would always be there for her, or that MHS truly was, as advertised, an "extended

family" that would not abandon her and that would care for her and see her through her crisis in

a stable environment.

**INSTEAD OF RETURNING ABBIE TO THE PROTECTIVE ENVIRONMENT OF THE
SCHOOL, MHS WILLFULLY SENDS ABBIE TO THE WORST OF ALL POSSIBLE
ENVIRONMENTS, HER CHAOTIC FAMILY, WHERE MHS KNOWS ABBIE
EXPERIENCES UNDUE STRESS WITH WHICH SHE CANNOT COPE**

110.    Despite knowing of Abbie's mental anguish and suicidal ideations caused by

concerns regarding her family – which was constantly identified by MHS clinicians as Abbie's

most serious stressors – MHS nonetheless did not invite Abbie back to the School on June 19

for further treatment and observation at MHS, despite those accommodations being available.

Instead, MHS directed that Abbie be discharged from PPI back to a chaotic family

environment, with no special instructions or warnings.

111.    Although the MHS academic year was ending on June 21, 2013, MHS had

programs that could have provided care for Abbie in a structured, stable environment over the

summer months.  Among other things, MHS could have invited Abbie to participate in the so-

called "Year Round Experience" or "YRE."

112.    The Handbook contains a number of representations related to the YRE,

pursuant to which students may remain on the MHS campus after the end of the academic year,

as follows:

> (1)    "The school has four Vacation Breaks during the academic year when
> children are free to leave campus for visitation or remain on campus for
> MHS's excellent Year Round Experience programs";
>
> (2)    "During the summer, several therapeutic camps designed to build social
> and emotional skills are offered by Behavioral Services through the Year
> Round Experience (YRE). ***Behavior Services also staffs the Crisis
> Intervention Team and provides behavioral support to students
> struggling within the regular YRE environment***"; and
>
> (3)    "The Year Round Experiences Program (YRE) is an extension of the
> MHS belief that learning is a year-round experience and that activities for

> student growth do not stop at the end of a school day. ... Any student who remains on campus during Summer Break must be registered and participate in available YRE programming."

Ex. H at 2, 38, and 68 (emphasis added.)

113.   Additional promotional material made available to students and parents extoll the virtues of YRE as a way "to escape" students' home situation, where MHS helps students "realize that there are people who care." Testimonials further describe YRE as "its' own family. We are so close knit here; more than most places. I wouldn't rather be anywhere else. This is where the heart is." A true and correct copy of these materials is attached hereto as Exhibit "J."

114.   The option of YRE or therapeutic summer camp was never presented to either Abbie or her parents after her release from PPI, despite the availability of this seemingly ideal opportunity for Abbie to remain at the one place where she felt connected and belonging. Nor did MHS explore other ways in which Abbie could remain at the School following her hospitalization or implement the type of safety and support plan recommended by Philhaven. No MHS social worker or therapist was assigned to make sure Abbie would get the treatment she needed for continued care and survival.

115.   Not a single precaution of any kind was taken. Indeed, MHS would next take affirmative steps to heighten Abbie's pain, worsen her psychological condition, and push her even further down the road to suicide.

116.   MHS's sudden and dramatic shift to a complete "hands off" approach to Abbie's care around the time she was admitted to PPI, in contrast to the several prior weeks of intensive management of her mental and emotional state, can be explained by the fact that MHS had already made the decision that Abbie would not be permitted to return to the School, merely

32

because of her known disability and despite her otherwise being a model student with an unblemished record.

### IN JUNE OF 2013, MHS WAS FOLLOWING A "SHADOW POLICY" TO FORCE ABBIE'S EXPULSION FROM THE SCHOOL ON ACCOUNT OF HER MENTAL AND EMOTIONAL DISABILITIES, IN CONTRAVENTION OF THE EQUAL OPPORTUNITY POLICY AND THE ADA

117.     Although the Equal Opportunity Policy, as discussed at length above, broadly prohibits all forms of discrimination against students with "disabilities" as that term is defined by the ADA, in June of 2013 MHS was abiding by another "policy," official or unofficial.  This other "shadow policy" robotically mandated that a student be expelled after two hospitalizations in outside mental health facilities, and with the hospitalization decisions in the first instance being recommended by MHS staff.

118.     Such a consequence is not provided for in the Equal Opportunity Policy and flies in the face of its requirements and ADA strictures requiring that students with disabilities be treated fairly with individualized assessments.  Indeed, the shadow "policy" actually has the perverse effect of *discouraging* students who are suffering from mental or emotional injuries from seeking help in the first place, for fear that doing so might lead to brief hospitalizations and a subsequent quick ticket out of MHS.

119.     This is an irrational, anti-child policy for dealing with children who are mature enough to recognize their own depression and seek help for it, but who are equally cognizant of the expulsion hanging over their heads, in the event that they might just need hospitalization.

120.     MHS applies the mechanical "two-institutionalization" rule: (a) without regard to the therapeutic results of the second hospitalization; (b) without consultation with the institution's care-providers; (c) without any further analysis of the mental health of the child and accommodations that could be made; and (d) without any analysis of the consequences to

the child of termination from MHS, the one stable and nurturing environment that many MHS children have had in their short lives.

121.     Upon information and belief, the shadow policy had other aspects to it that were so well established and accepted by MHS that they was openly discussed at MHS Board meetings.   During a Board meeting that occurred in or around 2010, there was a topic of discussion related to the decision to terminate a student because she had suicidal ideations. When one Board member questioned the decision, a senior MHS official stated words to the effect that MHS did not want the publicity of someone killing themselves at MHS.   Because the student in question expressed a desire to kill herself, she would be terminated.   Thus, a policy was institutionalized at the highest level.

122.     Abbie was loved by her MHS houseparents and teachers, and had strong connections to her housemates.   She had consistently expressed a strong desire to remain at MHS, as she saw this as the one circumstance in her life that gave her hope for her future.   One reason for this was assistance with higher education costs, to allow her to reach her dream of being an FBI agent, knowing that her parents had no financial resources to assist her.

123.     Dr. Herr first disclosed the automatic expulsion "policy" to Abbie's mother immediately before Abbie was placed in PPI, and reiterated it to Abbie's mother on multiple occasions during Abbie's second hospitalization.   Dr. Herr indicated that while a leave of absence (an "LOA") was a possibility in lieu of expulsion, the senior division staff (and not Dr. Herr) would ultimately make the decision.   Abbie's mother readily recognized (and responded at the time) that the "policy" was discriminatory.   When Dr. Herr shared the "policy" with Abbie, she was devastated, terrified of being thrown out, and burst into tears.

124. When Abbie's attending psychiatrist at PPI was told of the chilling "policy" and likelihood of expulsion, she expressed grave concern to Dr. Herr about the possibility that Abbie would lose her MHS enrollment and stated that she wanted Abbie to have hope for her future.

125. Thus, MHS had now been advised or warned by professionals at both mental health institutions that a removal from the structured environment of MHS could have dire consequences for Abbie.

126. But the decision about a child's life and well-being would not be made by bona fide child psychologists or others who put Abbie first. Instead, Abbie's future would rest in the hands of "administrators" with histories of fear, ignorance and elevation of image over childrens' well-being when it came to reviewing mental health issues.

127. On June 19, 2013, on the same day Abbie was released from PPI, Dr. Herr communicated to Abbie's mother that "there is a significant likelihood that the LOA will not be approved" and that Abbie will be expelled from MHS. He also advised Abbie that it was uncertain whether she would ever be permitted to return to MHS.

128. Just when Abbie needed support to "build her sense of belonging" and "strengthen her self-esteem," most, MHS negligently, callously, and irreparably harmed her in both regards, by brutally cutting her off from the only community she knew, the only one in which she felt comfortable and a sense of belonging, and the one upon which she depended for her self-esteem.

**IN FURTHERANCE OF THE "SHADOW POLICY" OBJECTIVE OF ELIMINATING ABBIE FROM THE SCHOOL, MHS CALLOUSLY BARS ABBIE FROM HER EIGHT GRADE GRADUATION CEREMONY AND FROM A GRADUATION PARTY HOSTED BY ABBIE'S HOUSEPARENTS**

129.    MHS sent letters home inviting Abbie and her family to MHS eighth grade graduation ceremonies.    These were scheduled for June 21, 2013 and were an extremely important event for children enrolled at MHS.    Abbie's houseparents also called to invite Abbie and her family to a post-graduation barbeque at her student home.

130.    Abbie qualified for the graduation ceremony and was excited about participating and attending the picnic.  She looked forward to seeing good friends from her student home that she had not been able to bond with at the end of eighth grade, due to her treatment at the MHS Health Center, Philhaven, and PPI.

131.    While at PPI, in preparation for her eighth grade graduation, Abbie designed cards to hand-deliver on graduation day to her houseparents, their children, and her classmates. In these notes, Abbie apologized for missing school time at the student home and expressed hope for the future, sensitively and lovingly thinking of other children first.  Abbie knew that in 9th Grade the girls would be split up and sent to new student homes, and thus would not be living together again, and that this would be her last chance to see them all together.  A true and correct copy of those cards is attached hereto as Exhibit "K."   When Abbie wrote the cards, the School had apparently just advised Abbie's mother that the "policy" required, at a minimum, that Abbie not return for 9th Grade. So Abbie wishfully remarked in the cards that "I might be able to come back in 10th grade;" "stay happy and helpful, I will too;" "I cry thinking about leaving MHS and all of you;" "all of you are like my family, I miss you all and hate leaving you," and "keep going Facebook so we can keep in touch."

132.    Abbie had teetered on the precipice of suicide for several weeks now, as explained in a diary entry of June 1, 2013, written while at Philhaven: "one second I was thinking how good everything is and now I am thinking that there is no point in life." The very next day she wrote, "I just want to get out of here and catch up on school work." While at PPI, on or about June 13, in response to an exercise to list "positive things about my life," in a sign of recovery, she lists "I'm pretty, I am creative, Independent, smart, Sensitive, Awesome, Good sense of humor, strong."

133.    At the very same time that Abbie was making progress with her mental health at PPI, MHS advised her that an "enrollment review" (known as a precursor to expulsion) was being conducted to decide her fate.  In light of this reality, on June 14, 2013, Abbie knew her likely fate and wrote in her diary, "People are having a whole meeting about me.  I feel so special," and then ominously added, "They are also deciding my future . . . Whatever the decision is I'll have to take it . . . everything turns out ok, and everything happens for a reason."

134.    An MHS "Enrollment Review" is a misnomer.  Specifically, it never deals with enrollment, but instead, it is only used to pursue expulsions; *i.e.*, when MHS is getting ready to send a child away, the administrators circle up in a proceeding that they euphemistically call an "Enrollment Review."

135.    MHS children are not permitted to attend, speak at, or be represented at their Enrollment Reviews.  Parents and guardians are similarly excluded.  There are no means of providing evidence, arguments, or pleas on behalf of children who are subjected to these sham proceedings.  Thus, there is no due process of any kind.

136.    MHS makes no account of the proceeding to provide to students or their guardians, and there is no right of appeal whatsoever.

137.    In sum, the entire Enrollment Review proceeding, with its near-inevitable result in most cases, is itself an affront to child welfare, due process and ADA norms.

138.    This chilling process was being pursued despite signs of Abbie's improved mental health at PPI.  On June 17, 2013, she sadly wrote: "I want to get really long hugs from my parents to know they love me.  I wish no one in my family had been in jail or did drugs or was an alcoholic."  That same day, Abbie expressed optimism: "I am starting a whole new chapter in my life, it will be an adventure I will fulfill.  I want to see [what] happens how it turns out and I will.  I got to stop worrying and let what happens happen."  She then notes she has letters to write for her houseparents, their children and her classmates that she will deliver at graduation in a few days.

139.    But this was not to be as MHS then delivered the final and fatal blow with a phone call on June 20, 2013.  This came one day before graduation, and just one day after Abbie's release from PPI, telling Abbie's mother that: (i) Abbie could not attend her graduation; (ii) Abbie could not attend her houseparents' barbeque, *i.e.*, that both invitations were revoked; (iii) Abbie could not set foot on MHS campus on that day, and if she tried she would be turned away and denied entry;  (iv) Abbie was a danger to other children; (v) Abbie could not attend 9th Grade at MHS; and (vi) the School will decide if it would even give consideration to allowing her to re-enroll after 9th Grade under certain strict conditions, at least one of which would be near impossible to meet.

140.    Despite the desperate pleas of Abbie's mother to let Abbie attend the graduation ceremony and barbeque, and despite the fact that MHS knew that Abbie was in a fragile emotional state only one day removed from PPI, MHS heartlessly, negligently, and recklessly refused to reconsider, or apply ADA-mandated standards.  When her mother pleaded that the

administrators have a heart, they robotically answered that "being at MHS is a privilege, not a right."

141.    The only MHS employees to show a modicum of compassion were Abbie's houseparents and Dr. Herr.  All three disagreed with MHS administrators on barring Abbie from her graduation.  Dr. Herr knew Abbie was not a threat, knew she had worked hard toward graduation, and knew it was very important for Abbie's mental well-being that she be allowed to attend and thereby preserve some shred of this child's dignity and self-esteem.  Dr. Herr later became very emotional and actually cried on the phone to Abbie's mother that MHS owed her an apology for how Abbie was treated.  Abbie's mother pleaded with MHS to reconsider, even on the morning of the graduation itself, but her request was denied and Abbie was crushed, unable to participate in the graduation she had worked for years to achieve, unable to be surrounded by her loving houseparents and housemates one final time, and unable to deliver her cards she had so lovingly and thoughtfully prepared.

142.    MHS administrators took these affirmative jarring and negligent steps that maximized Abbie's pain, humiliation, and abuse on an already psychologically vulnerable child just as her thought process was becoming more positive, without thought as to the predictable consequences.

143.    Dr. Herr had passionately argued in favor of making an exception to the "two hospitalization" expulsion policy and instead granting Abbie a leave of absence, due to her unique circumstances.  Among other things, Dr. Herr stressed the following reasons not to expel Abbie in an entry dated June 19, 2013 (but not signed until July 31, 2013):

> (1)    "Abbie's two hospitalizations were spaced less then a week apart, and it's unlikely that she was receiving much benefit from antidepressant medication at the onset of second hospital stay.  For clinical purposes, it's reasonable to consider her as having one hospitalization;"

119124787_1

(2) "Abbie has never before received treatment. She has never been given antidepressant medication before, she has never received either individual or family therapy in the past. Her capacities to benefit from this are unknown;"

(3) "Abbie has manifested some progress, in the limited time I've met with her" and "does manifest the ability to benefit from counseling;"

(4) "Abbie is an excellent student;"

(5) "Abbie is a well-behaved student . . . the adults who have been involved with her (teachers, principals, houseparents, HLA) have all expressed strong positive feelings toward Abbie, and have expressed a strong hope that she will be given the opportunity to continue her enrollment;"

(6) "Abbie is motivated to return to MHS . . . she wants to graduate from MHS, as she views this as the best route to a positive future;" and

(7) "I believe her . . . record, and motivation present enough positive prognostic indicators to grant her an opportunity to return."

144.  All seven of these indicators are reasons why Abbie should have remained at MHS, under the care and guidance of staff, rather than being turned out and sent back to Newport, Pennsylvania, where 10 days later she would in fact commit a suicide that otherwise could have been prevented. Tellingly, Abbie took her own life after telling her brother she had cried all night, hated Newport, and wanted to return to MHS, the place she viewed as home.

**DISCARDED BY THE MILTON HERSHEY SCHOOL, BARRED FROM HER OWN GRADUATION, AND LEFT WITH NO SENSE OF HOPE FOR THE FUTURE, ABBIE SUCCUMBS TO SUICIDE ON JUNE 29, 2013**

145.  Although Dr. Herr had indicated that MHS was considering whether to stop short of permanently expelling Abbie, by granting her a 12-month leave of absence, his entreaties appear to have fallen on deaf ears, as no formal decision was ever reached on the point. Moreover, the terms that Abbie had to live up to under any proposed leave were complex and unattainable and MHS certainly knew so. For example, one of the terms required Abbie, then struggling with depression and thoughts of death, to somehow promise to "be free

119124787_1

of all depressive symptoms and express zero suicidal ideation for a period of 6 months prior to her leave review; this must be reported by all parties, including student, legal guardian and therapist." Such an absurd requirement could only have encouraged this sensitive and intelligent child to dangerously internalize her feelings and not express them, as her only way back to MHS would have been not to think or, at least, not to express how she may have felt for a minimum of six months. Thus, MHS would accept only a quick and miraculous recovery from depression, unassisted by MHS's vast resources.

146. After the phone call of June 20, 2013, Abbie had a complete and overwhelming sense of hopelessness. She was emotionally devastated over not being able to attend graduation with her dear friends, and she doubted very much that she would ever be able to return to the structured and nurturing environment of her MHS home. In other words, MHS had doomed Abbie to remain in the very environment in which she felt most depressed, most alone, and was most likely to precipitate her suicide, in flagrant disregard of the law, the School's duties, and recent promises made to the Department of Justice.

147. Making Abbie's treatment by MHS even more tragic, MHS staff met on the morning of graduation and decided that if Abbie and her mother did attempt to attend graduation, MHS would have let them do so, disproving any claim MHS might have had that Abbie truly was a threat to the safety of other children. Worse still, no one communicated this change of heart to Abbie or her mother. So Abbie stayed home alone and off campus while her classmates walked down the aisle and enjoyed a celebratory picnic without her.

148. Days later, on June 29, 2013, Abbie committed suicide by hanging herself from the belt of her bathrobe at her father's residence in Newport.

149.     It is evident that after over nine years of near-perfect conduct and academic success, MHS had given up on Abbie and gone into termination mode, just weeks after the onset of an emotional episode.

150.     For example, on June 10, 2013, MHS began to prepare Abbie and her mother for a pre-ordained termination, stating "there were real questions about whether MHS can meet [Abbie's] needs." A day later, Dr. Herr indicated "that Middle Division will have questions about Abbie's level of emotional needs." Thus, the more a long-term student/resident at MHS needs emotional support in crisis, the less inclined MHS will be to retain him or her.

151.     Just two days later, while Abbie was at PPI, Dr. Herr told Abbie's mother that an MHS staff meeting would be held on Friday, June 14, to determine Abbie's future. The expulsion process and Enrollment Review was moving forward with great speed.

152.     In an entry made approximately two weeks after Abbie's death, Dr. Herr acknowledged that he was "less directly involved" in Abbie's treatment after she was admitted to PPI, because the expulsion "policy" dictated that "Abbie could not immediately return to MHS after this second hospitalization." Dr. Herr further noted in the entry that problems with "many family stressors including father's alcoholism and legal difficulties, tensions between father and stepmother, concerns about the emotional status of youngest brother, history of drug/alcohol and legal involvement in both maternal and paternal line, history of mood disorders in maternal line" were the major life events affecting Abbie's mental health diagnosis and treatment as of the time of her death. It is painfully clear that MHS knew Abbie was more at risk of suicide in Newport than at MHS, but no one would make that analysis for the record.

153.     Despite these concerns, Abbie was turned away from MHS to return to her parents on June 19, 2013. These are individuals with their own serious struggles and who were

119124787_1

unequipped to handle Abbie's severe depression, no matter how deeply they loved their child. After all, it was the sad realization that Abbie was better off at MHS that had led them to enroll Abbie in the first place.

154.    Abbie's loving father could only poke and tease Abbie in therapy sessions, not imagining he could lose her.  Her loving mother believed Abbie could be talked out of her ideation and did not grasp the gravity.  Ms. Fitzpatrick similarly could not translate her love of Abbie into an effective shield against depression.

155.    Abbie was essentially told by MHS that she would have to recover on her own, with no further assistance from MHS, the only place she knew as home, from age 5 to 14.  No "family," and certainly not one with $12 billion of resources and teams of trained professionals, would have been so negligent and callous, without any regard for what their child would have to overcome on her own, in a fragile, sometimes suicidal state.  MHS's actions were a virtual death sentence to a vulnerable and sensitive child.

156.    Abbie's suicide was completely preventable.  While Abbie was barred from setting foot on campus, she never received a written termination notice, and thus remained in the care of MHS until her death, as she anxiously awaited word of her future, which never came.  MHS, which Abbie viewed as her family just as MHS adamantly encouraged, the family that had nurtured her and watched her thrive, could have saved Abbie, by treating her with love, compassion, and concern.  MHS could and should have enveloped her in the cocoon of MHS, where she had been troubled only the last 2 months of her life, but where she felt safe and had flourished for over nine years.

157.    MHS professionals and administrators knew or should have known the following about risks of suicide to Abbie on account of a depressive disorder, and applied these concepts in their treatment of Abbie and the standard of care required under these circumstances:

(a)    A child with suicide ideation has a perception that she does not belong, feels alienated from others, perceives herself as a burden to others, and does not feel she is an integral part of a family, circle of friends, or other valued group, all perceptions expressed by Abbie to MHS, and all perceptions that MHS brought into sharp focus when it barred her from the MHS community;

(b)    Abbie had many of the warning signs of suicide, *i.e.*; ideation, purposelessness, anxiety, agitation, feeling trapped, hopelessness, withdrawal, mood fluctuations;

(c)    Abbie's emotional crisis, while temporary, interfered with logic and planning during this critical period of May and June 2013;

(d)    Abbie's option of death began to tower over other options;

(e)    Suicide is an act of profound loneliness and inconsequentiality, but MHS compounded these feelings in Abbie by its treatment of her in June 2013;

(f)    Ideation is usually accompanied by feeling insignificant, miserable or misunderstood, as Abbie felt;

(g)    The suicidal mind is characterized by ambivalence with competing forces tugging at the individual from sides of both life and death. The life side of the struggle is still active and still compelling the person to plan for life, just as everyone else does, and as Abbie did;

(h)    Extreme alienation from family and community is a robust predictor of suicide, as are isolation, rejection and ostracism, all compounded by MHS actions;

(i)    There was no point of no return for Abbie. She could have been brought back from her break if surrounded by understanding and made to feel like she belonged to her MHS community;

(j)    Connections to others become obliterated before suicide, aided in this case by MHS actions to cut Abbie off from any contact;

(k)    Suicide can be prevented, and when it is, the person has an extremely high likelihood of leading a productive life;

(l)    There is a window of opportunity for others to intervene before someone ends her life; one can nudge a deeply ambivalent person, who is tottering on the precipice between life and death, back toward life. MHS negligently failed in this respect.

(m)   A suicidal person will question whether reliable social ties are there and can be counted on. Much depends on the answer. If the answer is understanding, life can prevail, if the answer is dismissive, it may not. MHS was dismissive toward Abbie once it concluded on June 10, 2013 that it would not allow her to return to MHS.

(n)   The suicidal mind feels beaten down and demoralized to the point that death becomes comforting; MHS conduct beat Abbie down in the last twenty (20) days of her life.

(o)   For suicide prevention, there is one common theme throughout centuries of experience, it is the provision of human contact, the comfort of another concerned person, often authoritative, conveying a message of hope. MHS snatched that hope from Abbie.

All of this understanding of suicide is contained in the book "Myths About Suicide" (University Press 2010), by Thomas Joiner, Distinguished Research Professor and Bright-Burton Professor of Psychology at Florida State University and author of "Why People Die by Suicide."

158.   MHS failed Abbie in nearly every respect from June 10, 2013, when they first indicated her enrollment was in question until her death on June 29, 2013. The exception was Abbie's loving houseparents, who, sensing Abbie's extremely distressed mental state, visited her home for a private graduation ceremony. These front line care-providers knew that Abbie needed far better care and treatment than was exhibited by the MHS administration.

159.   While Abbie already felt herself a burden to her financially strapped and troubled parents, she was also made to feel like a burden to MHS, which had ample resources to care for her, but chose not to use them on Abbie.

160.   MHS heightened Abbie's alienation, loneliness, and break with the only community where she felt she belonged (MHS), and made her feel her future would be hopeless without MHS. Thus, Abbie was made to feel that there was no place where she belonged, and no place where she perceived herself not a burden, as MHS knew she was not comfortable with her family, having even eliminated overnight weekend visits with them. MHS obliterated Abbie's connections with friends and the MHS community, all she had known and relied upon

45

for comfort. She feared she could not count on her biological family for her emotional needs, and now knew she could not count on her MHS family, who no longer wanted to care for her.

161.    MHS, with $12 billion of assets and a small army of mental health professionals, made no assessment of how Abbie would fare back in Newport, Pennsylvania, her address of residence with her jobless father on his way to prison and with a severe alcohol dependency. Instead, the message was "cure yourself, we cannot help you, and if completely cured so that you will not cause us any mental health issues, we might consider a return." Even this last point was not communicated to her by MHS, as the draft letter for a leave of absence sat unsigned on someone's desk at MHS.

162.    Abbie's tragic death due to MHS's egregious conduct has already received attention from national news media, most notably in a piece aired on CNN's Anderson Cooper 360 evening newscast. A true and correct copy of the video file of that report is included on the CD attached hereto as Exhibit "L."

163.    While MHS conduct toward Abbie's shocks the conscience, it is not an isolated incident in the mental health policies of MHS.

164.    For example, AD was enrolled in MHS in third grade in 2003, and was by every account a model student, including being sent by MHS to "enrollment fairs," to help recruit other children.

165.    But when AD experienced depression, MHS expelled him, just as his 11th grade year was ending. His housemother recognized the injustice done to AD, but she could not assist him as doing so would have jeopardized her own position and promising career as a poster child for MHS, having graduated herself from the School.

166.    AD's circumstances were later so harrowing that at one point he ended up in a homeless shelter, as a high school senior, with virtually nowhere to turn.

167.    KR, like Abbie, was an eighth grader when she too was expelled, and again, merely for facing depression.   KR's post-expulsion mistreatment was also cavalier and compounded the pain she felt.

168.    On information and belief, there are many other children who have been similarly mistreated by MHS for mental health issues, with the School and its board members allowing this unlawful discrimination to continue unabated.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

169.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

170.    Abbie met all of MHS's eligibility criteria during her enrollment to reside at the School.

171.    MHS discriminated against Abbie by denying her housing at MHS on the basis of her mental handicap.

172.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Abbie, including, *inter alia*, participation in the Year Round Experience or some form of further presence in MHS housing on the MHS campus following her release from PPI on June 19, 2013.

173. Instead, Defendants negligently, carelessly, intentionally and recklessly permitted her to be returned to Newport, Pennsylvania, which Defendants knew was, for Abbie, a dangerous situation for her then-existing mental and emotional state.

174. Defendants further failed to accommodate Abbie's attendance and participation in her graduation ceremony and the related celebratory gathering with her houseparents and friends.

175. Defendants negligently, carelessly, intentionally and recklessly disinvited Abbie from these proceedings, and barred her from campus on the eve of graduation, another perilous action in light of Abbie's then-existing mental and emotional state.

176. Abbie did not pose a direct threat to anyone such that the Defendants' conduct would be permissible under the FHA. Moreover, the Defendants have never indicated when, how and to whom Abbie posed such a direct threat, having failed to make any individualized assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

177. Defendants negligently, carelessly, intentionally and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including taking away a child's housing, and barring the child from stepping foot on campus or attending graduation ceremonies open to the public. Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at Philhaven, PPI or MHS, the Defendants based their decisions on unfounded assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

178.    The Defendants denied Abbie continued residence at the School, the right to participate in and benefit from the residential programs at the School, and the right to other goods, services, facilities, privileges, advantages and accommodations provided by the School based on her depression, anxiety and other mental and emotional illnesses.

179.    At all relevant times, Abbie had a mental impairment (diagnosed mental and emotional illness) that substantially limited the operation of her major bodily functions, as well as substantially limited other major life activities, such that she was an individual with a handicap within the meaning of the FHA, 42 U.S.C. § 3602(h).

180.    In addition, Abbie's medical records all note a diagnosis of a mental impairment, such that they reflect that she was an individual with a handicap within the meaning of the FHA.

181.    Finally, the Defendants regarded Abbie as an individual with a handicap within the meaning of the FHA.

182.    Abbie is an aggrieved person as defined by the FHA, 42 U.S.C. § 3602(i)(1), and has suffered damages as a result of the Defendants' discriminatory conduct as described above.

183.    Defendants' discrimination was a direct and factual cause that led Abbie to sustain severe emotional and psychological harm and humiliation, as well as take her own life.

184.    Abbie's student home at MHS was a dwelling, as set forth in the FHA, 42 U.S.C. § 3602(b).

185.    Abbie, like all students enrolled at MHS and living in the student homes on campus, were given chores and other tasks to do by their houseparents.  Theses chores and tasks were required, and constitute consideration for Abbie's residence in the student home.

119124787_1

186.    Additional consideration for Abbie's residence in the student home was provided

to the School by The Milton Hershey School Trust, which contributed money, funding and

other tangible consideration.

187.    As described above, Defendants have:

(a)    Discriminated against Abbie in the sale or rental, or otherwise making
unavailable or denying a dwelling to Abbie because of her disability, in
violation of the FHA, 42 U.S.C. § 3604(f)(1);

(b)    Discriminated against Abbie in the terms, conditions, or privileges of
rental of a dwelling or in the provision of services or facilities in
connection with a dwelling, because of her disabilities, in violation of the
FHA, 42 U.S.C. § 3604(f)(2); and

(c)    Refused to make reasonable accommodations in their rules, policies,
practices or services, when such accommodations were necessary to afford
Abbie equal opportunity to use and enjoy her dwelling, in violation of the
FHA, 42 U.S.C. § 3604(f)(3).

(d)    Afforded Abbie with an unequal benefit in regard to its offering of goods,
services, facilities, privileges, advantages or accommodations on the basis
of her disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28
C.F.R. § 36.202(b).

188.    Defendants' discrimination was a direct and factual cause that led Abbie to

sustain severe emotional and psychological harm and to take her own life.  Defendants'

discrimination directly and proximately caused Abbie to sustain severe emotional and

psychological harm and to take her own life, as her fragile mental state could not absorb the

severing of her relationship with the MHS community, her houseparents, teachers and

classmates, and the lost opportunity and hope that such severing meant to her, despite having

given MHS over nine (9) years of her best efforts and exemplary conduct.

189.    Plaintiffs seek immediate injunctive relief which shall consist of, *inter alia*, (a)

creation by MHS of a therapeutic student home for the seriously depressed children in its care,

with 24 hour professional coverage; (b) appointment of an advocate for children to participate

in all enrollment reviews; and (c) a commitment to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination are made.

190.    Plaintiff also seeks the recovery of money damages, attorney's fees, litigation expenses and costs consistent with the FHA.

191.    The discriminatory actions of the Defendants were intentional, willful, and taken in disregard of Abbie's federally protected rights.

## COUNT II – BREACH OF CONTRACT

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

192.    Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint as if each was individually set forth at length within this Count.

193.    Abbie and the other children enrolled in MHS were intended third party beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, and as to provisions applicable to enrolled students, were the only intended beneficiaries.

194.    The Defendants' specific intent was to make children enrolled at MHS intended beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook.  Such children were within the contemplation of those documents at the time they were entered into and/or distributed to children, parents and/or sponsors.

195.    The ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook each created a contractual duty of increasing tolerance for and eliminating discrimination of disabled children enrolled at MHS.

196.    The child beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, including Abbie, have a right to performance to effectuate the intention of the parties because the circumstances indicate that the promisee, the United States of America, intended to give enrolled children at MHS the benefit of the promised performance.  The promisor, MHS, had a similar intent, and the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, along with the circumstances, reflect that intent.

197.    Alternatively, the circumstances of tolerance and anti-discrimination are so compelling that recognition of an enrolled child's right to acceptance is appropriate to effectuate the intention of the parties, and indicate that the United States of America intended to give enrolled children the benefit of the promised performance.

198.    The Defendants breached their promise in the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook to correct then-existing discriminatory practices against disabled students, and Abbie was directly harmed thereby.

199.    The above-described conduct directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death (and related Wrongful Death Act and Survival Act damages), and has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## COUNT III – NEGLIGENCE - BREACH OF DUTY OF CARE

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

200.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

201.   An affirmative duty on the Defendants' part to care for Abbie and protect her from harm arose from the special custodial relationship that existed between Defendants and Abbie.

202.   Specifically, and as described at length above, through its "unique, home-like environment," the Defendants, by and through their agents, servants and employees, exercised custody and control over its enrolled students, such as Abbie.   At all relevant times, MHS functioned as Abbie's primary caregiver, providing education, housing, food, clothing and medical, dental and psychological care.   In these and other ways, Abbie was dependent on the Defendants to meet her basic needs of sustenance, care and protection.   Moreover, the Defendants had imposed limitations on Abbie's freedom to act on her own behalf and has deprived Abbie of her normal opportunities for protection.

203.   In addition to the above, the Defendants, by and through their agents, servants and employees, further exercised custody and control over Abbie by requiring Abbie to submit to in-patient admissions at both Philhaven and PPI.

204.   For all of these reasons, the Defendants owed Abbie a special and higher duty of care, in addition to a duty of ordinary care, to protect her from harm.

205.   The Defendants, by and through their agents, servants and employees, breached the duty arising by virtue of their special relationship with Abbie in ways which include, but are not limited to, the following:

(1)     By requiring that Abbie be admitted to two mental institutions so that MHS could effectuate its two institution expulsion policy and also scale back the medical care being provided by MHS staff;

(2)     By permitting Abbie to be discharged from PPI directly to her parents' rather than maintaining custody over Abbie at MHS.  For example, MHS could have, but did not, require or otherwise invite Abbie to return to the MHS campus to participate in the Year Round Experience over the summer of 2013.  Nor did MHS offer any other options that would permit Abbie to remain on the MHS campus for observation and/or further treatment immediately following her discharge from PPI;

(3)     By failing to develop a care plan for Abbie before she was discharged to her parents;

(4)     By failing to provide adequate medical care to Abbie prior to her discharge from PPI and, specifically, during her time at PPI, when Dr. Herr admitted to taking a more limited role in Abbie's treatment due to the expulsion policy and related likelihood that Abbie would not be permitted to return to MHS – during the very time that Abbie was receiving intense therapy at PPI for her suicidal ideations, suffered from low self-esteem and teetered in the precipice of life or death;

(5)     By holding out the threat of expulsion and/or a forced leave of absence; and

(6)     By dis-inviting Abbie from her graduation ceremony and related celebration on the eve of graduation.

206.    Defendants had a further duty to protect Abbie because they created or exacerbated a dangerous situation as described in the preceding paragraph, including by (a) first caring for her in a supportive environment for over nine (9) years and then deserting her when she needed MHS the most; and (b) then inviting and disinviting her from graduation events. Defendants breached that duty by failing to protect Abbie in June of 2013.

207.    Defendants had a further duty to protect Abbie because MHS withdrew critical, life-saving support after partially performing, and after Abbie had relied upon MHS's care and assistance to the exclusion of other alternative assistance.

54

208.   Defendants had a further duty to protect Abbie because MHS took charge of Abbie, who was helpless to adequately aid or protect herself, but then discontinued its aid and protection, thereby leaving Abbie in a worse position than when MHS took charge of Abbie in the first place.

209.   Abbie was significantly damaged by all of these breaches by the Defendants, mentally, emotionally, physically and monetarily.

210.   As a result of the above-described conduct, Abbie suffered significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death; and/or Abbie has been denied at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

211.   All of these damages were foreseeable to the Defendants because at the time of each breach described above, the Defendants knew or should have known that remaining in the supportive environment of MHS was essential for Abbie's well-being and survival given her then-existing fragile mental state.   Moreover, the Defendants knew or should have known that Abbie's parents lacked financial resources and were otherwise unable to provide her with the type of psychological care that she needed at the time of her discharge from PPI.   Finally, the Defendants also knew or should have known that disinviting Abbie from graduation ceremonies and celebrations and barring her from campus would have a devastating effect on Abbie due to her fragile emotional state.

212.   The specific harm of suicide was foreseeable to the Defendants because of their knowledge of both (1) Abbie's prior documented attempts of suicide and suicidal ideation and

119124787_1

(2) her taking of Zoloft at the time of her discharge from PPI, which was another factor requiring extensive care, continued monitoring and treatment.

213.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

## COUNT IV – INTENTIONAL CREATION OF DANGER

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

214.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

215.    MHS intentionally created and/or exacerbated a known dangerous situation by engaging in the specific affirmative conduct described herein.

216.    MHS further deliberately and recklessly established and maintained a custom, practice or policy that caused Abbie harm.   That custom, practice or policy was to expel students suffering with mental impairments once they have been twice institutionalized, and to bar those same students from the MHS campus.

217.    MHS's intentional, deliberate and reckless acts directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, conscious pain and suffering and her tragic death and further have denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

218.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

219.

## COUNT V – WRONGFUL DEATH

**Plaintiffs, Julie Ellen Wartluft and Frederick L. Bartels, Jr. v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

220.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

221.   Abbie is survived by her parents Julie Ellen Wartluft and Frederick L. Bartels, Jr.

222.   The aforementioned negligent, careless, intentional and reckless conduct of the Defendants caused Abbie to endure a mental illness with such despair that it directly resulted in her completion of what was a preventable suicide.

223.   By reason of the death of Abbie, as caused by the aforementioned wrongful acts, neglect or negligence of the Defendants, Abbie's parents have in the past and will in the future continue to suffer great pecuniary loss, including, but not limited to, loss of support, loss of aid, loss of services, loss of companionship, loss of consortium and comfort, loss of counseling and loss of guidance.

224.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

225.   Plaintiffs Julie Ellen Wartluft and Frederick L. Bartels, Jr. as parents of Abbie and Administrators of the Estate of Abrielle Kira Bartels, Deceased, bring this action by virtue of the Wrongful Death Act, 42 Pa.C.S.A. § 8301 and claim all benefits and recoverable damages under the Wrongful Death Act on behalf of all other persons entitled to recover under law.

119124787_1

## COUNT VI – SURVIVAL ACT

**Plaintiff, the Estate of Abrielle Kira Bartels v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

226.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

227.    The damages suffered by the Estate of Abrielle Kira Bartels, Deceased by reason of the death of Abbie include, but are not limited to, the following:

(1)    the severe injuries to Abbie, which resulted in her death by asphyxiation;

(2)    the anxiety, horror, fear of impending death, mental disturbance, pain, suffering and other intangible losses which Abbie suffered prior to her death;

(3)    the loss of future earning capacity suffered by Abbie from the date of her death until the time in the future that she would have lived had she not died as a result of the injuries she sustained; and

(4)    the loss and the total limitation and deprivation of her normal activities, pursuits and pleasures from the date of her death until such time in the future as she would have lived had she not died as a result of the injuries sustained by reason of the carelessness, recklessness, negligence and gross negligence of defendants.

228.    Plaintiffs bring this action on behalf of the Estate of Abrielle Kira Bartels, Deceased, by virtue of the Survival Act, 42 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of the Estate of Abrielle Kira Bartels, Deceased, and other persons entitled to recover under law.

## COUNT VII - NEGLIGENT MISREPRESENTATION

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

229.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

119124787_1

230.   Defendants, through their employees and agents, represented to Plaintiff and her family the following things:

(1)    MHS does not discriminate against applicants or students on the basis of any disability;

(2)    students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School;

(3)    students cannot have their enrollment discontinued solely on the basis of their disability;

(4)    MHS does not exclude persons with disabilities from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability;

(5)    MHS makes reasonable modifications to its policies, practices and procedures when the modification are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities;

(6)    MHS develops and implements individualized plans for disabled students to ensure that MHS is able to accommodate those students at the School; and

(7)    MHS has developed and provided mandatory and comprehensive training on the ADA, and specifically on Title III of the ADA, to all staff and administrators.

231.   Defendants, through their employees and agents, also represented to Plaintiff and her family that MHS provided a "comprehensive array" of psychological services to students, including "individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, crisis intervention and prevention," and that the "type of psychological service provided for a student is dependent on the individual student's need."

232.   Each of these representations was material and false as to Abbie and others.

233.   In addition to the representations being made directly to Abbie, Defendants, through their officials, made these representations to Abbie's parents and caregivers with

59

knowledge and intent that they would be communicated to and relied upon by Abbie through words and actions.

234.   Defendants' representations to Abbie, Plaintiffs and their family began in April of 2003 and continued until June of 2013.

235.   Defendants should have known that their representations were false when made.

236.   Defendants reasonably should have foreseen that these representations would subject Abbie to an unreasonable risk of harm.

237.   Abbie and her parents and caregivers believed and justifiably relied upon Defendants' representations, which caused her to succumb to suicide and to suffer the other damages described herein.

238.   Abbie's injuries were proximately caused by her reliance on the representations.

239.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

240.   The above-described conduct directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death and has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## COUNT VIII - INTENTIONAL MISREPRESENTATION

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

241.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

119124787_1

242.     Defendants knew that the material representations set forth in Count VII above made by Defendants, through their employees and agents, to Plaintiff and her family and caregivers were false when made or, alternatively, acted with reckless disregard as to the truth or falsity of such representations.

243.     Plaintiff believed and justifiably relied upon Defendants' representations, which caused her to succumb to suicide and to suffer the other damages as more particularly described herein.

244.     Upon information and belief, Defendants made the misrepresentations with the intent to deceive Plaintiff and to induce her and her family members and caregivers to act on the misrepresentations to their detriment and harm.

245.     Abbie's damages and injuries were proximately caused by her reliance on the representations such that Defendants actions were a factual cause of her death.

246.     The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

247.     The above-described conduct directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death and has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## COUNT IX - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

248.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

249.    By acting in conscious disregard of the findings of the Department of Justice as set forth in the ADA Settlement Agreement and in conscious disregard of the anti-discrimination requirements set forth in both the Equal Opportunity Policy and the ADA, Defendants did by extreme and outrageous conduct intentionally or recklessly cause severe emotional distress and bodily harm to Abbie.

250.    Defendants' conduct in holding out its premises as a safe environment for young children with mental impairments when it had reason to know the School could be a dangerous place for children such as Abbie due to the School's discriminatory treatment of students with disabilities, constitute extreme and outrageous conduct that was atrocious and went beyond all bounds of decency such that it is conduct utterly intolerable in a civilized society.

251.    Defendants acted extremely and outrageously in threatening to expel Abbie on the basis of her mental impairments at the very time when she was the most fragile, including while a patient at PPI undergoing therapy and seeing life as hopeless except for MHS, and despite the fact that Defendants purportedly provided a vast array of psychological and psychiatric services, including, but not limited to, crisis intervention.

252.    Defendants' rescission of the invitations to Abbie and her family to graduation events that she had earned for no valid reason was negligent, discriminatory, outrageous and callous and an action that MHS knew would cause her severe and unnecessary emotional distress.

253.   Defendants' conduct intentionally and/or recklessly caused Abbie and Plaintiffs severe physical and emotional distress, including severe mental anguish and horror, because the natural and probable consequences of Abbie's proposed expulsion from the School was Abbie's emotional distress.

## COUNT X - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

254.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

255.   Defendants, by and through their agents, servants and employees, knew or reasonably should have known of the dangerous conditions that existed by virtue of the School's discriminatory treatment of students with disabilities and their exclusion from campus events such as graduation ceremonies and celebrations.

256.   Defendants, by and through their agents, servants and employees, knew or reasonably should have known that Abbie was being discriminated against by virtue of the School's custom, practice or policy requiring the expulsion of students suffering with mental impairments.

257.   Defendants breached the duty of care owed to Abbie by failing to protect her from foreseeable pain and suffering related to her proposed expulsion from MHS and the revocation of invitations for eighth grade graduation events.

258.   Defendants' conduct resulted Abbie suffering severe physical and emotional distress, including severe mental anguish and horror.

## COUNT XI - CIVIL CONSPIRACY TO ENDANGER CHILDREN

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

259.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

260.   Defendant The Milton Hershey School, The Milton Hershey School Trust, Board of Managers of the Milton Hershey School and The Hershey Trust Company, along with individual members of the Board of Managers not presently named as defendants and senior MHS administrators, acted with a common purpose, and conspired to endanger the welfare of children, including Abbie, in violation of Pennsylvania law by continuing dangerous discriminatory policies unbeknownst to the public and contrary to their public pronouncements.

261.   In Pennsylvania, there is an implied civil cause of action for endangering the welfare of children by a child whose welfare was endangered.

262.   Also in Pennsylvania, there is a civil cause of action for negligence *per se* for violation of the statute against endangering the welfare of children.

263.   Abbie has standing to bring this claim because she was one of the children who was discriminated against as a result of this conspiracy to endanger the welfare of children.

264.   Members of the Trust/MHS boards and senior leadership at the School had or should have had information that discriminatory customs, practices and policies were still in place and/or that the anti-discrimination requirements set forth in the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook had not been enacted, enforced or abided by, and that MHS mental health policies, procedures and practices were dangerous.

265.   The decision to continue discriminatory customs, practices and policies and the collective silence of various individuals at MHS in addition to Defendants were overt acts

committed in pursuance of the common purpose to endanger the welfare of children, concealed from Abbie the unsafe living environment.

266.    These decisions and their concealment directly injured Abbie because it caused Abbie and her family and caregivers to keep Abbie enrolled at the School to endure further discrimination.

267.    The above-described conduct directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death and has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## COUNT XII – BREACH OF THE FIDUCIARY DUTIES OF CARE AND GOOD FAITH

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

268.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

269.    The Board of Managers and the Trustee owed Abbie fiduciary duties of care and good faith to provide a safe environment for all children in their care, requiring them to exercise the kind of reasonable inquiry, skill and diligence that a person of ordinary prudence would use in overseeing the care of young at-risk children and protecting them from known dangers.

270.    The Board of Managers and the Trustee, officers and key employees of the School and the School Trust also have a fiduciary relationship with the School and School Trust which requires that they act in good faith with regard to the School and School Trust's best

interests, and also requires that they apply the highest moral, legal, and ethical standards in their conduct.

271.    The Board of Managers and the Trustee breached their duties by: (1) failing to appoint residential childcare and mental health experts to their boards; (2) failing to hire qualified senior MHS administrators; (3) failing to implement policies or institutional controls that would prevent incidents of discrimination against disabled students and allow identification of such abuse once it had occurred; (4) not following through on the ADA Settlement Agreement, the Equal Opportunity Policy or the Handbook by, among other things, failing to properly train staff and administrators on the requirements of Title III of the ADA; and (5) failing to monitor and comply with the ADA Settlement Agreement, the Equal Opportunity Policy, the Handbook and/or Title III of the ADA.

272.    The Trustee and Board of Managers, by and through their agents, servants and employees, as signatories to the ADA Settlement Agreement, and authors of the Equal Opportunity Policy and the Handbook, knew or reasonably should have known of the dangerous conditions that existed on campus by virtue of the active discrimination against disabled children.

273.    Defendants all knew of the numerous prior instances of discrimination against disabled students, and yet, indefensibly given this history, intentionally subjected Abbie to the discriminatory custom, practice and/or policy requiring the expulsion of students suffering with mental impairments.

274.    Based on the explicit findings of the ADA Settlement Agreement, Abbie's documented history of mental impairment and literature in the field of depression, it was reasonably foreseeable and, indeed, completely predictable, that if the Trustee and Board of

Managers did not adequately exercise or provide the duty of care owed to young children suffering with mental impairments in their care, including but not limited to Abbie, those children would be vulnerable to emotional, mental and physical harm.

275.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious, and as to the Trustee, constituted a breach of trust, such that punitive damages are further warranted.

276.   The above-described conduct directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death and/or has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## COUNT XIII – NEGLIGENCE *PER SE*

**Plaintiffs v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School and The Hershey Trust Company, as Trustee**

277.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

278.   Defendants have violated at least three statutes, (1) the ADA, (2) the FHA, and (3) the Pennsylvania Human Relations Act.

279.   The purpose of these statutes, at least in part, is to protect the interest of Abbie, as she is an intended beneficiary of both statutes.

280.   The aforementioned statutes clearly apply to the conduct of the Defendants in this case.

119124787_1

281.   As described above, the Defendants have violated these statutes, which is negligence *per se*.

282.   The violation of these statutes has directly caused Abbie significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering and her tragic death (and related Wrongful Death Act and Survival Act damages), and has denied Abbie at least $400,000 worth of education at MHS and $80,000 of post-secondary education benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

(a)   A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees abide by and comply in all respects with the terms of the FHA, the ADA and the ADA Settlement Agreement;

(b)   A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees develop and implement a written anti-discrimination policy, insuring that no student will be expelled or otherwise discriminated against because of his or her mental impairment in the future;

(c)   A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees conduct mandatory School-wide sensitivity training for all staff regarding depression and other mental impairments;

(d)   A permanent injunction, or in the alternative an order, requiring that Defendants create a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage;

(e)   A permanent injunction, or in the alternative an order, requiring that Defendants appoint an advocate for children to participate in all enrollment reviews;

(f)   A permanent injunction, or in the alternative an order, requiring that Defendants provide a commitment and assurance to continue care for children suffering from a mental health disability for a duration of at least

twelve (12) months from diagnosis before any decisions on termination or enrollment are made;

(g)    Actual and punitive damages, attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 3613;

(h)    Compensatory and actual damages to the Estate of Abrielle Kira Bartels, Deceased and to Julie Ellen Wartluft and Frederick L. Bartels, Jr. in an amount to be determined at trial;

(i)    Wrongful death damages to Julie Ellen Wartluft and Frederick L. Bartels, Jr. in an amount to be determined at trial;

(j)    Survival damages to the Estate of Abrielle Kira Bartels in an amount to be determined at trial;

(k)    Punitive damages in an amount to be determined at trial;

(l)    Cost and reasonable attorney's fees; and

(m)    Such other and further relief as this Court deems just and proper.

Respectfully submitted:

Dated:  June 30, 2016

Gregory F. Cirillo, Esquire
Matthew Faranda-Diedrich, Esquire
Alexander J. Nassar, Esquire
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
215-575-7000
Emails:  gcirillo@dilworthlaw.com
          mfd@dilworthlaw.com
          anassar@dilworthlaw.com
*Attorneys for Plaintiffs*

119124787_1