# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JULIE ELLEN WARTLUFT**, *et al.*, | : CIVIL ACTION NO. 1:16-CV-2145 |
| Plaintiffs | : (Chief Judge Conner) |
| v. | : |
| **THE MILTON HERSHEY SCHOOL**, *et al.*, | : |
| Defendants | : |

## MEMORANDUM

Plaintiffs filed the instant action against defendants the Milton Hershey School and the Hershey Trust Company, as Trustee for the Milton Hershey School Trust (collectively, "the School"), alleging federal and state claims in the wake of the tragic suicide of their daughter, Abrielle Kira Bartels ("Abrielle"). In this opinion, we will revisit our August 10, 2017 decision, which improvidently dismissed several of plaintiffs' tort claims pursuant to the gist of the action doctrine.

## I. Factual Background & Procedural History

Julie Ellen Wartluft (formerly Julie Ellen Bartels) and Frederick L. Bartels, Jr. (collectively, "plaintiffs") are the natural parents and administrators of the estate of the decedent, Abrielle. (Doc. 29 ¶ 1). Prior to her death, Abrielle was a student of the School, which is a private, nonprofit institution that offers cost-free education to low income children from pre-kindergarten through twelfth grade. (Id. ¶¶ 2, 16). The School also provides residential accommodations for students, housing them in group homes with supervisory "houseparents." (Id. ¶¶ 21-26). Abrielle enrolled in the School in August 2004 at the age of five. (Id. ¶ 16). At the time of enrollment,

Abrielle had "great social needs related to her family structure and home life," as her immediate family members suffered from severe mental health problems and substance abuse. (Id. ¶¶ 59-60). Prior to Abrielle's admission, plaintiffs executed the School's "Enrollment Agreement," a three-page document setting forth terms and conditions of enrollment including, *inter alia*, attendance, conduct and discipline, student dating, school-provided health care, release of personal information, visitation, textbooks, and religious services. (See Doc. 11-1 at 6-8).

Plaintiffs aver that Abrielle excelled and thrived during her nine years at the School. (Doc. 29 ¶¶ 16, 18). They describe Abrielle as a "model student," twice being named middle school "Student of the Month" and consistently achieving honor roll status. (Id. ¶¶ 17-18). She was also a member of the swim team and an "anti-bullying" organization. (Id. ¶ 18). Abrielle's likeness was even utilized by the School in marketing materials. (Id. ¶ 28). According to plaintiffs, Abrielle planned to graduate from the School, attend college, and then join the Federal Bureau of Investigation. (Id. ¶ 18).

Abrielle began eighth grade at the School in August 2012. (Id. ¶ 69). That year she allegedly was subjected to several incidents of bullying and experienced other stressors, including her father's likely incarceration for a second DUI offense and another student falsely accusing her of making physical threats. (Id. ¶¶ 70-72). In the face of these challenges, Abrielle's emotional well-being began to deteriorate. (Id. ¶ 70). In April 2013, as a result of the accusations of threatening behavior, Abrielle was removed from her student home and committed to the School's Health

Center, an "on-campus hospital-type facility." (Id. ¶¶ 73-74). After release from the Health Center, Abrielle's School psychologist, Benjamin Herr, M.D. ("Dr. Herr"), learned that she had recently expressed a desire to kill herself—a claim that Abrielle denied when questioned. (Id. ¶ 77). On May 1, 2013, Abrielle was again admitted to the Health Center for overnight observation after she expressed self-harm ideations and disclosed past self-harm conduct to her houseparents. (Id. ¶ 78). During her psychological examinations in the following weeks, Abrielle indicated that family difficulties, including her father's job loss, alcohol abuse, and potential loss of visitation rights, were animating her depression and thoughts of self-harm. (Id. ¶¶ 79-81, 83-84). Abrielle also expressed anxiety and discomfort regarding an upcoming visit to her father's residence in light of his alcohol problems and the volatility of his relationship with his female companion, whom Abrielle referred to as her "stepmother." (Id. ¶¶ 80-82).

Throughout May 2013, Abrielle underwent multiple admissions to the Health Center for suicidal ideations, depression, and anxiety. (Id. ¶¶ 83-88). She frequently reported during treatment that family concerns and instability were the driving forces behind her mental health issues and that she preferred to remain on campus rather than return to her father's home for holiday breaks. (Id.) On Dr. Herr's recommendation, Abrielle underwent inpatient treatment at an off-campus mental and behavioral health care facility from May 28 to June 5, 2013. (Id. ¶¶ 88-89). During inpatient therapy, Abrielle repeated the stressors of family mental health,

3

discord, and substance abuse as the impetus for her self-harm and suicidal ideations.  (Id. ¶ 89).

Abrielle's serious mental health problems continued when she returned to the School, necessitating further treatment and admissions to the Health Center.  (Id. ¶¶ 91-92).  On June 10, 2013, School physicians recommended that Abrielle again be treated at an inpatient mental health facility as soon as possible.  (Id. ¶ 93).  Abrielle was admitted to a different inpatient mental health care facility the following day, beginning a nine-day course of psychotherapy.  (Id. ¶ 96).

Plaintiffs allege that, despite knowing that Abrielle's depression and suicidal ideations were driven largely by her unstable family life, the School directed that she be discharged from inpatient care back to her family home rather than to her campus residence under the care of her houseparents.  (Id. ¶ 101).  According to plaintiffs, the School was operating under an official or unofficial "shadow policy," which mandated that students be expelled after two mental health hospitalizations in outside facilities, even if those hospitalizations were recommended by School medical staff.  (Id. ¶ 108).  Dr. Herr purportedly explained this two-hospitalization policy to Abrielle's mother before and during Abrielle's second inpatient hospitalization.  (Id. ¶ 114).  Dr. Herr also informed Abrielle of the policy, causing her to be "devastated" and "terrified of being thrown out" of school.  (Id.)  When a psychologist at the inpatient mental health care facility learned of the policy, she "expressed grave concern" to Dr. Herr about the effects of such a policy on Abrielle.  (Id. ¶ 115).  On June 19, 2013, the day Abrielle was discharged from her second

4

inpatient hospitalization back to her father's home, Dr. Herr informed Abrielle that there was a "significant likelihood" that she would be expelled. (Id. ¶¶ 118, 144).

Plaintiffs aver that, prior to Abrielle's second inpatient discharge, the School had performed an "enrollment review"—a closed-door, internal process by School administrators that essentially was a precursor to expulsion. (Id. ¶¶ 124-28). On June 20, 2013, the day before middle school graduation, the School informed Abrielle that it was rescinding her invitations to the graduation ceremony and her houseparents' graduation barbeque. (Id. ¶ 130). The School further barred her from returning to campus and from attending ninth grade. (Id.) School officials allegedly told Abrielle's mother that the School may consider allowing Abrielle to return for tenth grade if she could satisfy certain conditions, which plaintiffs maintain were nearly impossible to meet.[1] (Id.) Plaintiffs aver that Abrielle's houseparents and Dr. Herr disagreed with the School's decision to prohibit Abrielle from attending graduation. (Id. ¶ 132). Dr. Herr also opposed expulsion, outlining in his records a lengthy list of reasons why Abrielle should be permitted to return to the School. (Id. ¶ 134).

Tragically, ten days after she was discharged from her second off-campus inpatient hospitalization to her father's home, Abrielle took her own life. (Id. ¶¶ 139, 144). Plaintiffs allege that Abrielle's suicide was preventable and was caused by her compelled return to her father's unstable home rather than to her campus

---

[1] For example, one of the purported conditions was to "be free of all depressive symptoms and express zero suicidal ideation for a period of 6 months" as reported by Abrielle, her legal guardian, and her therapist. (Id. ¶ 136).

5

residence, being barred from attending graduation and her houseparents' celebration, and being prohibited from attending the School for at least the first year of high school. (Id. ¶¶ 144-47).

Plaintiffs commenced this action in the United States District Court for the Eastern District of Pennsylvania. The Eastern District transferred the matter to this district pursuant to 28 U.S.C. § 1404(a). Plaintiffs filed an amended complaint in October 2016, wherein they allege violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, (Count I), as well as state law tort claims for negligence (Count III), wrongful death (Count V), damages pursuant to Pennsylvania's Survival Act, 42 PA. CONS. STAT. ANN. § 8302 (Count VI), negligent misrepresentation (Count VII), intentional misrepresentation (Count VIII), intentional infliction of emotional distress (Count IX), negligent infliction of emotional distress (Count X), civil conspiracy to endanger children (Count XI), breach of fiduciary duties of care and good faith (Count XII), and negligence *per se* (Count XIII).[2]

The School moved to dismiss Counts III, VII, VIII, IX, X, XI, and XII of the amended complaint. In a memorandum opinion dated August 10, 2017, this court granted the School's motion to dismiss. Wartluft v. Milton Hershey Sch. & Sch. Tr., No. 1:16-CV-2145, 2017 WL 3433803, at *1, 4 (M.D. Pa. Aug. 10, 2017). We held that the challenged state law tort claims were barred by the gist of the action doctrine and that amendment would be futile. Id. at *2-3. Plaintiffs moved to amend the

---

[2] Plaintiffs' claims are not consecutively numbered; the amended complaint skips both Counts II and IV. (See Doc. 29 ¶¶ 160-97).

6

August 10, 2017 order to permit interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which the court denied.  Motion practice in a companion case to the instant matter recently compelled reconsideration of the court's gist of the action ruling therein.  See Dobson v. Milton Hershey Sch., No. 1:16-CV-1958, Doc. 127 (M.D. Pa. Dec. 7, 2018) (Conner, C.J.).  Upon review, we will vacate our prior ruling on the motion to dismiss in this action as well.

## II.     Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents.  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

So long as a district court has jurisdiction over a case, it has "the inherent power to reconsider prior interlocutory orders" when consonant with justice to do so. State Nat'l Ins. Co. v. County of Camden, 824 F.3d 399, 406 & n.14 (3d Cir. 2016) (citing United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973)). We find that this case presents the rare situation where justice requires us to reconsider, *sua sponte*,

our interlocutory Rule 12(b)(6) order. We first address our prior analysis regarding the gist of the action doctrine. We then turn to the School's arguments regarding the sufficiency of several of plaintiffs' tort claims, arguments we previously found unnecessary to reach.

### A. Tort Claims and "Gist of the Action" Doctrine

In our August 10, 2017 decision, we found—in abbreviated fashion—that the state law tort claims challenged by the School were barred by the gist of the action doctrine. Upon review of a similar issue in a related case, we conclude that our dismissal of these tort claims was improvidently rendered. We will therefore vacate our prior opinion and reinstate plaintiffs' dismissed tort claims in accordance with our discussion *infra*.

#### 1. *Gist of the Action Doctrine*

Under the gist of the action doctrine, a contracting party cannot assert a tort claim against another party to the contract when the gravamen of such a claim is, in actuality, breach of contract. Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014).[3] When distinguishing between tort and breach of contract claims at the motion to dismiss stage, the determinative factor is "the nature of the duty alleged to have been breached" as pled by the plaintiff. Id. If the duty is created by the terms of the parties' agreement, then the claim sounds in breach of contract; if it derives

---

[3] The parties agree that Pennsylvania law governs the instant state law claims.

9

from a defendant's "broader social duty owed to all individuals," the claim must be regarded as a tort. Id. at 68-69.

It is true, as we previously observed, that the Pennsylvania Superior Court has described the relationship between a student and a private school as "contractual in nature." McCabe v. Marywood Univ., 166 A.3d 1257, 1262 (Pa. Super. Ct. 2017) (quoting Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)). But the Superior Court rendered that holding in the context of the viability of a student's breach of contract claim against a private school when the school allegedly violates "guidelines, polices, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." Id. That contractual association, however, does not exclusively define the relationship between a private school and its students. A contract between a student and a private institution may establish certain rights and obligations, but it is axiomatic that there may be *other* legal duties owed by private institutions to their students defined by different sources of law, including tort law. See, e.g., Feleccia v. Lackawanna Coll., 156 A.3d 1200, 1216 (Pa. Super. Ct. 2017) (holding private college owed tort-based duty of care to students participating in school-sponsored, school-supervised athletic activities on college property); RESTATEMENT (SECOND) TORTS §§ 342, 343A (AM. LAW INST. 1965).

The question then is whether plaintiffs' negligence, emotional distress, misrepresentation, civil conspiracy, and fiduciary duty claims implicate contractually based obligations or "broader social dut[ies]" owed by the School to

its students. We find the latter to be the case, and now hold that the gist of the action doctrine does not bar the tort claims challenged by the School in its motion to dismiss.

In Count III, plaintiffs assert a standard negligence claim against the School. They allege the School exercised year-round custody, care, and control over students and functioned as primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care. Plaintiffs aver that the School, in this "*in loco parentis*" status,[4] owed Abrielle a duty of care, independent of any contractual obligation, to protect her from harm. Plaintiffs assert that the School breached this duty by, *inter alia*, recommending Abrielle undergo two inpatient hospitalizations so it could expel her rather than continue providing psychological care; permitting Abrielle to be discharged from inpatient care to her parents instead of maintaining custody over her to provide further necessary psychological treatment; failing to develop a care plan for her before she was discharged to her parents; failing to provide adequate psychological care for her prior to her discharge from the second inpatient facility; threatening expulsion or a forced leave of absence simply because Abrielle was suffering from a mental impairment; and rescinding Abrielle's invitation to attend her graduation and related festivities, exacerbating her depression. These allegations implicate social duties which are broader in scope than applicable contractual obligations.

---

[4] (See Doc. 29 ¶¶ 25-36, 184-87); see also Peters v. Costello, 891 A.2d 705, 710 (Pa. 2005) (defining "*in loco parentis*"); RESTATEMENT (SECOND) TORTS § 314A(4).

Notwithstanding the existence of the Enrollment Agreement (and any other written policies or guidelines), we conclude that the nature of the duty alleged in plaintiffs' negligence claim is based on custodial care and protection of minor children and exists independent of any contractual obligation.[5] The gist of the action doctrine does not apply to such a claim.

The same is true for plaintiffs' infliction of emotional distress claims in Counts IX and X. Plaintiffs aver that the School negligently or intentionally caused significant emotional distress and physical harm. The alleged conduct includes ignoring Abrielle's serious mental health issues and family-based causative factors, consciously disregarding prior settlement agreements involving discrimination against students with disabilities, threatening to expel Abrielle on the basis of her mental impairments when she was most fragile, discharging Abrielle back to her parents rather than allowing her to return to school to receive ongoing psychological care in her preferred environment, and callously rescinding invitations to Abrielle and her family to attend middle school graduation and related festivities. We reject the School's argument that these claims are grounded in contract. Plaintiffs' allegations may imply that the School violated the Enrollment Agreement or some of its own anti-discrimination policies, but even if this were true it would not transform plaintiffs' emotional distress claims into

---

[5] We note that even if some of plaintiffs' allegations implicate portions of the Enrollment Agreement regarding school-provided healthcare, (see Doc. 11-1 at 7, ¶ 8), and thus appear to assert a breach of that agreement, Pennsylvania law is clear that negligent *performance* of a contractual duty still sounds in tort. Bruno, 106 A.3d at 69-70.

12

breach of contract claims.  Plaintiffs are alleging that the School inflicted severe emotional distress—either negligently or intentionally—through its purportedly egregious conduct toward Abrielle.  The essence of these claims derives from tort law and the broader social policies implicated thereby, not contract law.

Plaintiffs' misrepresentation, civil conspiracy, and breach of fiduciary duty claims are no different.  The allegations underlying these claims involve purported wrongdoing by the School outside of any "contractual" obligations that may have existed under the Enrollment Agreement or any other written materials provided to Abrielle or her family.  For example, plaintiffs aver that School officials and administrators knowingly conspired to endanger the welfare of its students by implementing discriminatory and dangerous mental health policies despite the foreseeable risks such conduct posed to students with disabilities.  Plaintiffs also contend that the School made numerous false representations to them regarding the psychological care the School would provide Abrielle while in its custody, inducing reliance on the School's treatment and leading to Abrielle's suicide.  Plaintiffs likewise allege that the School breached a fiduciary duty to Abrielle by failing to hire and appoint qualified administrators and board members, failing to implement appropriate institutional policies and controls to prevent discrimination, and failing to comport with previous anti-discrimination settlements and policies.  The gravamen of these claims implicates a more fulsome social duty to all individuals not falling within the ambit of any contractual duty that may exist

between plaintiffs and the School. Consequently, the gist of the action doctrine does not bar plaintiffs' challenged tort claims.

### 2. *Sufficiency Challenges Under Rule 12(b)(6)*

In its motion to dismiss, the School also challenged the sufficiency of plaintiffs' misrepresentation and intentional infliction of emotional distress claims. We did not previously reach those challenges but will do so now.

#### a. **Misrepresentation**

The elements for intentional misrepresentation are: (1) the defendant made a material misrepresentation of fact; (2) the defendant knew the representation was false or acted recklessly as to its falsity; (3) the defendant intended to mislead the plaintiff into relying on the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the resulting injury was proximately caused by the plaintiff's justifiable reliance. See Porreco v. Porreco, 811 A.2d 566, 570 (Pa. 2002) (citing Bortz v. Noon, 729 A.2d 555, 560 (1999)). Negligent misrepresentation consists of nearly identical elements, except the negligence version only requires that the defendant "ought to have known" the representation was false. Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270, 277 (Pa. 2005) (quoting Bortz, 729 A.2d at 561). The existence of a duty of care owed by one party to the other is, logically, a precondition for a "negligent" misrepresentation claim. Id. at 277, 280.

The School contends that plaintiffs' misrepresentation claims are insufficient because they fail to allege facts showing justifiable reliance on a representation or

14

that the School had the requisite intent of inducing action in response to its representations. Assuming, *arguendo*, that the School's multiple representations regarding health care and nondiscrimination are material and plaintiffs reasonably relied on those representations, the amended complaint is still deficient. Plaintiffs aver that they "justifiably relied upon [the School's] representations, which caused [Abrielle] to succumb to suicide and to suffer the other damages described herein." (Doc. 29 ¶ 214). This type of conclusory pleading fails to state a claim for relief. Plaintiffs do not explain how their reliance on the School's misrepresentations *caused* Abrielle's suicide or other injuries. In other words, the amended complaint fails to state how plaintiffs or Abrielle acted, or refrained from acting, in reliance on the School's representations such that Abrielle's injuries were proximately caused thereby. See Fletcher-Harlee Corp. v. Szymanski, 936 A.2d 87, 100-01 (Pa. Super. Ct. 2007) (explaining that fraud—i.e., intentional misrepresentation—requires inducing plaintiff to act or fail to act causing plaintiff detriment); *Reliance*, BLACK'S LAW DICTIONARY (10th ed. 2014). We will therefore dismiss without prejudice plaintiffs' negligent and intentional misrepresentation claims.

### b. Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was "substantially certain" to occur. Brown v. Muhlenberg Township, 269 F.3d 205, 217-18 (3d Cir. 2001) (quoting

RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).[6] Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the court's determination. M.S. *ex rel.* Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014) (citing Reimer v. Tien, 514 A.2d 566, 569 (Pa. Super. Ct. 1986)). The Supreme Court of Pennsylvania has cited approvingly the Superior Court's requirement that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (alteration in original) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

The School argues that plaintiffs' intentional infliction of emotional distress claims are insufficient because plaintiffs have not properly pled physical harm and because the alleged conduct does not rise to the extreme degree necessary to state a cause of action. Plaintiffs appear to assert intentional infliction of emotional distress claims in a personal capacity as well as on behalf of Abrielle. (See Doc. 29 ¶ 230). As to infliction of emotional distress on Abrielle, plaintiffs aver that due to the School's conduct, she suffered "physical manifestations of emotional distress," "conscious pain and suffering, "bodily harm," and, ultimately, suicide. (Doc. 29

---

[6] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress. See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000). The Third Circuit has predicted that the state's high court will ultimately adopt the Restatement (Second) of Torts' formulation. Williams v. Guzzardi, 875 F.2d 46, 50-51 (3d Cir. 1989); see also Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652).

16

¶¶ 139, 193, 226, 230). Allegations of suicide clearly satisfy the "physical harm" requirement for an intentional infliction of emotional distress claim.[7]

To the extent plaintiffs assert personal claims for emotional distress, they do not plausibly allege that they experienced any physical harm. The sole injury plaintiffs assert is "severe physical and emotional distress, including severe mental anguish and horror[.]" (Id. ¶ 230). This averment, without more, does not suffice under Pennsylvania law. In Abadie v. Riddle Memorial Hospital, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991), the Superior Court found that allegations of psychological factors affecting a plaintiff's "physical condition" and causing "injuries" that would require future medical care were inadequate to plead physical harm. Conversely, in Love v. Cramer, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992)—a case cited by plaintiffs—the complainant alleged physical manifestations including "nightmares, stress[,] and anxiety," which the court found sufficient to state physical injury. Plaintiffs' allegations fail to establish that they suffered physical harm. We will thus dismiss without prejudice plaintiffs' individual claims for intentional infliction of emotional distress.

As for the School's second contention, we find that the conduct as pled rises to the requisite "outrageous" level. Plaintiffs aver that the School threatened to expel Abrielle due to her mental impairments and did, in fact, suspend her for at least ninth grade the day after she was discharged from inpatient treatment for

---

[7] Neither party discusses the viability of maintaining an intentional infliction of emotional distress claim when a decedent is the individual who suffered the emotional distress. Consequently, we do not reach this question.

17

severe depression and suicidal ideation.  This conduct allegedly occurred on the heels of a settlement with the Department of Justice regarding the School's mistreatment of students with disabilities.  The School also purportedly forced Abrielle to be discharged back to her natural family, who had their own mental health, legal, and substance abuse issues that were the driving factors in Abrielle's severe depression.  According to plaintiffs, the School knowingly removed Abrielle from her campus home of nine years and put her in the exact environment that was causing her depression and suicidal tendencies.  Plaintiffs further allege that the School encouraged Abrielle to get inpatient mental health care while knowing that such treatment would result in automatic expulsion or suspension under the two-hospitalization policy.  These allegations, taken together, are sufficiently extreme and outrageous as to be considered "utterly intolerable in a civilized society."  Hoy, 720 A.2d at 754 (quoting Buczek, 531 A.2d at 1125).  Accordingly, we will deny the School's motion to dismiss the intentional infliction of emotional distress claim filed on Abrielle's behalf.

## IV. Conclusion

Upon reconsideration, we will vacate our August 10, 2017 memorandum and order. (Docs. 62, 63). We will reinstate plaintiffs' challenged state law tort claims with the exception of negligent and intentional misrepresentation (Counts VII and VIII, respectively) and intentional infliction of emotional distress as to plaintiffs (Count IX). These three claims will be dismissed without prejudice. In light of today's decision, we will dismiss the School's motion (Doc. 119) for judgment on the pleadings and motion (Doc. 158) for summary judgment without prejudice to the right to reinstitute and supplement said motions at the request of the parties. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     December 7, 2018