## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE ELLEN WARTLUFT F/K/A JULIE ELLEN BARTELS AND FREDERICK L. BARTELS, JR., Individually and as Administrators of the Estate of Abrielle Kira Bartels, Deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>THE MILTON HERSHEY SCHOOL, and THE HERSHEY TRUST COMPANY, AS TRUSTEE OF THE MILTON HERSHEY SCHOOL TRUST,<br><br>Defendants / Third-Party Plaintiffs,<br><br>vs.<br><br>KAREN FITZPATRICK, and THOMAS FITZPATRICK,<br><br>Third-Party Defendants. | C.A. NO.:<br>1:16-cv-02145-JEJ<br><br>(Jones III, J.)<br><br>Jury Trial Demanded |

## DEFENDANTS/THIRD-PARTY PLAINTIFFS' COMPLAINT AGAINST THIRD-PARTY DEFENDANTS KAREN FITZPATRICK <u>AND THOMAS FITZPATRICK</u>

Defendants / Third-Party Plaintiffs, the Milton Hershey School ("MHS" or the "School") and The Hershey Trust Company ("HTC"), as trustee of The Milton Hershey School Trust (collectively, "Defendants"), through undersigned counsel, hereby file this Third-Party Complaint against Third-Party Defendants Karen Fitzpatrick ("Ms. Fitzpatrick"), and Thomas Fitzpatrick ("Mr. Fitzpatrick") for

contribution under Pennsylvania's Uniform Contribution Among Joint Tortfeasors Act, 42 Pa. C.S.A. § 8321, *et seq.*

A.B.'s parents have chosen to bring this lawsuit for damages against Defendants.  Plaintiffs' lawsuit, however, completely ignores the Individual Plaintiffs' undeniable culpability in A.B.'s death, as well as that of Ms. Fitzpatrick, and Mr. Fitzpatrick.

MHS is a cost-free, not-for-profit residential school established in 1910, to provide a positive, structured academic and residential curriculum to help children gain the skills and opportunities to be successful in all aspects of life. Today, MHS is among the largest residential schools in the nation, offering individualized attention, small class sizes, and topnotch academic programs to children in prekindergarten through 12th grade from low-income families.

A.B. began attending MHS in 2004 in kindergarten. In her eighth grade year, A.B.'s mental health began to rapidly deteriorate as a result of depression and suicidal ideations.  In response, Plaintiffs, Julie Ellen Wartluft f/k/a Julie Ellen Bartels ("Ms. Wartluft"), and Frederick L. Bartels, Jr. ("Mr. Bartels") (together, "Individual Plaintiffs"), with Ms. Fitzpatrick, a legal guardian of A.B. authorized by the Individual Plaintiffs to exercise legal and physical custody of A.B., requested that A.B. be permitted to leave MHS and reside and attend public school in Newport, PA where Ms. Fitzpatrick, Mr. Bartels, and Mr. Fitzpatrick resided in

a recently-renovated, suburban, two-story home.  A.B. wanted to leave MHS and go home, and the Individual Plaintiffs and Ms. Fitzpatrick wanted her home.  In May 2013, according to the Individual Plaintiffs and Ms. Fitzpatrick, A.B.'s departure from MHS was what was best for her, as A.B. was homesick and desired to attend public school in Newport like her brother, who also resided with Ms. Fitzpatrick and Mr. Fitzpatrick, and for whom the Individual Plaintiffs had also authorized Ms. Fitzpatrick to exercise legal and physical custody.

In May 2013, A.B.'s mental health deteriorated to a degree that precluded her from participating in MHS's academic and residential curriculums.  A.B.'s thoughts of suicide continued to intensify, necessitating a higher level of care than MHS could provide.  An in-patient mental health hospitalization was required to treat A.B. on May 28, 2013.  On June 5, 2013, A.B. was discharged to her parents.

Soon after returning to MHS, A.B. disclosed to a classmate that she was again experiencing urges to harm herself and that her medication was not working. At that that time, A.B.'s suicidal ideation was rated a 10 out of 10.  Accordingly, A.B. required a higher level of care than MHS could provide, necessitating her readmission to an in-patient mental health institution to treat her recurring and increasingly severe suicidal ideations.

Therefore, on June 11, 2013, with the consent of the Individual Plaintiffs and Ms. Fitzpatrick, A.B. was admitted to Pennsylvania Psychiatric Institute ("PPI").

PPI conducted its own independent assessment of A.B., and concluded that she required in-patient treatment at its facilities. In anticipation of her discharge from PPI, Ms. Wartluft and Ms. Fitzpatrick worked collaboratively with PPI and outside mental health providers that they identified to fashion a discharge plan for A.B. The discharge plan crafted by PPI, with the participation and express agreement of Ms. Wartluft and Ms. Fitzpatrick, did not involve MHS, nor did it include any provision for treatment by MHS clinicians.

To ensure continuity of A.B.'s care, the discharge plan crafted by PPI, with the express consent of Ms. Fitzpatrick and Ms. Wartluft, required treatment of A.B. upon her discharge from PPI with a psychotherapist, specifically Lesley P. Davis ("Ms. Davis"), of Pinnacle Health Psychological Associates ("PHPA") at "Brady Hall." Ms. Davis is a psychotherapist that Ms. Wartluft identified to PPI for the provision of the required services to A.B., and with whom PPI, at Ms. Wartluft's direction, coordinated aftercare of A.B., commencing with an appointment for treatment just hours after her discharge from PPI.

In addition to continuing care of A.B. with Ms. Davis, the discharge plan also directed Ms. Wartluft and Ms. Fitzpatrick to ensure that: A.B.'s medication, Zoloft, was taken as prescribed; medication monitoring was arranged with PHPA; family-based mental health services were engaged to provide for A.B.'s long-term aftercare needs; A.B. attended all follow-up appointments with PHPA; and they

4

knew to contact crises intervention offices or the nearest emergency room if urgent assistance related to A.B.'s mental health was required.  Ms. Wartluft and Ms. Fitzpatrick agreed to the terms of PPI's discharge plan, and accepted the responsibility of implementing the discharge plan for the benefit of A.B. and the treatment of her mental health needs.

On June 19, 2013, A.B. was discharged to Ms. Wartluft and Ms. Fitzpatrick pursuant to the plan for aftercare crafted by A.B.'s treating clinicians at PPI, and in conjunction with, and by the express agreement of, the Individual Plaintiffs and Ms. Fitzpatrick.  Immediately upon her discharge on June 19, 2013, A.B. was transported by Ms. Fitzpatrick from PPI to Brady Hall where Ms. Wartluft met them for Ms. Davis's initial treatment session with A.B.   Following the appointment with Ms. Davis, Ms. Wartluft scheduled a follow-up appointment with Ms. Davis for A.B.  However, she failed to demand or select the earliest appointment for A.B. available on Ms. Davis's schedule.

Following her initial session with Ms. Davis, A.B. returned to Mr. Bartels', Ms. Fitzpatrick's, and Mr. Fitzpatrick's home in Newport, PA – the same location where, just one month prior, the Individual Plaintiffs and Ms. Fitzpatrick had advised MHS that they and A.B. wanted her to be.

Unfortunately, once A.B. was with the Individual Plaintiffs and Ms. Fitzpatrick, as they had requested in May 2013, the Individual Plaintiffs, Ms.

Fitzpatrick, and Mr. Fitzpatrick repeatedly and tragically failed to adequately care for A.B. These parental and custodial failures included, *inter alia*: (i) dismissing A.B.'s depression and suicidal thoughts as merely "teenage angst" and generally ignoring the severity of A.B.'s mental health symptoms; (ii) failing to administer PPI's prescribed psychotropic medications to A.B. prior to her death; (iii) failing to notify authorities or A.B.'s treating physicians that A.B.'s psychotropic medication had gone missing three days before her suicide; (iv) failing to follow PPI's clear and direct discharge instructions for A.B.'s aftercare; (v) failing to schedule the earliest available appointment for A.B.'s psychological treatment after discharge from PPI, leaving A.B. with no psychological care during the ten (10) days from her discharge from PPI until she died by suicide at Mr. Bartels', Ms. Fitzpatrick's, and Mr. Fitzpatrick's home on June 29, 2013; (vi) and failing to adequately supervise A.B., leaving her on the day of her death, and just ten (10) days following her discharge from a mental health institution for severe suicidal ideations, in the custody of Ms. Fitzpatrick's elderly father, Mr. Fitzpatrick, who advised the Pennsylvania State Police that despite A.B. having told him recently that "life was not worth living," coupled with his knowledge that A.B.'s psychotropic medication had gone missing days before, he left A.B. alone in the home in the morning hours of June 29, 2013, and alone in her room for an extended period prior to discovering her death by suicide.

A.B. was never terminated from MHS. There is no "shadow policy" as the Amended Complaint avers. And at the time of her death by suicide, MHS was on summer break, and A.B. was home, in the custody of her family, just as she had been every summer since her enrollment began in 2004.

## PARTIES

1.     Third-Party Defendant Ms. Wartluft alleges to be a competent adult who resides in Cottonwood, Yavapai County, AZ, and the mother and natural guardian of decedent, A.B.

2.     Third-Party Defendant Mr. Bartels alleges to be a competent adult who resides in Snyder County, PA, and the father and natural guardian of decedent, A.B. At all relevant times, Mr. Bartels resided with the Fitzpatricks at 465 North 4th Street, Newport, PA 17074, or in the Perry County Prison.

3.     Third-Party Defendant Ms. Fitzpatrick is a competent adult who resides at 465 North 4th Street, Newport, PA 17074. At all relevant times, Ms. Fitzpatrick was Mr. Bartels' live-in girlfriend and a legal guardian of A.B., authorized by the Individual Plaintiffs to exercise legal and physical custody of A.B.

4.     Third-Party Defendant Mr. Fitzpatrick is a competent adult who resides at 465 North 4th Street, Newport, PA 17074, and is the father of Ms.

Fitzpatrick.  Mr. Fitzpatrick was authorized by the Individual Plaintiffs and Ms. Fitzpatrick to exercise physical custody of A.B.

5.     MHS is a cost free, private, residential school with grades pre-Kindergarten to 12th for income-eligible families that is organized and exists under the laws of the Commonwealth of Pennsylvania.  MHS is located at 711 Crest Lane, Hershey, PA, 17033, and today is amongst the largest residential schools in the nation, offering individualized attention, small class sizes, and first-rate academic programs.

6.     HTC is a for-profit, state-chartered trust company founded in 1905, and serves as the trustee for the Milton Hershey School Trust.  HTC is located at 100 Mansion Road East, Hershey, PA 17033.

## JURISDICTION

7.     The Court has federal question jurisdiction of the claims asserted in the Amended Complaint under 28 U.S. C. § 1331.  Further, more than the sum of $75,000, exclusive of interest and costs, is in dispute in this action.

8.     The Court has supplemental jurisdiction over the joinder claims asserted in this Third-Party Complaint under 28 U.S.C. § 1367(a) because the claims asserted here form part of the same case and controversy as the claims asserted in the Amended Complaint.

## FACTUAL BACKGROUND

9.     This action stems from A.B.'s death by suicide on Saturday, June 29, 2013, at the home of Mr. Bartels, Ms. Fitzpatrick, and Mr. Fitzpatrick in Newport, PA.

10.     In 2004, A.B. began attending kindergarten at MHS.

11.     Every summer after the school year ended, A.B. went home to stay with her family in: (i) Newport, PA, with Mr. Bartels, Ms. Fitzpatrick, and Mr. Fitzpatrick; (ii) Steelton, PA, with Ms. Wartluft; and/or (iii) Cottonwood, AZ with her grandparents, the Nenningers (Ms. Wartluft's parents).

12.     A.B. also went home to Newport, PA, and/or Steelton, PA, nearly every weekend of the school year, each and every school break, and every vacation period when school was not in session.

13.     The School's Year Round Experience ("YRE") program is a type of summer camp experience that lacks the same level of supervision offered to students during the school year.

14.     Consistent with A.B.'s history of enrollment at the School, neither Ms. Wartluft, Mr. Bartels, nor Ms. Fitzpatrick sought enrollment for A.B. in YRE for the summer of 2013.

15.     In fact, in the spring of 2013, Ms. Wartluft expressly declined participation by A.B. in YRE as Ms. Wartluft and Ms. Fitzpatrick indicated their

9

preference that A.B. stay at home in Newport, PA, Steelton, PA, and/or Cottonwood, AZ for the summer of 2013.

16.    In 2013, when A.B. was in eighth grade, A.B.'s mental health deteriorated and she disclosed that she was depressed and had suicidal ideations.

17.    MHS provided A.B. with the counseling services of Dr. Ben Herr, a licensed psychologist, who provided A.B. treatment for her mental health needs at the School.

18.    Ms. Wartluft, Mr. Bartels, and Ms. Fitzpatrick consented to MHS providing A.B. psychological services while A.B. was at school and consulted with Dr. Herr regarding A.B.'s mental health.

19.    In May of 2013, A.B. reported to Ms. Fitzpatrick that she wanted to leave MHS and attend school at home in Newport, PA with her brother.

20.    As a result of this, Ms. Wartluft and Ms. Fitzpatrick petitioned the school to allow A.B. to take a leave of absence in May of 2013.

21.    Ms. Fitzpatrick told the School that A.B. "is tired and needs a break of her rigid schedule" and "right now she is overwhelmed scholastically and emotionally and she isn't dealing well with it like she has in the past."

22.    A.B. wanted to leave MHS and go home to Newport and/or Steelton and Ms. Wartluft wanted her home.

23.    AB wanted to leave MHS and go home to Newport and/or Steelton and Ms. Fitzpatrick also wanted her home.

24.    On May 21, 2013, while at the School, A.B. expressed a desire to kill herself.

25.    Dr. Herr conducted a clinical risk assessment, consulted with peers, and provided out-patient clinical treatment to A.B. consistent with best practices.

26.    On May 28, 2013, Dr. Herr determined that A.B.'s suicidality presented an unacceptably high risk and that her mental health had deteriorated to a degree that required an in-patient hospitalization. Dr. Herr determined that because A.B.'s thoughts of suicide continued to intensify, she required a higher level of care than he could provide at the School.

27.    As a result of Dr. Herr's assessment of A.B.'s mental health needs, he referred A.B. to Philhaven, an in-patient mental health hospital.

28.    Philhaven independently evaluated A.B. and determined that A.B. required in-patient hospitalization.

29.    Ms. Wartluft consented to the treatment of A.B. by Philhaven and A.B. was subsequently admitted to Philhaven for in-patient mental health treatment from May 28, 2013, through June 5, 2013.

30.     On or about June 5, 2013, Mr. Bartels was incarcerated at the Perry County Prison, and delegated his parental rights and responsibility for A.B.'s legal and physical custody to Ms. Wartluft and Ms. Fitzpatrick with their consent.

31.     A.B. was discharged from Philhaven to her parents on June 5, 2013, and Ms. Wartluft, in turn returned A.B. to MHS to resume A.B.'s participation in the School's academic and residential programs.

32.     Two days later, however, A.B. disclosed to a classmate that she was experiencing urges to harm herself and that her medication was not working.

33.     Thereafter, a psychiatrist, Dr. Jeanette Morales-Brand, conducted an assessment that rated A.B.'s suicidality a 10 out of 10.   Dr. Morales-Brand determined that A.B.'s mental health needs required a higher level of care than that which could be provided at the School, and that A.B. required an in-patient hospitalization to treat her suicidal ideations.

34.     Professionals from MHS made appropriate referrals for A.B.'s treatment.  A bed was not available at Philhaven.

35.     Therefore, MHS professionals referred A.B. to PPI after determining that there was a bed available for her there.

36.     PPI conducted its own independent assessment of A.B., and concluded that A.B. indeed required in-patient treatment at its facility.

37.     Ms. Wartluft consented to A.B.'s hospitalization at PPI.

38.     PPI treating clinicians switched A.B.'s medication from Prozac to Zoloft.

39.     Ms. Wartluft consented to PPI's change in A.B.'s medication.

40.     MHS communicated to PPI that there was a concern that MHS's services could not appropriately meet the level of care that A.B. required to address her mental health needs.

41.     In anticipation of her discharge from PPI, Ms. Wartluft and Ms. Fitzpatrick worked collaboratively with PPI and outside mental health providers that they identified to fashion a discharge plan for A.B.

42.     The discharge plan crafted by PPI, with the participation and express agreement of Ms. Wartluft and Ms. Fitzpatrick, did not involve MHS, nor did it include any provision for treatment by MHS clinicians.

43.     Prior to her discharge, A.B. executed releases of information to several mental health providers to ensure continuity of care.

44.     A.B. signed the discharge plan and instructions affirming that she acknowledged and understood them.

45.     Ms. Fitzpatrick signed the discharge plan and instructions affirming that she acknowledged and understood them.

46.     PPI discharged A.B. to Ms. Wartluft and Ms. Fitzpatrick on June 19, 2013, after Ms. Wartluft and Ms. Fitzpatrick expressly agreed to the terms of PPI's

discharge plan and accepted the responsibility of implementing the discharge plan for the benefit of A.B.

47.     Neither Ms. Wartluft nor Ms. Fitzpatrick advised MHS of A.B.'s pending discharge from PPI.

48.     In fact, MHS had no notice that A.B. was being discharged from PPI.

49.     Further, MHS only learned that A.B. had been discharged from PPI after her discharge.

50.     The outside mental health provider that Ms. Wartluft identified to PPI for the provision of the required services to A.B. was a psychotherapist, Ms. Davis, with whom PPI, at Ms. Wartluft's direction, coordinated aftercare of A.B., commencing with an appointment for treatment just hours after her discharge from PPI.

51.     In addition to continuing care of A.B. with Ms. Davis, the discharge plan also directed Ms. Wartluft and Ms. Fitzpatrick to ensure that: A.B's medication, Zoloft, was taken as prescribed; medication monitoring was arranged with PHPA; family-based mental health services were engaged to provide for A.B.'s long-term aftercare needs; A.B. attended all follow-up appointments with PHPA; and they knew to contact crises intervention offices or the nearest emergency room if urgent assistance related to A.B.'s mental health was required.

52.     Ms. Wartluft and Ms. Fitzpatrick agreed to the terms of PPI's discharge plan, and accepted the responsibility of implementing the discharge plan for the benefit of A.B. and the treatment of her mental health needs.

53.     Thus, on June 19, 2013, A.B. was discharged to Ms. Wartluft and Ms. Fitzpatrick pursuant to the plan for aftercare crafted by A.B.'s treating clinicians at PPI, and in conjunction with, and by the express agreement of Ms. Wartluft and Ms. Fitzpatrick.

54.     Immediately upon her discharge on June 19, 2013, A.B. was transported by Ms. Fitzpatrick from PPI to Brady Hall where Ms. Wartluft met them for Ms. Davis's initial treatment session with A.B.

55.     Following the appointment with Ms. Davis, Ms. Wartluft scheduled a follow-up appointment with Ms. Davis for A.B.  However, she failed to demand or select the earliest appointment for A.B. available on Ms. Davis's schedule.

56.     Following her initial session with Ms. Davis, A.B. returned to Mr. Bartels', Ms. Fitzpatrick's, and Mr. Fitzpatrick's home in Newport, PA – the same location where, just one month prior, the Individual Plaintiffs and Ms. Fitzpatrick had advised MHS that they and A.B. wanted her to be.

57.     On June 19, 2013, Ms. Fitzpatrick filled A.B.'s 50 mg Zoloft prescription at Weis's pharmacy in Newport, PA.

58.     However, from June 19, 2013 to June 29, 2013, Ms. Wartluft and Ms. Fitzpatrick failed to implement PPI's discharge plan in order to treat her mental health needs, notwithstanding their express agreement to the terms of PPI's discharge plan and accepting the responsibility of implementing the discharge plan for the benefit of A.B, with fatal consequences for A.B.

59.     On or about June 26, 2013 – one week after PPI discharged A.B. into the care of Ms. Fitzpatrick, A.B.'s Zoloft prescription "went missing."

60.     Ms. Wartluft, Ms. Fitzpatrick, and Mr. Fitzpatrick were all aware that A.B.'s psychotropic medication had "gone missing" prior to A.B.'s death by suicide on June 29, 2013.

61.     No one, including Ms. Wartluft, Ms. Fitzpatrick, or Mr. Fitzpatrick, notified the authorities, medical personnel, emergency services, A.B.'s family doctor, Dr. Kendra Davis, or A.B.'s assigned treating psychotherapist, Ms. Davis, that her prescription was "missing."

62.     Significantly, they also failed to attempt to replace A.B.'s missing prescription medication.

63.     Ms. Wartluft, Ms. Fitzpatrick, and Mr. Fitzpatrick failed to adequately supervise A.B., including, but not limited to, leaving her unsupervised for an extended period of time in the custody of Mr. Fitzpatrick, who reported to the Pennsylvania State Police that he left A.B. alone at home in the morning hours of

June 29, 2013, and alone in her room for an extended period of time prior to his discovery of A.B.'s death by suicide.

64.   Mr. Fitzpatrick left A.B. alone on June 29, 2013, despite A.B. having told him recently that "life was not worth living," and knowing that A.B.'s psychotropic medication had gone missing days before.

65.   From June 19, 2013 through June 29, 2013, after A.B.'s discharge from PPI,  Ms. Wartluft, Ms. Fitzpatrick, and Mr. Fitzpatrick: dismissed A.B.'s depression and suicidal thoughts as merely "teenage angst" and generally ignored the severity of A.B.'s mental health symptoms; failed to administer PPI's prescribed psychotropic medications to A.B. prior to her death;  failed to notify authorities or A.B.'s treating physicians that A.B.'s psychotropic medication had gone missing three days before her suicide; failed to follow PPI's clear and direct discharge instructions for A.B.'s aftercare; failed to schedule the earliest available appointment for A.B.'s psychological treatment after discharge from PPI, leaving A.B. with no psychological care during the ten (10) days from her discharge from PPI until she died by suicide at Mr. Bartels', Ms. Fitzpatrick's, and Mr. Fitzpatrick's Newport, PA home on June 29, 2013; and failed to adequately supervise A.B., leaving her on the day of her death, and just ten (10) days following her discharge from a mental health institution for severe suicidal ideations, in the custody of Ms. Fitzpatrick's elderly father.

66.   Thus, Ms. Wartluft, Ms. Fitzpatrick, and Mr. Fitzpatrick contributed to and/or caused A.B's death by suicide in the Newport, PA home on June 29, 2013, when A.B. was on summer break and home from school, and while she was in the exclusive care and custody of Ms. Wartluft, Ms. Fitzpatrick, and Mr. Fitzpatrick, with the consent of Mr. Bartels.

## THE ALLEGATIONS OF PLAINTIFFS' AMENDED COMPLAINT

67.   Defendants incorporate by reference the foregoing paragraphs as though set forth at length herein.

68.   On June 29, 2016, the Individual Plaintiffs filed an Amended Complaint individually and as administrators of the Estate of A.B. (all collectively, "Plaintiffs") against Defendants.  (Ex. "1".)

69.   Defendants deny any liability to Plaintiffs for any purported damages or liability, and incorporate herein by reference without admission the allegations of negligence as contained in Plaintiffs' Amended Complaint.  (*Id.*)

70.   The Amended Complaint alleges that Ms. Fitzpatrick is the "live-in companion of" Mr. Bartels, and "at all times relevant, acted as another guardian" of A.B.  (*Id.* at ¶ 1.)

71.   In the Amended Complaint, Plaintiffs allege that Defendants owed A.B. a duty of care to protect her from harm.

72.     Plaintiffs further aver in the Amended Complaint that Defendants breached purported duties owed to A.B. in various ways.

73.     For example, Plaintiffs aver that Defendants breached a duty owed to A.B. based on the following:

    a.  By requiring that [A.B.] be admitted to two mental institutions so that MHS could effectuate its two institution expulsion policy and scale back the medical care being provided by MHS staff;

    b.  By permitting [A.B.] to be discharged from PPI directly to her parents' [sic] rather than maintaining custody over [A.B.] at MHS. For example, MHS could have, but did not, require or otherwise invite [A.B.] to return to the MHS campus to participate in the Year Round Experience over the summer of 2013.  Nor did MHS offer any other options that would permit [A.B.] to remain on the MHS campus for observation and/or further treatment immediately following her discharge from PPI;

    c.  By failing to develop a care plan for [A.B.] prior to her discharge from PPI and, specifically, during her time at PPI, when Dr. Herr admitted to taking a more limited role in [A.B.'s] treatment due to the expulsion policy and related likelihood that [A.B.] would not be permitted to return to MHS – during the very time that [A.B.] was

receiving intense therapy at PPI for her suicidal ideations, suffered

from low self-esteem and teetered in the precipice of life or death;

d. By holding out the threat of expulsion and/or a forced leave of

absence; and

e. By dis-inviting [A.B.] from her graduation ceremony and related

celebration on the eve of graduation.

(*Id.* at ¶¶ 188(1)-(6).)

74.     Plaintiffs also allege that Defendants caused A.B. to suffer harm and

damages.

75.     Thus, Plaintiffs further allege in the Amended Complaint that A.B.

suffered harm and damages based on Defendants' conduct.

76.     Accordingly, the Amended Complaint contends that A.B. suffered

injuries as a result of Defendants' alleged actions and/or inactions, such as mental

anguish, emotional distress, pain and suffering, and "death[.]"  (*Id.* at ¶ 193.)

77.     The Amended Complaint also claims that A.B.'s "suicide was

foreseeable[.]"  (*Id.* ¶ 195.)

78.     Defendants specifically deny that it is liable to Plaintiffs in any

manner or proximately caused any of Plaintiffs' injuries, including A.B.'s death by

suicide.

79.    Nevertheless, if Defendants are determined to be liable to Plaintiffs or responsible for Plaintiffs' injuries, they assert that they are not solely responsible for those injuries, including A.B.'s death, and that the negligent actions and/or inactions of the Ms. Fitzpatrick and Mr. Fitzpatrick are at least partially, if not wholly, responsible for Plaintiffs' injuries, and specifically A.B.'s death by suicide.

80.    Consequently, if Defendants are found liable for tortiously causing any injuries to A.B., Defendants have a claim for contribution against the Ms. Fitzpatrick and Mr. Fitzpatrick because their negligent acts contributed to A.B.'s injuries.

## CLAIMS FOR RELIEF

### COUNT I – CONTRIBUTION PURSUANT TO PENNSYLVANIA'S UNIFORM CONTRIBUTION AMONG JOINT TORTFEASORS ACT, 42 Pa. C.S.A. § 8321, *et seq.*

### DEFENDANTS/THIRD-PARTY PLAINTIFFS THE MILTON HERSHEY SCHOOL, AND THE HERSHEY TRUST COMPANY, AS TRUSTEE OF THE MILTON HERSHEY SCHOOL TRUST v. THIRD-PARTY DEFENDANTS KAREN FITZPATRICK AND THOMAS FITZPATRICK

81.    Defendants incorporate by reference the foregoing paragraphs as though set forth at length herein.

82.    Ms. Fitzpatrick and Mr. Fitzpatrick owed A.B. a duty of care, including the duty to protect her from harm and self-harm.

83.    The Individual Plaintiffs authorized Ms. Fitzpatrick to exercise legal and physical custody of A.B.

84.     The Individual Plaintiffs delegated their parental rights and responsibilities to Ms. Fitzpatrick, who accepted those rights and responsibilities.

85.     Ms. Fitzpatrick, as a surrogate parent, stepmother, and legal guardian of A.B., owed her a heightened, special duty of care.

86.     Mr. Fitzpatrick, as a surrogate grandparent, step grandfather, and legal guardian of A.B., owed her a heightened, special duty of care.

87.     The Ms. Fitzpatrick and Mr. Fitzpatrick breached their duties owed to A.B. by, amongst other matters:

    a.  Failing to properly supervise A.B.;

    b.  Failing to properly care for A.B.;

    c.  Dismissing A.B.'s depression and suicidal ideation as "teenage angst;"

    d.  Failing to properly administer A.B.'s prescribed, psychotropic medication;

    e.  Failing to notify authorities, emergency services, health care professionals, and/or A.B.'s medical providers that A.B.'s psychotropic medication was lost on or about June 26, 2013, three days prior to her death;

    f.  Failing to follow PPI's discharge instructions and plan;

g. Failing to take or arrange for A.B. to attend her scheduled appointments with clinicians following her discharge from PPI;

h. leaving A.B. alone in Newport, PA, on June 29, 2013;

i. Failing to properly ascertain that Ms. Fitzpatrick lacked the ability to safely supervise A.B.;

j. Failing to properly ascertain that Mr. Fitzpatrick lacked the ability to safely supervise A.B.;

k. Failing to alert Children and Youth Services of their inability to properly care for A.B.;

l. Failing to accept appointments offered to A.B. by Ms. Davis prior to A.B.'s June 29, 2013, death;

m. Taking A.B.'s June 19, 2013, appointment when it was scheduled for A.B.;

n. Failing to act reasonable under the circumstances;

o. Otherwise failing to properly and adequately supervise A.B. in light of her depression and suicidal ideations; and

p. Failing to properly conduct themselves as A.B.'s caretakers and guardians.

88.     Ms. Fitzpatrick's and Mr. Fitzpatrick's negligent conduct, actions and inactions, contributed to and/or caused some or all of the alleged damages suffered by A.B., including her death by suicide.

89.     Ms. Fitzpatrick's and Mr. Fitzpatrick's negligent conduct aggravated A.B.'s medical and mental health condition, and increased the risk of harm to A.B., as well as the risk of A.B. committing self-harm and suicide.

90.     If Plaintiffs suffered any damages as alleged in the Amended Complaint, these damages were not the result of any alleged acts and/or omissions on behalf of Defendants.

91.     Nevertheless, if Defendants are determined to be liable to Plaintiffs or responsible for Plaintiffs' injuries, including A.B.'s death by suicide, which liability Defendants specifically deny, Defendants assert that it is not solely responsible for any injuries, and that Ms. Fitzpatrick and Mr. Fitzpatrick have at least contributed to and are partially, if not wholly, responsible for Plaintiffs' injuries, including A.B.'s death.

92.     Additionally, if Defendants are determined to be liable to Plaintiffs, which liability Defendants specifically deny, the Ms. Fitzpatrick and Mr. Fitzpatrick are jointly and/or severally liable with Defendants to Plaintiffs by way of contribution, indemnity, and/or apportionment based on respective degrees of fault, for all such damages.

**WHEREFORE**, Defendants the Milton Hershey School, and The Hershey Trust Company, as trustee of the Milton Hershey School Trust, demand judgment against Third-Party Defendants Karen Fitzpatrick, and Thomas Fitzpatrick for all sums that may be adjudged against Defendants, including costs and attorneys' fees, and such other relief that the Court deems appropriate.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Defendants pray for judgment as follows:

1.     That the Amended Complaint be dismissed with prejudice;

2.     That Defendants be awarded their costs of suit, including, but not limited to, reasonable attorneys' fees;

3.     That Plaintiffs are liable for contribution to Defendants for any of A.B.'s alleged injuries;

4.     That Third-Party Defendants are liable for contribution to Defendants for any of A.B.'s alleged injuries; and

5.     That Defendants be awarded such other and further relief as is just and appropriate.

Respectfully submitted,

*/s/ Jarad W. Handelman*
Jarad W. Handelman, Esquire
(PA 82629)
Kyle M. Elliott, Esquire
(PA 306836)
Elliott Greenleaf, P.C.
17 N. Second Street, Suite 1420
Harrisburg, PA 17101
717.307.2600 (phone) / 717.307.2060 (fax)
215.977.1000 (phone) / 215.977.1099 (fax)
jwh@elliottgreenleaf.com
kme@elliottgreenleaf.com

Dated: February 1, 2019          *Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I, Kyle M. Elliott, Esquire, hereby certify that I caused the foregoing Third-Party Complaint against Third-Party Defendants Karen Fitzpatrick and Thomas Fitzpatrick to be filed with the Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document upon all counsel of record, including:

Gregory F. Cirillo, Esquire
John J. Higson, Esquire
John W. Schmehl, Esquire
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102

*Counsel for Plaintiffs*

Dated: February 1, 2019

/s/ *Kyle M. Elliott*
Kyle M. Elliott, Esquire