# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JULIE ELLEN WARTLUFT *et al.*,           :        1:16-cv-2145
                                         :
                    Plaintiffs,          :        Hon. John E. Jones III
                                         :
         v.                              :
                                         :
THE MILTON HERSHEY SCHOOL                :
AND SCHOOL TRUST *et al.*,               :
                                         :
                    Defendants.          :

## MEMORANDUM

## March 18, 2020

Presently pending before the Court are cross-motions for summary judgment filed by the parties in the above-captioned case. (Docs. 293, 297). Both motions have been fully briefed, (Docs. 293, 294, 332, 336; Docs. 297, 298, 312-1, 337), and are ripe for disposition. For the reasons that follow, Plaintiffs' motion, (Doc. 293), shall be denied, and Defendants' motion, (Doc. 297), shall be granted. Moreover, because we shall order the Clerk of Court to close the file on this case, we shall deny as moot F. Frederic Fouad's First Motion to Intervene. (Doc. 334).

## I.      BACKGROUND

The underlying facts of this case have been discussed at length in several previous Memoranda and Orders issued by this Court, (Docs. 62, 216, 230, 258,

279), but we reiterate herein several important details revealed in discovery relevant to the instant motions.

Defendants the Milton Hershey School and the Hershey Trust Company, as Trustee for the Milton Hershey School Trust (collectively, "Defendants" or "the School"), operate a cost-free, not-for-profit, residential academy. (Doc. 294-1 at ¶ 1; Doc. 299 at ¶¶ 19–20). Plaintiffs Julie Wartluft ("Wartluft") and Frederick Bartels, Jr. ("Bartels") are the mother and father of Abrielle Kira Bartels ("Abrielle"), a former student. (Doc. 29 at ¶ 1). In the instant case, Plaintiffs Wartluft and Bartels seek relief in their individual capacities and in their capacities as administrators of the Estate of Abrielle Kira Bartels ("the Estate").[1]

Abrielle attended the Milton Hershey School since kindergarten. (Doc. 294-1 at ¶ 2). Abrielle was a good student. (*Id.* at ¶ 3). In April 2013, however, Abrielle began to express feelings of anxiety, depression, and thoughts of self-harm to the School's psychologist, Dr. Benjamin Herr ("Dr. Herr"). (*Id.* at ¶¶ 4–5). Abrielle admitted that she had struggled with suicidal ideations since at least the sixth grade, (Doc. 299 at ¶ 64), and that she had unsuccessfully acted on those impulses. (*Id.* at ¶ 75). As a result of these statements, and others, Abrielle was in and out of the student health center for several weeks. On May 21, 2013, Dr. Herr

---

[1] We refer to Plaintiffs Wartluft, Bartels, and the Estate collectively as "Plaintiffs" and refer to Plaintiffs Wartluft and Bartels collectively in their individual capacities as "Individual Plaintiffs."

conducted an assessment of Abrielle during which Abrielle admitted that she planned to stab herself with a knife from the kitchen of her student home. (*Id*. at ¶ 90 (citing Def. Ex. 1 at Bartels 00160)). Abrielle also admitted to having tried to kill herself in the past by strapping a pillow over her face with a belt. (*Id*.). As a result of Dr. Herr's assessment, Abrielle was once again admitted to the health center but soon after returned to her student home. (Doc. 299 at ¶¶ 102–103). Nonetheless, over the following weekend, Abrielle again expressed "intense suicidal ideations" and, on May 28, 2013, Dr. Herr drove Abrielle to Philhaven Mental and Behavioral Healthcare Facility ("Philhaven") for inpatient mental health treatment. (Doc. 294-1 at ¶ 6; Doc. 295-1 at 2). Abrielle was signed into Philhaven by her mother. (*Id*.). Abrielle was discharged from Philhaven on June 5, 2013 and returned to the School. (*Id*.). In discharge notes, Philhaven recommended that Abrielle

> receive aftercare in the supportive environment of in the structured support of returning [*sic*] to Milton Hershey School . . . develop a safety/support plan with Milton Hershey School Therapist and staff . . . include[ing] weekly therapy sessions; weekly check-ins with house parents and the therapist or other identified support staff . . . return to medication management with a psychiatrist . . . participate in a community/school service or organization *i.e.* church youth group, school programs (sports, clubs, assisting a teacher, etc . . .) to help build her sense of belonging to a community and strengthen her self esteem. Without this level of care, it is possible that Abrielle could decompensate and require future hospitalizations.

(Doc. 295-4 at 2).

Upon Abrielle's return to campus, she spent the night in the student health center but returned to class and other activities on June 6, 2013. (Doc. 294-1 at 12). The following day, however, Abrielle told a classmate that she was again experiencing suicidal ideations and that she had scissors in her pocket. (Doc. 299 at ¶ 137). Abrielle met with Dr. Herr and, during that session, reported that she was again experiencing suicidal urges. (*Id.* at ¶¶ 139; Doc. 296 at 99). Abrielle was again admitted to the student health center. (Doc. 299 at ¶ 143–44). On June 10, 2013, Dr. Jeannette Morales-Brandt, a psychiatric consultant, conducted an evaluation of Abrielle. (Doc. 299 at ¶ 155). Dr. Morales-Brandt recommended that Abrielle be readmitted to a psychiatric hospital for support and stabilization. (*Id.* at ¶ 156). On June 11, 2013, Dr. Herr drove Abrielle to the Pennsylvania Psychiatric Institute ("PPI") where she met her mother and signed herself in voluntarily for inpatient hospitalization. (Doc. 294-1 at 12).

On June 12, 2013, Dr. Herr spoke with Abrielle's mother and recounted to her "as [he] had before initiating this second hospitalization, that it is highly unlikely that Abbie will be permitted to return to [the School] after her time at PPI is concluded." (Doc. 296-1 at 1). Dr. Herr also noted that "a meeting of staff will occur on Friday[, June 14, 2013], with the goal of determining Abbie's future" at the School, with two likely outcomes, either "cessation of enrollment" or a "leave of absence." (*Id.*). Although Dr. Herr informed Abrielle's mother that he would

recommend a leave of absence, Dr. Herr reiterated that "the senior division staff would ultimately make the decision." (*Id.*). Also on June 12, 2013, one of the School's administrators, Heather Teter ("Teter"), called PPI to notify them that "it is most likely we will be recommending that [Abrielle] not return [to the School] following PPI . . . due to high level of need currently beyond our programming." (Doc. 296-1 at 4–7). Thus, Teter recommended that PPI begin planning to discharge Abrielle to her family and her home community rather than back to the School. (*Id.*).

On June 13, 2012, Dr. Herr conferred with Abrielle's treating physician at PPI, Dr. Lidija Petrovic-Dovat. During the call, Dr. Petrovic-Dovat noted that Abrielle's mother had informed Abrielle that she would not likely be returning to the School. (*Id.* at 2). Dr. Petrovic-Dovat reported to Dr. Herr that Abrielle was upset. (*Id.*). Dr. Herr informed Dr. Petrovic-Dovat that, although he "agreed with [her] concerns . . . [School] staff must determine if Abbie's psychological needs could be met within the scope of [the School's] programming." (*Id.* at 2). According to Dr. Herr, "the question is purely one of level of services needed vs. what [the School] can provide." (*Id.*).

On June 17, 2013, Abrielle reported that she "ha[d] been doing well," that she was "looking forward to be[ing] discharged," and that she wanted "to go live with her step mom until dad gets out of jail for DUI." (Def. Ex. 15 at PPI 150).

Although Abrielle would have preferred to return to the School, she reported that "[s]he is OK with going to a different school for a year and then returning to [the Milton Hershey School] after she is stable." (*Id*.).

On June 19, 2013, Abrielle was discharged from PPI to her family in accordance with a discharge plan developed by PPI. (Doc. 296 at 99; Doc. 299 at ¶¶ 214–62). Because Abrielle was discharged to her family's care and was no longer under the School's care, home-life administrator Mic Stewart decided that Abrielle was not permitted to attend her on-campus eighth grade graduation or a subsequent after-party at her student family home on June 21, 2013. (Doc. 295-3 at 170–86). Several administrators expressed displeasure with this decision. (*Id*.). Nonetheless, Abrielle and her family were notified of the same and Abrielle did not attend either event. (*Id*.).

Between June 19, 2013 and June 29, 2013, Abrielle spent time with her family in Newport, Pennsylvania and with her family in Steelton, Pennsylvania. Abrielle spent time with her friend and engaged in ordinary adolescent activities. (Doc. 299 at ¶ 295, 303–306). Sadly, on June 29, 2013, Abrielle hanged herself in a bedroom closet. (Doc. 294-1 at ¶ 27).

Plaintiffs filed a Complaint in this Court on June 29, 2016, (Doc. 1), and an Amended Complaint on October 28, 2016. (Doc. 29). In their Amended Complaint, Plaintiffs allege that, despite knowing that Abrielle suffered from

depression and suicidal ideations, Defendants discharged her from their care under a "shadow policy" which mandated that students be expelled from the School after two mental health hospitalizations, even if those hospitalizations were recommended by school staff. (Doc. 29 at ¶ 108). Following several rulings from this Court,[2] the following Counts alleged in Plaintiffs' Amended Complaint, (Doc. 29), remain viable. In Count I, the Estate contends that Defendants violated two provisions of the Fair Housing Act ("FHA") by dismissing Abrielle from the School and by barring her from attending her eighth-grade graduation and the subsequent after-party at her student family home because of her mental disability. In Count III, the Estate avers that Defendants were negligent in dismissing Abrielle from their care thereby forcing her into an assertedly unstable environment resulting in her death. In Count V, Individual Plaintiffs allege a wrongful death action, and in Count VI, the Estate alleges a survival action. In Counts IX and X, the Estate alleges intentional and negligent infliction of emotional distress. In Count XII, the Estate alleges that Defendants breached their fiduciary duty of care

---

[2] On December 7, 2019, Chief Judge Christopher C. Connor dismissed Counts III, VII, VIII, IX, X, XI, XII of Plaintiffs' amended complaint. (Doc. 63). Following reconsideration, on December 7, 2018, Chief Judge Connor reinstated Counts III, IX, X, XI, and XII. (Doc. 217). This matter was subsequently reassigned to the undersigned on January 23, 2019. On August 13, 2019, this Court dismissed Counts I, III, IX, and XII to the extent those claims sought relief on behalf of Plaintiffs Wartluft and Bartels in their individual capacities and dismissed Counts XI and XIII in their entirety.

and of good faith in failing to enact certain policies and/or measures that a person of ordinary prudence would use in overseeing the care of children.

On December 17, 2019, Plaintiffs filed the instant motion for partial summary judgment seeking a ruling that Defendants failed to comply with their own policies and procedures when they dismissed Abrielle from the School and barred her from her eighth-grade graduation and from the subsequent after party. (Doc. 293). That motion was fully briefed. (Docs. 294, 332, 336). On the same day, Defendants filed a joint cross-motion for summary judgment and a brief in support thereof seeking summary judgment as to all still-viable Counts of Plaintiffs' Amended Complaint. (Docs. 297, 298). Defendants' motion was fully briefed. (Docs. 298, 312-1, 337). Both motions are now ripe for disposition. For the reasons that follow, Plaintiffs' motion shall be denied and Defendants' motion shall be granted. Moreover, and as aforestated, because we shall Order the Clerk of Court to close the file on this case, we shall also deny as moot F. Frederic Fouad's First Motion to Intervene. (Doc. 334).

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party,

and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh*

*Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.  DISCUSSION

In their partial motion for summary judgment, Plaintiffs essentially seek a declaration that Defendants' failed to comply with their own applicable policies and procedures when they dismissed Abrielle from the School and barred her from attending her eighth-grade graduation and the subsequent after-party at her student family home.  Simultaneously, Defendants move for summary judgment on all still-viable Counts of Plaintiffs' Amended Complaint.  We first address Plaintiffs' motion and then address Defendants' arguments *seriatim*.  In closing, we address Intervenor F. Frederic Fouad's First Motion to Intervene.

### a.  Plaintiffs' Motion for Summary Judgment

In their motion and accompanying brief, Plaintiffs contend that Defendants' decision to dismiss Abrielle from the School and then prohibit her from attending her eighth-grade graduation and the subsequent after party at her student family home violated Defendants' own policies and procedures.  According to Plaintiffs,

it is undisputed that Abrielle was "terminated"[3] from the School and that the School "had certain policies and procedures in place that set forth criteria for a student resident's termination for psychological reasons," including: (1) conducting "an internal 'SPT' meeting;" (2) conducting a meeting between home-life, the principle, and the coordinator of student health; (3) completing a "termination packet;" (4) advising the family that a termination request has been forwarded to the division head; (5) preparing a transition plan; and (6) preparing a final decision from the division heads and vice president of student programs. (Doc. 294 at 13–14). In Plaintiffs' views, Defendants failed to do any of these things. Indeed, the only thing Plaintiffs allege Defendants did which in any way demonstrated that they intended to follow any procedure at all prior to terminating Abrielle was to draft a leave of absence letter—a letter which was never actually provided to Abrielle's family. Thus, "Plaintiffs simply request that the Court enter summary judgment on the issue of whether [Defendants] complied with its policies and procedures when it determined that Abbie could not return to school. The undisputed facts demonstrate that such a judgment in Plaintiffs' favor is warranted." (Doc. 294 at 16–17). For reasons both procedural and practical, we disagree.

---

[3] In their opposition brief, Defendants contend that, at the time of her death, Abrielle was not "terminated" but was rather in the process of being placed on a temporary leave of absence for one year after which she would be re-evaluated for return to the School. According to Defendants, Abrielle passed away before any such plans could be formalized.

Federal Rule of Civil Procedure 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED.R.CIV.P. 56(a).  Thus, by its terms, summary judgment under Rule 56(a) may not be used to render judicial determinations on purely factual questions.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc*., 54 F.3d 1125, 1127 (3d Cir. 1995) (reiterating that "[c]ourts must not resolve factual disputes or make credibility determinations" when ruling upon summary judgment motions); *Martin v. City of Reading*, 118 F. Supp. 3d 751, 783 (E.D. Pa. 2015) ("Rule 56 . . . 'does not allow a party to bring a motion for a mere factual adjudication'") (quoting *SEC v. Thrasher*, 152 F.Supp.2d 291, 297 (S.D.N.Y. 2001)); *see also Little v. Lower Bucks Restoration Servs., Inc*., No. 2:17-CV-03446-AB, 2019 WL 936644, at *1 (E.D. Pa. Feb. 26, 2019) ("[A] motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief.") (quoting *Collins v. Cottrell Contracting Corp*., 733 F. Supp. 2d 690, 698 (E.D. N.C. 2010)).

Under Federal Rule of Civil Procedure 56(g), however, "[i]f the court does not grant all the relief requested by [a properly presented summary judgment] motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." FED.R.CIV.P. 56(g).  The advisory committee notes to the

2010 Amendment to Rule 56 explains, however, that subdivision (g) "becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion." *Id*. at 2010 Amendment. That is, it is only after the Court's duty to rule upon the parties' entitlement to judgment as a matter of law is discharged that "the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute." *Id*. Nonetheless, "[e]ven if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established." *Id*. "The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event." *Id*. Therefore, it goes without saying that, "[t]he question whether to exercise that authority is within the court's discretion." 10B FED. PRAC. & PROC. CIV. § 2737 (4th ed.).

In their motion for partial summary judgment, Plaintiffs are plainly seeking a pretrial factual determination notwithstanding their efforts to characterize their request as "probative" of Defendants' fourth affirmative defense that Defendants "fulfilled any duties, responsibilities, and obligations owed to [Abrielle] and Plaintiffs within the scope of their educational and child welfare mission." (Doc. 222 at 66). Tellingly, Plaintiffs specify in their opening brief that they "are not

asking the Court to delve into issues of liability and causation." (Doc. 294 at 16).

It is not until Plaintiffs' Reply that they even mention that their request is probative

of one of Defendants' affirmative defenses and we assume that they only did so in

an effort to find some attenuated connection to a relevant claim or defense and in

response to Defendants' arguments that Plaintiffs' request was procedurally

improper for failing to do so earlier. Moreover, although the judicial determination

that Plaintiffs seek may be in some way tangentially related to one of Defendants'

defenses, the notion that such a determination is in any way "dispositive" of even a

part of that defense is specious at best and, therefore, we find it improper to resolve

Plaintiffs' request on summary judgment. *See Little,* 2019 WL 936644, at *1

("Because deciding this question would not dispose of all or part of a 'claim or

defense,' Fed. R. Civ. P. 56(a), it is not subject to disposition on summary

judgment.").

To the extent Plaintiffs could have pursued their request via Rule 56(g), we

find that argument to be waived. Moreover, even were we inclined to have

reviewed a request under Rule 56(g) had it been properly presented, we would

have denied it. First, Plaintiffs' only request in their motion for partial summary

judgment was for this factual determination. They never sought disposition as to

any actual claims or defenses. As such, under Rule 56(g), the Court could never

have even entertained Plaintiffs' request for a factual declaration. *See*

FED.R.CIV.P. 56(g) at 2010 Amendment (stating that it is only once the Court's summary judgment "duty is discharged," that "the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute"). Furthermore, whether Defendants complied with their own policies and procedures appears to be in dispute inasmuch as Defendants insist that Abrielle was never "terminated" but was instead placed on a temporary leave of absence during which she passed away. (*See* Doc. 332 at 6–14). Thus, Defendants aver that the policies to which Plaintiffs cite were never applicable and a genuine issue of material fact would preclude the entry of summary judgment as to that issue. Finally, even if Plaintiffs' request was not in genuine dispute, in our view, "the cost of determining whether [these] potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial." *See* FED.R.CIV.P. 56(g) at 2010 Amendment. As such, even had Plaintiffs presented their request in the context of Rule 56(g), we would have exercised our discretion and would have denied Plaintiffs' motion. Accordingly, because Plaintiffs' request is procedurally improper under Rule 56(a), because Plaintiffs did not frame their request under Rule 56(g), and because we would have denied their request even if so presented, Plaintiffs' motion for partial summary judgment, (Doc. 293), shall be denied.

**b.  Defendants' Motion for Summary Judgment**

### 1.  Count I FHA Claim – 42 U.S.C. §§ 3406(f)(1), 3406(f)(2)

In Count I, the Estate contends that Defendants violated two provisions of

the FHA by discriminating against Abrielle based upon her mental disability.

Specifically, the Estate points to Abrielle's dismissal from the School and her

concurrent loss of housing and the fact that she was barred from attending her

eighth-grade graduation and the subsequent after-party at her student family home

immediately after undergoing two mental health hospitalizations.  Because we find

herein that Abrielle was not a "buyer or renter" under the terms of the FHA, we

shall grant summary judgment in favor of Defendants as to Count I to the extent it

is predicated upon Section 3406(f)(1) of the FHA.  Moreover, because the Estate

avers only that Abrielle was denied housing—and not that she was discriminated

against "in the provision of services or facilities in connection with such

dwelling"—we shall also grant summary judgment in favor of Defendants as to

Count I to the extent it is predicated upon Section 3406(f)(2).  Because prior

rulings from this Court limited Plaintiffs' claims in Count I to only Sections

3406(f)(2) and 3604(f)(2), we shall grant Defendants summary judgment as to

Count I in its entirety.

Under Section 3406(f)(1) of the FHA, it is unlawful to (1) "discriminate in

the sale or rental, or to otherwise make unavailable or deny, a dwelling to any

buyer or renter because of a handicap." 42 U.S.C. § 3406(f)(1). To establish a *prima facie* case of discrimination under Section 3604(f)(1), a plaintiff must demonstrate: (1) that he or she was discriminated against; (2) that such discrimination occurred in the sale or rental of a dwelling, or that such dwelling was made unavailable or denied; (3) that he or she was a buyer or renter; and (4) that such discrimination occurred because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling, or any person associated with that buyer or renter." 42 U.S.C. § 3406(f)(1).

A claimant is said to be a "buyer or renter" under the FHA when he or she supplies consideration in exchange for an interest in property. *See* 42 U.S.C. § 3602 (defining "to rent" for purposes of the FHA as "to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant"); *Growth Horizons, Inc. v. Delaware Cty., Pa*., 983 F.2d 1277, 1283 n.10 (3d Cir. 1993) ("Because the handicapped individuals in this case are not supplying the funds nor seeking a proprietary interest in the property, they are neither buyers nor renters."); *Defiore v. City Rescue Mission of New Castle*, 995 F.Supp.2d 413, 419 (W.D. Pa. 2013) ("What qualifies as consideration under the FHA has been examined by a limited number of courts and this Court finds that resolution of the issue will turn on whether [the housing facility at issue] receives consideration for a resident's stay.").

Under Pennsylvania law,[4] "[c]onsideration consists of a benefit to the promisor or a detriment to the promisee." *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. 2003) (citing *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 128 (Pa. 1940)).

> It is not enough, however, that the promisee has suffered a legal detriment at the request of the promisor. The detriment incurred must be the "*quid pro quo*", or the "price" of the promise, and the inducement for which it was made . . . . If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract. The distinction between such a conditional gift and a contract is well illustrated in Williston on Contracts . . . where it is said: "If a benevolent man says to a tramp—'If you go around the corner to the clothing shop there, you may purchase an overcoat on my credit,' no reasonable person would understand that the short walk was requested as the consideration for the promise, but that in the event of the tramp going to the shop the promisor would make him a gift."

*Stelmack*, 14 A.2d at 128 (internal citations omitted). Universally, consideration must be actually bargained for and "[n]othing is consideration that is not regarded as such by both parties." *Philpot v. Gruninger*, 81 U.S. 570, 577 (1871).

---

[4]     Because this case comes before us on federal question jurisdiction, (*see* Doc. 29 at ¶ 8–9), but necessarily involves creatures of state law—namely, consideration—and involves predominantly state law claims, and because the parties look to Pennsylvania law when arguing the same, we look to Pennsylvania jurisprudence when determining whether Abrielle's chores constituted valid consideration to warrant a finding that she was a buyer or renter under the terms of the FHA.

In this case, the Estate contends that Abrielle was a "buyer or renter" under the terms of the FHA because she was "required"[5] to perform chores while attending the School, an activity which the Estate argues constitutes valid consideration. Defendants disagree, arguing that Abrielle's chores were wholly gratuitous. We agree with Defendants. In our view, Abrielle's chores were performed as part of a conditional gift—admission to the School; those chores are analogous to the tramp's short walk to the store. *See Stelmack*, 14 A.2d at 128 ("If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract."). The School's Deed of Trust specifies that "under no circumstances shall any charge be made to any scholar, or any fees, rewards, or compensation be accepted by the Managers from or on account of any scholar." (Def. Ex. 55 at ¶ 18). Likewise, the enrollment agreement that Abrielle's guardian signed when she enrolled in the School specifies that "a home, food, clothing,

---

[5]    Plaintiffs have cited to various points in the record to suggest that Abrielle's chores were a "requirement." (Def. Ex. 7 at ¶ 6 ("You agree that your child must obey all School rules and policies while enrolled at the School. These rules address behavior, program requirements, visiting privileges, vacations, studies, **chores,** substance abuse and all other matters to your child's conduct at the School.") (emphasis added) (capitalization in original); Def. Ex. 4 at 4 ("Each student home will determine a developmentally and age appropriate Chore program, that will be linked to a Merit Program. Chore programs should remain consistent with programs taught by HLPD.") (capitalization in original); Pl. Ex. 4 at 46:17–20 ("There are very high expectations within a student home setting. There are chores to be completed. There are behavioral expectations."); Pl. Ex. 39 (explaining that "students engage in kind of typical family activities that would be scheduled throughout the course of the week like meals, maybe devotions in the morning, **doing chores**, obeying rules, following instructions, doing study, homework . . . .") (emphasis added)).

health care, and an education" shall be provided "at no cost to you [the parents or guardians] or your child."  (Def. Ex. 7 at ¶ 1).  Indeed, Plaintiffs Amended Complaint highlights that the School is "cost-free," and includes housing.  (Doc. 29 at ¶ 12).  Thus, the fact that Abrielle was "required" to perform chores, does not render those chores consideration.  In our view, Abrielle was "required" to perform chores in the same way that she was "required" to do her homework.  Abrielle's chores were a learning tool implemented as part of a broad-based curriculum.  Those chores were not offered as *quid pro quo* consideration for her living arrangement.

Accordingly, because Abrielle's chores were not consideration as a matter of law, we conclude that she cannot be considered a "buyer or renter" under the FHA.  *See* 42 U.S.C. § 3602 (defining "to rent" for purposes of the FHA as "to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant"); *Growth Horizons, Inc*., 983 F.2d at 1283 n.10 ("Because the handicapped individuals in this case are not supplying the funds nor seeking a proprietary interest in the property, they are neither buyers nor renters."); *Defiore*, 995 F.Supp.2d at 419 ("What qualifies as consideration under the FHA has been examined by a limited number of courts and this Court finds that resolution of the issue will turn on whether [the housing facility at issue] receives consideration for a resident's stay.").  Therefore, the Estate has failed to

demonstrate a *prima facie* case of discrimination under Section 3406(f)(1) of the FHA and we shall grant Defendants summary judgment as to Count I to the extent it is premised thereon.

Under Section 3406(f)(2) of the FHA, it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap," 42 U.S.C. § 3406(f)(2). To establish a *prima facie* case under Section 3604(f)(2), a plaintiff must demonstrate: (1) that he or she was discriminated against; (2) that such discrimination occurred in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling; and (3) that such discrimination occurred because of a handicap of that person, a person residing in or intending to reside in that dwelling, or any person associated with that person. 42 U.S.C. § 3604(f)(2).

Although the common law in this Circuit has not specifically outlined the contours of what is included within "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," federal regulations have included "denying or limiting services or facilities" as one way that an individual could so discriminate against another. 24 C.F.R. § 100.65 (relating to discrimination in terms, conditions and privileges and

in services and facilities).  Generally speaking, however, courts have found that to raise a claim under Subsection (f)(2), a litigant must demonstrate "that their terms, conditions or privileges of the rental differed from other tenants," *Congdon v. Strine*, 854 F.Supp. 355, 360–62 (E.D. Pa. 1994), or that they were subject to "more burdensome application procedures." *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013).  According to the Third Circuit, "[b]y its express terms, this section applies to 'the provision of services or facilities' to a dwelling, such as sewer service . . . ." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005).

As we noted in our Memorandum and Order of August 13, 2019 granting in part Defendants' Motion for Judgment on the Pleadings, (Doc. 279), an expansive reading of 24 C.F.R. § 100.65 together with Section 3604(f)(2) "may, in some cases, render Subsection (f)(2) indistinguishable from Subsection (f)(1)." (*Id*. at 27).  That is, if an individual could discriminate against another in "the provision of services or facilities in connection with [a] dwelling" by denying access to the facilities entirely, any violation of Subsection (f)(2) would also necessarily violate Subsection (f)(1) and the two provisions would be superfluous.  *Compare* 42 U.S.C. § 3406(f)(1) (stating that it shall be unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap") *with* 42 U.S.C. § 3406(f)(2) (stating that it shall be

unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap").

In this case, Defendants reason that they are entitled to summary judgment as a matter of law to the extent the Estate's FHA claim is premised upon Subsection (f)(2) because, having already established that Abrielle was not a "buyer or renter," the Estate has failed to demonstrate that Abrielle was discriminated against "in the provision of services or facilities in connection with such dwelling." Rather, Defendants reason, the Estate contends only that Abrielle denied access to the School *in toto* and was told that she was not allowed to return to the School and was not permitted to attend her eighth-grade graduation or the after party at her student family home. We agree.

Although at the motion for judgment on the pleadings stage we declined to dismiss the Estate's claims under Subsection (f)(2) based upon the deferential standard of review in effect at that time, having received detailed briefing on the issue on summary judgment, we are not so constrained at this juncture. At this point, we are cognizant of our Supreme Court's guidance that courts should not "adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185–86

(2011); *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988). Were we to include the Estate's contentions that Abrielle was denied access to her student home and barred from school activities *in toto* as falling within the ambit of Subsection (f)(2), we would render Subsections (f)(1) and (f)(2) distinct without a difference and violate the well-settled aforementioned jurisprudential principle. We decline to do so here and shall grant Defendants summary judgment as to Count I on that basis to the extent it is premised upon Section 3604(f)(2).

Our decision is also influenced by the distinct claimants authorized by Subsections (f)(1) and (f)(2); Subsection (f)(1) permits claims by only "buyers or renters" whereas Subsection (f)(2) permits claims by "any person." *See* 42 U.S.C. §§ 3406(f)(1), (f)(2). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, we must assume that Congress did not intend to allow "any person" to raise a claim under Subsection (f)(1) and shall not allow "any person" to do so herein by hyper-expanding the scope of Subsection (f)(2). In other words, allowing the Estate to proceed under Subsection (f)(2) for the same conduct that we explicitly rejected as recoverable under Subsection (f)(1) because Abrielle was not a "buyer or renter"

would nullify Congress' intentional and purposeful choice to distinguish between "any person" in Subsection (f)(2) and a "buyer or renter" in Subsection (f)(1). Accordingly, and for the aforementioned reasons, we shall grant summary judgment in favor of Defendants as to Count I to the extent it is premised upon 42 U.S.C. § 3604(f)(2).

## 2. Defendants' Motion for Summary Judgment – Count III Negligence Claim

In Count III, the Estate avers that Defendants were negligent in dismissing Abrielle from their care and in barring her from her eighth-grade graduation and from the subsequent afterparty at her student family home thereby forcing her into an assertedly unstable home environment which resulted in her death. Because we find herein that Defendants' duty of care ended when Abrielle was admitted to PPI and then discharged to her family, we find that the Estate has failed to demonstrate a *prima facie* case of negligence and we shall grant Defendants summary judgment as to Count III.

Plaintiffs' Amended Complaint and briefing throughout this litigation clarified that the Estate's negligence claim outlined in Count III is premised upon the duty incurred by Defendants when they opted to stand *in loco parentis* to Abrielle. (Doc. 29 at ¶¶ 36, 184–85 ("An affirmative duty on the Defendants' part to care for Abbie and protect her from harm arose from the special custodial relationship that existed between Defendants and Abbie . . . . Abbie was

dependent on Defendants to meet her basic needs . . . [which] deprived Abbie of her normal opportunities for protection.").[6]  Although the concept of *in loco parentis* is generally used in Pennsylvania jurisprudence to refer to a party's standing to pursue custody of a child, *see Peters v. Costello*, 891 A.2d 705, 710 (Pa. 2005), the phrase *in loco parentis* has been used in the context of Pennsylvania negligence law to refer to the heightened duty owed by an individual

---

[6]      The Estate also references in passing in their brief in response to Defendants' motion for summary judgment that Defendants owed Abrielle a duty to provide "continuity of care" which they imply is different than the duty Defendants owed because of their *in loco parentis* status. (Doc. 312-1 at 41 ("Even assuming that *in loco parentis* status expired upon Abbie's admission to PPI—which it did not—a school can still owe its student an independent duty despite the absence of an *in loco parentis* relationship . . . .  Here, the facts establish the continued need for continuity of care.") (citing *Hawkins v. Waynesburg Coll.*, No. CIV.A. 07-5, 2008 WL 2952888, at *6 (W.D. Pa. July 30, 2008) ("Although these considerations may inform the District Court's deliberations, they are unnecessary to the denial of summary judgment in connection with the *in loco parentis* theory.  The law has long been clear that colleges may be liable to their students under ordinary negligence principles."))).  However, as Defendants point out in their briefs, Plaintiffs have always relied upon Defendants' *in loco parentis* status as the duty upon which their negligence claim is based, (*see* Doc. 82 at 8, 12), and the Court accepted the same. (Doc. 216 at 11–12).  Thus, we agree with Defendants that it would be inappropriate at this juncture to allow Plaintiffs to effectively amend their complaint by alleging some new, nebulous duty owed by the Defendants. *Warfield v. SEPTA*, 460 F.App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment.") (citing *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir.1996); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641–42 (3d Cir. 1993)).  Such a shift in strategy is particularly troublesome in this case where Defendants argue that the Estate's attempt to change the duty from an *in loco parentis* duty to a "continuity of care" duty appears to transform the claim from ordinary negligence to medical negligence.  Specifically, Defendants highlight, the Estate did not name the expert upon which it relies in support of this "continuity of care" duty and did not cite to anything in the record in support thereof.  According to Defendants, the only Plaintiffs-side expert that opined as to the standard of care Defendants owed was Dr. John Gavazzi who, according to Defendants, limited his discussion to the duty owed by Dr. Herr to Abrielle within the context of their psychologist-patient relationship. (*See* Doc. 337 at 31–32).  To be clear, we render no opinion herein as to whether Defendants actually owed a duty to provide "continuity of care" or whether a "continuity of care" duty is limited to medical negligence claims as a matter of law but rather hold only that, if such a duty did apply, the Estate's failure to pursue that theory earlier waived any argument in connection therewith at summary judgment.  *See Warfield*, 460 F.App'x at 132.

who voluntarily takes custody of another as outlined in Section 314A of the Restatement (Second) of Torts. *See* RESTATEMENT (SECOND) OF TORTS § 314A (1965) (assigning a heightened of care to "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection"); *Gress v. Philadelphia & R. Ry. Co*., 77 A. 810, 811 (Pa. 1910); *Knaupp v. Bolen*, 83 Pa.D.&C.4th 323, 329 (Pa. Com. Pl. Adams Cty. 2006) ("Although Knaupp's claims against Bolen recognize that a parent-child relationship did not exist, the allegations in the complaint establish that Bolen was acting *in loco parentis*. It would appear, therefore, that the reasoning . . . is equally applicable to the current circumstance in clarifying the theory of liability."); *Atias v. Trocki Hebrew Acad*., No. CV 05-6102, 2007 WL 9617936, at *2 (E.D. Pa. Feb. 14, 2007) ("While it is true that schools and teachers have generally been held *in loco parentis* to their students, the duty that status creates 'is coextensive with the physical custody and control over the child and does not ordinarily extend beyond the area of control of school authority, so that the duty ceases when the child passes out of the orbit of the school district's authority.'"). Both parties appear to agree that, under Pennsylvania law, a party standing *in loco parentis* has an affirmative duty to protect the other as outlined in Section 314A of the Restatement (Second) of Torts.

Nonetheless, the parties do not agree when or how an *in loco parentis* duty ends. According to Defendants, in the context of a school-student relationship, an *in loco parentis* duty "is coextensive with the physical custody and control over the child and does not ordinarily extend beyond the area of control of school authority, so that the duty ceases when the child passes out of the orbit of the school district's authority." (Doc. 298 at 22 (quoting *Atias*, 2007 WL 9617936, at \*2)). According to Plaintiffs, however, the special *in loco parentis* relationship between a school and its students comes "with an attendant independent social obligation to provide reasonable care for and to maintain the safety of vulnerable minor children in its care"—a duty which does not end simply because the student leaves campus. (Doc. 312-1 at 20). Indeed, Plaintiffs reason, such a finding "would defy common sense" inasmuch as Defendants could "cut off treatment in contravention of the standard of care and then be absolved of any responsibility for the consequences of their actions." (*Id.*).

In this case, neither party has pointed to clearly binding precedent which identifies when an *in loco parentis* duty ends. Rather, Defendants rely upon a single unpublished district court decision and two Pennsylvania Courts of Common Pleas decisions. (Doc. 298 at 22 (citing *Atias*, 2007 WL 9617936, at \*2; *Watson v. PennDOT*, 33 Pa.D.&C.4th 325, 333 (Pa. Com. Pl. Mont. Cnty. 1996); *Stetler v. Piecyk*, 61 Pa.D.&C.4th 181, 185–86 (Pa. Com. Pl. Phila. Cnty. 2002)).

28

In *Atias*, the district court found that, under Pennsylvania law, an *in loco parentis* duty "is coextensive with the physical custody and control over the child and does not ordinarily extend beyond the area of control of school authority, so that the duty ceases when the child passes out of the orbit of the school district's authority." *Atias*, 2007 WL 9617936 at *2–*3. Thus, the *Atias* Court concluded, once a school expelled a student and "he stopped physically coming to campus . . . [the school] could no longer stand *in loco parentis*." *Id*. In *Watson*, the Montgomery County Court of Common Pleas reasoned that the student-plaintiff was not entitled to relief on his negligence claim when he "was not acting within the scope of any special relationship at the time of his accident," "[h]e had completed the day's schoolwork and had physically exited the school grounds," and "was standing on a public sidewalk and was not *en route* to a school-sponsored activity." *Watson*, 33 Pa.D.&C.4th at 333. In *Stetler*, the Philadelphia County Court of Common Pleas relied upon *Watson* to conclude that "a private school has no duty to provide a safe means of crossing a public street, at least in the case where classes have ended for the day, the child is beyond the school's property and on his or her way home, and is not *en route* to a school-sponsored activity." *Stetler*, 61 Pa.D.&C.4th at 185–86. Plaintiffs have not presented a single case relevant to when an *in loco parentis* duty ends but only argue for a nebulous ongoing duty of care based upon principles of foreseeability. (*See supra* n.5).

Our review of the *in loco parentis* doctrine as it relates to the duty owed by a school to its students suggests that any duty Defendants owed to Abrielle ended when Abrielle was admitted to PPI for treatment and was no longer under Defendants' custody or control. Section 314A of the Restatement (Second) of Torts—the operative provision to which the Estate cite in support of a duty owed by the School to Abrielle—provides that, one "who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection" faces a duty to: (a) protect the individual over whom they have taken custody "against unreasonable risk of physical harm, and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." RESTATEMENT (SECOND) OF TORTS § 314A (1965). Thus, by its terms, any duty that attaches under Section 314A remains only until the individual over whom one has taken voluntary custody "can be cared for by others." *Id.* In line with this interpretation, comment c to Section 314A notes that:

> The rules stated in this Section apply only where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation. A carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises. Nor is a possessor of land under any such duty to one who has ceased to be an invitee.

*Id.* at comment c. Likewise, comment f specifies that:

> In the case of an ill or injured person, [the individual that owes a duty] will seldom be required to do more than . . . turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.

*Id*. at comment f.  In other words, as Defendants highlight, an *in loco parentis* duty appears to be coextensive with physical custody and control and, therefore, a school's duty of care owed to its students terminates when that school relinquishes custody and/or control of the student to another guardian.  *See Atias*, 2007 WL 9617936, at *2; *Watson*, 33 Pa.D.&C.4th at 333; *Stetler*, 61 Pa.D.&C.4th at 185–86.

In our view, the Estate's attempt to impose upon Defendants an ongoing duty of care that extends beyond the period when Defendants maintained custody and control over Abrielle confuses the line between duty and causation.  That is, Plaintiffs' insistence that the School's decision to bar Abrielle from campus in some way contributed to her death is not dispositive of whether the School owed Abrielle a legal duty in the first instance or whether that duty had terminated upon Abrielle's admission to PPI.  This is so, notwithstanding Plaintiffs' contention that Abrielle's suicide was foreseeable and notwithstanding the vulnerable position in which Abrielle found herself upon her admission to PPI.  Although Plaintiffs press that "[s]uch a conclusion would defy common sense," (Doc. 312-1 at 40), we find

the opposite to be true. If Abrielle's admission to PPI did not sever the duty Defendants owed to her, then, theoretically, Defendants could have been liable for practically anything that occurred to Abrielle, or that Abrielle did to another, at a time when, arguably, the Defendants had no way of even knowing what she was doing. We decline to find such an expansive duty at this juncture nor do we find such a duty imposed by Pennsylvania law.

To the extent that the Estate has pleaded that the School pressured Abrielle to be admitted for a second inpatient hospitalization "so that [the School] could effectuate its two-institution expulsion policy" while Abrielle was still in the care and custody of the School, (Doc. 29 at ¶ 188), we find that Defendants' conduct in that vein could not constitute a breach sufficient to support a negligence action. Other than their own unsubstantiated allegations, Plaintiffs have not presented any basis to conclude that Defendants admitted Abrielle to PPI for any nefarious reason. Clearly, Defendants were presented with a student who was suffering from increasing suicidal ideations with a history of depression and suicidal tendencies. Providing that student with an opportunity to seek professional medical help could not amount to a breach of any duty incurred. Just the opposite. Had Defendants *not* provided Abrielle with such an opportunity, they would have unquestionably breached their *in loco parentis* duty.

Likewise, we find Plaintiffs' assertion that Defendants breached their duty to Abrielle by failing to provide her with a follow-up plan after her discharge from PPI misguided. (Doc. 312-1 at 43–44). We reiterate, once Abrielle was admitted to PPI, Defendants' *in loco parentis* duty was discharged. Thus, regardless of Defendants' conduct *after* Abrielle was discharged from PPI, Defendants could not have breached a duty which they no longer owed. Once again, Plaintiffs' argument appears to confuse the duty Defendants owed and whether Defendants were arguably a contributing factor to Abrielle's death.[7] Accordingly, because Plaintiffs' negligence claim in Count III is premised upon Defendants' conduct *after* Abrielle had been admitted to PPI and after Defendants relinquished custody and control of Abrielle, and any conduct that could be attributed to the Defendants *before* Abrielle was admitted to PPI could not constitute a breach, we find that Plaintiffs have failed to demonstrate essential elements of their negligence claim and we shall grant Defendants summary judgment as to Count III.[8]

### 3. Count IX – IIED

---

[7] Because we shall grant summary judgment to Defendants based upon Plaintiffs' failure to demonstrate duty and breach, we do not address the parties' arguments related to causation and issue no ruling thereupon.

[8] Because we find that Plaintiffs have failed to demonstrate a negligence claim in Count III, we also necessarily find that they have failed to demonstrate a claim of negligent infliction of emotional distress as outlined in Count X. *See Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa. Super. 2000) ("In order to recover under . . . negligent infliction of emotional distress . . . [a party] must prove the elements of a cause of action for negligence."). Accordingly, we shall grant summary judgment to Defendants as to Count X.

A claim for intentional infliction of emotional distress ("IIED") requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was "substantially certain" to occur. *Brown v. Muhlenberg Township*, 269 F.3d 205, 217–18 (3d Cir. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d). Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the Court. *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist*., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014) (citing *Reimer v. Tien*, 514 A.2d 566, 569 (Pa. Super. 1986)). The Supreme Court of Pennsylvania has cited approvingly the Superior Court's requirement that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (alteration in original) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)).

In this case, although the Court found previously that the Estate had pleaded sufficient facts in its IIED claim which, if taken as true, were sufficient to state a plausible claim for relief and survive a motion to dismiss, we now find on summary judgment that the Estate has failed to substantiate those allegations in discovery and has failed to demonstrate that Defendants' conduct was sufficiently

extreme or outrageous to support its IIED claim. At the motion to dismiss stage, the Court concluded that the following pleaded facts—if taken as true—were sufficient to support the Estate's IIED claim: (1) "the School threatened to expel Abrielle due to her mental impairments and did, in fact, suspend her for at least ninth grade the day after she was discharged from inpatient treatment for severe depression and suicidal ideation . . . on the heels of a settlement with the Department of Justice regarding the School's mistreatment of students with disabilities;" (2) "The School . . . forced Abrielle to be discharged back to her natural family, who had their own mental health, legal, and substance abuse issues that were the driving factors in Abrielle's severe depression . . . [and] knowingly removed Abrielle from her campus home of nine years and put her in the exact environment that was causing her depression and suicidal tendencies;" and (3) "the School encouraged Abrielle to get inpatient mental health care while knowing that such treatment would result in automatic expulsion or suspension under the two hospitalization policy." (Doc. 216 at 16–17). Accordingly, in its brief in opposition to Defendants' motion for summary judgment, the Estate argues:

> Plaintiff has shown that [the School] essentially expelled Abbie due to her mental health and, suspended her from [the School] the day after she was discharged from inpatient treatment for suicidal ideation and severe depression, without any regard for the treatment she received at PPI. Discovery has shown that [the School] foisted Abbie back into a home with parents who had their own mental, legal, and substance abuse issues—all factors known by [the School] to contribute to Abbie's depression and suicidal ideation.

(Doc. 312-1 at 48). However, as Defendants note, the Estate has failed to provide a single citation to the record supporting any of these purported demonstrations. In fact, as Defendants also note in their brief, many of these claims have been expressly disproven in discovery. For example, the Estate alleged that the School "essentially expelled" Abrielle "due to her mental health" and that the School encouraged Abrielle to admit herself to a treatment program so that the School could effectuate her dismissal under its two-hospitalization policy. In discovery, however, the evidence of record demonstrates that the School engaged in an individualized assessment of Abrielle's condition, determined that Abrielle required a higher level of care, and then made a clinical judgment call that it would be unable to meet Abrielle's mental health needs upon her discharge thereby necessitating her return to her family. (*See* Doc. 298-4 at ¶¶ 27–29 ("While she was on campus, [Abrielle] was provided individualized treatment by [the School's] licensed clinical staff and, consistent with best practices for providers in a school . . . . [Abrielle] required treatment off campus by Philhaven, an independent inpatient, twenty-four (24) hour psychiatric hospital . . . [and then] required treatment off campus by the Pennsylvania Psychiatric Institute."); Def. Ex. 40 at 70:6–10 ("Q: Was coming back to school after completing her time at the second hospital an option? A: Yes. It would have been an option. It depended on a lot of factors. It is an individualized situation for every child."); Def. Ex. 39 at 40:6–10 ("Every

single student who presents with suicide ideation is given a full independent, individualized assessment . . . those decisions are made and treatment plans are based on individual evaluations."); Pl. Ex. 26 ("I clarified that we are not intending to treat Abbie differently b/c she struggles with depression; rather, we had to determine if her level of emotional need falls within the scope of our programming.")).  Indeed, the Estate has not presented any evidence demonstrating that the School did not conduct an independent evaluation of Abrielle's condition or that there was some concerted effort to discriminate against Abrielle based upon her mental health by forcing her to voluntarily enter a treatment program thereby triggering the School's "shadow policy" to expel students who undergo more than one mental health hospitalization.

The Estate's efforts to construe what appears to be a reasoned decision by Defendants as leaving PPI with "no choice" but to discharge Abrielle to her parents is misguided.  Simply because Defendants refused to allow Abrielle to return to the School following her discharge from PPI does not indicate in and of itself that Defendants made that decision nefariously.  The record only supports the Estate's assertion that the School "forced" Abrielle to return to her parents to the extent that they did not permit her to return to the School's care.

On a less granular level, and setting aside for a moment the allegations that the Court found dispositive at the motion to dismiss stage, we find that the Estate

has failed to demonstrate that Defendants engaged in conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 754 (quoting *Buczek*, 531 A.2d at 1125). In short, the Estate's IIED claim is predicated upon Defendants' decision to bar Abrielle from returning to the School after being discharged from PPI which in turn meant that she had no place else to go but to her parents home, an assertedly-unsafe environment, and meant that she was not allowed to attend her eighth-grade graduation and the subsequent after party. Thus, at bottom, the Estate contends that Defendants' decision to bar Abrielle from returning to school was so extreme and outrageous as to go beyond all possible bounds of decency. Based upon the record before us, we cannot so find. Schools throughout this country frequently decide to remove students from their programs for myriad reasons. Given the undisputed facts, Defendants' decision to bar Abrielle from returning to school or preclude her from attending her graduation, in and of itself, could not as a matter of course constitute extreme and outrageous conduct that goes "beyond all possible bounds of decency" and cannot be "regarded as atrocious, and utterly intolerable in a civilized society." *See Hoy*, 720 A.2d at 754 (quoting *Buczek*, 531 A.2d at 1125). Were we to so find, we would unduly neuter the standard for extreme and outrageous conduct under Pennsylvania law or hyper-expand its scope. To the

extent that the Estate attempts to label Defendants' decision as extreme and outrageous based upon their view that Defendants' decision was a concerted effort to discriminate against Abrielle or that Defendants' decision was made nefariously, the Estate has failed to provide evidence demonstrating the same other than their own bald and unsupported assertions. Thus, the Estate's claims are both factually deficient and insufficient as a matter of law and Defendants are entitled to summary judgment as to Count IX.

### 4. Count XIII – Breach of Fiduciary Duty

Under Pennsylvania law, "[t]he general test for determining the existence of . . . a [fiduciary] relationship is whether it is clear that the parties did not deal on equal terms." *Frowen v. Blank*, 425 A.2d 412, 416 (Pa. 1981). A fiduciary relationship will be found to exist "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible." *Id.* "[I]n order to breach a fiduciary duty, the dominant party must act for his or her own personal gain or to his or her own advantage," *Manning v. Temple Univ.*, 2004 WL 3019230, at *10 (E.D. Pa. 2004), and to establish a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove that a fiduciary duty was in place and "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all

matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bring[ing] about plaintiff's injuries." *Dinger v. Allfirst Fin., Inc*., 82 Fed.App'x. 261, 265 (3d Cir. 2003).

In their Amended Complaint, the Estate avers that Defendants owed Abrielle fiduciary duties of care and good faith "to provide a safe environment" and to "apply the highest moral, legal, and ethical standards in their conduct" based upon the special and all-encompassing relationship between the School and its students. (Doc. 29 at ¶¶ 246–47). According to the Estate, Defendants breached these duties by: (1) "failing to appoint childcare and mental health experts to their boards;" (2) "failing to hire qualified senior [School] administrators;" (3) "failing to implement policies or institutional controls that would prevent incidents of discrimination;" (4) "not following through on the ADA settlement agreement, the Equal Opportunity Policy, or the Handbook by failing to properly train staff on the requirements of Title III of the ADA;" and (5) failing to monitor and comply with the ADA settlement agreement, the Equal Opportunity Policy, the Handbook and/or Title II of the ADA. (*Id*. at ¶ 248).

In the Estate's responsive brief to Defendants' motion for summary judgment, however, the Estate does not cite to any evidence of record to support the aforementioned breaches. Rather, the Estate simply reiterates the standard for

the existence of a fiduciary relationship and concludes that such a fiduciary relationship did exist and that Defendants "clearly breached that duty and caused harm for all the reasons set forth." (Doc. 312-1 at 51). Thus, the Estate appears to argue that, because it believes it has demonstrated that Defendants acted negligently, it has also demonstrated that Defendants breached their fiduciary duties to Abrielle.

Setting aside the fact that we have concluded *supra* that the Estate has failed to demonstrate an ordinary negligence claim against Defendants, assuming *arguendo* that a fiduciary relationship existed between Defendants and Abrielle, we conclude as well that the Estate has failed to demonstrate that Defendants breached any fiduciary duties that stemmed therefrom. First, as Defendants note in their briefs, the Estate has failed to substantiate the allegations which form the basis of their breach of fiduciary duty claim outlined in its Amended Complaint. Other than a reference to other sections of its brief related to different causes of action, the Estate has not cited to any evidence demonstrating that Defendants (1) "fail[ed] to appoint childcare and mental health experts to their boards;" (2) "fail[ed] to hire qualified senior [School] administrators;" (3) "fail[ed] to implement policies or institutional controls that would prevent incidents of discrimination;" (4) failed to follow "through on the ADA settlement agreement, the Equal Opportunity Policy, or the Handbook by fail[ed] to properly train staff

on the requirements of Title III of the ADA;" or (5) failing to monitor and comply with the ADA settlement agreement, the Equal Opportunity Policy, the Handbook and/or Title II of the ADA. (Doc. 29 at ¶ 248). Second, even had the Estate substantiated said allegations in discovery, it has not provided any basis to conclude that such failures amount to a breach of fiduciary duty. In other words, the Estate has not provided any basis to conclude that these failures: (1) were negligent or intentional, (2) were done in bad faith, (3) were done solely for their own benefit, and (4) were the actual and proximate cause of Abrielle's injuries. *See Dinger*, 82 Fed.App'x. at 265. For example, the Estate has failed to express why it was incumbent upon Defendants to "appoint childcare and mental health experts to their boards," why the School administrators whom it did hire were "unqualified" or why its "policies or institutional controls" were insufficient to "prevent incidents of discrimination," and the specific ways in which Defendants failed to follow through on its ADA settlement agreement. Likewise, the Estate has also failed to demonstrate that these acts were done in bad faith or solely for Defendants' own benefit or how said failures were the actual or proximate cause of Abrielle's injuries. Thus, the Estate has failed entirely to substantiate its breach of fiduciary duty claim in discovery and we shall grant Defendants summary judgment as to Count XIII.

### 5. Count V and VI – Wrongful Death and Survival Action

Under Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Sullivan v. Warminster Twp.*, 765 F.Supp.2d 687, 707 (E.D. Pa. 2011) (citing 42 Pa.C.S.A. § 8301(a) ("An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery."); *Carroll v. Skloff*, 202 A.2d 9, 10-11 (Pa. 1964), *overruled on other grounds by Amadio v. Levin*, 501 A.2d 1085, 1089 (Pa. 1985) ("The cause of action created by the survival statute is strictly derivative. It is, as it is named, a surviving action. It is grounded upon an existing personal cause of action which the deceased could have but did not institute during his or her lifetime."). "Because wrongful death and survival actions are not independent claims, a plaintiff asserting these claims must assert some other independent, cognizable claim to survive a motion to dismiss the wrongful death and survival claims." *Lansberry v. Altoona Area Sch. Dist.*, 356 F.Supp.3d 486, 504 (W.D. Pa. 2018) (citing *Salvio v. Amgen, Inc.*, 810 F.Supp.2d 745, 757 (W.D. Pa. 2011) (dismissing wrongful death and survival claims because

they "cannot be brought . . . as claims in-and-of themselves, because an underlying claim, such as negligence, is needed for these claims to be cognizant.")).

Accordingly, because we shall grant summary judgment in favor of Defendants as to all still-viable Counts in Plaintiffs' Amended Complaint thereby leaving Plaintiffs with no other independent causes of action, we are compelled to grant Defendants summary judgment as to Individual Plaintiffs' wrongful death action in Count V and as to the Estate's survival action in Count VI.

### c. F. Frederic Fouad's Motion to Intervene

On February 4, 2020, F. Frederic Fouad ("Fouad")[9] filed a motion to intervene in the instant action for "the limited purposes of protecting [his] enduring rights of privacy and opinion work-product protections from [the School]'s ongoing misuse and any trial in this case." (Doc. 334 at 1–2). Fouad's motion was fully briefed. (Docs. 335, 342, 347). Because for the reasons discussed *supra* we shall Order the Clerk of Court to close the file on this case, there will be no trial in this case and any concerns related to the use or misuse of any alleged work product are necessarily moot. Accordingly, we shall deny Fouad's motion as moot.

### IV.    CONCLUSION

---

[9]    Fouad is the organizer of Protect The Hersheys' Children, Inc., a non-profit organization seeking to reform the Milton Hershey School. Although Fouad is a party in a related action currently pending in this district, Fouad seeks to intervene in the instant case to preclude Defendants from using or in any way citing to an assertedly confidential memo that he alleges Defendants intercepted in 1999 after Fouad faxed the memo to himself while a guest at The Hotel Hershey.

The panoply leading to Abrielle's suicide, and her death itself, as revealed through the abundant discovery that has been conducted in this case, are undeniably tragic. But in the end, Plaintiffs' causes of action were undergirded by certain factual assumptions that could not be substantiated. Abrielle's death is manifestly heartbreaking. Sadly, however, and as is often the case in our system of civil justice, we find that this is simply not an actionable demise.

For the aforementioned reasons, Plaintiffs' motion for partial summary judgment, (Doc. 293), shall be denied and Defendants' motion for summary judgment, (Doc. 297), shall be granted. Moreover, F. Frederic Fouad's First Motion to Intervene, (Doc. 334), shall be denied as moot. An appropriate Order shall issue.